# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

ERICA R. BARRETT, KATHLEEN D. )
VINCENT, CONNIE ENDERLE, EDWARD )
Q. INGERSON, II, PENNY M. KENOYER )
and GILBERT J. ONTIVEROS, individually )
and on behalf of all others similarly situated, )
                                  )
                 Plaintiff, )
       v. )
                                    )
O'REILLY AUTOMOTIVE, INC., THE )
BOARD OF DIRECTORS OF O'REILLY )
AUTOMOTIVE, INC., O'REILLY )
AUTOMOTIVE 401(K) PLAN )
INVESTMENT COMMITTEE and JOHN )
DOES 1- )
30. )
                                    )
             Defendants. )

**CIVIL ACTION NO.: 6:22-cv-3111-BCW**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Erica R. Barrett, Kathleen D. Vincent, Connie Enderle, Edward Q. Ingerson, II, Penny M. Kenoyer and Gilbert J. Ontiveros ("Plaintiffs"), by and through their attorneys, on behalf of the O'Reilly Automotive, Inc. Profit Sharing and Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include O'Reilly Automotive, Inc. ("O'Reilly" or "Company") and the Board of Directors of O'Reilly Automotive, Inc. and its members during the Class Period

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

("Board")[2] and the O'Reilly Automotive 401(k) Plan Investment Committee and its members during the Class Period ("Committee").

2. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3. The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees,"* *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] As will be discussed in detail below, the Class Period is defined as May 2, 2016 through the date of judgment ("Class Period").

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

9.      At all times during the Class Period, the Plan had at least $820 million dollars in assets under management.  At the Plan's fiscal year end in 2020 and 2019, the Plan had over $1.19 billion dollars and $1.1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of the Independent

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

Auditor of the O'Reilly Automotive, Inc. Profit Sharing and Savings Plan ("2020 Auditor Report") at 3.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     The Plan is also large in terms of the number of its participants. From 2016 to 2020, the Plan had between 51,084 and 53,561 participants with account balances. Only in 2018 did the number of participants dip below 50,000 and it stood at 49,782 participants with account balances. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 125 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances. The size of the Plan, measured by the number of participants, afforded the Plan fiduciaries' significant leverage to negotiate lower prices for the Plan and its participants.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs

and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping ("RKA") costs.

13. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V. PARTIES

**Plaintiffs**

18.     Plaintiff, Erica R. Barrett ("Barrett"), resides in Dayton, Ohio. During her employment, Plaintiff Barrett participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Barrett suffered injury to her Plan account by overpaying for her share of RKA costs. In addition, Plaintiff Barrett suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of CapTrust Advisors, LLC consulting  ("CapTrust") who received at least $23,198 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Barrett suffered injury to her Plan account by the fact that her interest in her share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

19.     Plaintiff, Kathleen D. Vincent ("Vincent"), resides in Mesa, Arizona. During her employment, Plaintiff Vincent participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below.  Plaintiff Vincent suffered injury to her Plan account by overpaying for her share of RKA costs. In addition, Plaintiff Vincent suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as

described below. These funds were maintained and monitored with the assistance of CapTrust who received at least $23,198 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Vincent suffered injury to her Plan account by the fact that her interest in her share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id.*

20.     Plaintiff, Connie Enderle ("Enderle"), resides in Lanett, AL. During her employment, Plaintiff Enderle participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Specifically, Plaintiff Enderle, invested in, but not limited to, the BlackRock Equity Dividend Instl, JPMorgan Mid Cap Value L and the Metropolitan West Total Return Bd Admin referenced in this Complaint. Each of these funds paid revenue sharing which was in turn used to pay the excessive RKA costs. Accordingly, Plaintiff Enderle suffered injury to her Plan account by overpaying for her share of RKA costs.  In addition, Plaintiff Enderle suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of CapTrust who received at least $23,198 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Enderle suffered injury to her Plan account by the fact that her interest in her share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically

identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*

21.     Plaintiff, Edward Q. Ingerson, II ("Ingerson"), resides in Nixa, MO. During his employment, Plaintiff Ingerson participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Ingerson suffered injury to his Plan account by overpaying for his share of RKA costs. In addition, Plaintiff Ingerson suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of CapTrust who received at least $23,198 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Ingerson suffered injury to his Plan account by the fact that his interest in his share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id.*

22.     Plaintiff, Penny M. Kenoyer ("Kenoyer"), resides in Des Moines, Iowa. During his employment, Plaintiff Kenoyer participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below.  Plaintiff Kenoyer suffered injury to

her Plan account by overpaying for her share of RKA costs. In addition, Plaintiff Kenoyer suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of CapTrust who received at least $23,198 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Kenoyer suffered injury to her Plan account by the fact that her interest in her share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*

23.      Plaintiff, Gilbert J. Ontiveros ("Ontiveros"), resides in Port Hueneme, California. During his employment, Plaintiff Ontiveros participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Ontiveros suffered injury to his Plan account by overpaying for his share of RKA costs. In addition, Plaintiff Ontiveros suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of CapTrust who received at least $23,198 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Ontiveros suffered injury to his Plan account by the fact that his interest in his share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically

identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id.*

24. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. In addition, Plaintiffs have standing because they suffered damage to their plan accounts by having to pay their share of the consulting fee charged by CapTrust to maintain and manage the funds specifically identified below which have excessive expense ratios and which include, but are not limited to, those funds not specifically identified but which are used to pay for the excessive total plan costs. Further, Plaintiffs have standing because their interest in their share of investments in the Plan is diminished by the high recordkeeping and underperforming funds suffered by the Plan whether they are specifically identified herein or not as discussed above. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

25. Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

26.     O'Reilly Automotive, Inc. is the Plan sponsor and a named fiduciary with a principal place of business being 233 South Patterson Avenue, Springfield, MO 65801. The December 31, 2020 Form 5500 of the O'Reilly Automotive, Inc. Profit Sharing and Savings Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. O'Reilly "intends to be the dominant supplier of auto parts in our market areas by offering our retail customers, professional installers, and jobbers the best combination of price and quality provided with the highest possible service level."[4]

27.     O'Reilly appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. T. Rowe Price Retirement Plan Services, Inc., Pre-Approved Defined Contribution Plan, Basic Plan Document ("Plan Doc.") at 64. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     Accordingly, O'Reilly during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

29.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

---

[4] https://corporate.oreillyauto.com last accessed on April 7, 2022.

**Board Defendants**

30.　　O'Reilly, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Plan Doc. at 64. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.　　Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

32.　　The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

33.　　A discussed above, O'Reilly appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Plan Doc. at 64.

34.　　The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

35.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

36.     To the extent that there are additional officers, employees and/or contractors of O'Reilly who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, O'Reilly officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.  CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between May 2, 2016 through the date of judgment (the "Class Period").

38.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 53,561 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

39. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

40. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A. Whether Defendants are/were fiduciaries of the Plan;

    B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C. Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D. The proper form of equitable and injunctive relief; and

    E. The proper measure of monetary relief.

41. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

42.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

43.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

44.     The Plan is a defined contribution plan covering substantially all eligible employees of O'Reilly. 2020 Auditor Report at 8. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id.* Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

45.     In general, the Plan covers all employees of the O'Reilly who are age 21 or older and have completed at least one year of service. 2020 Auditor Report at *Id.*

*Contributions*

46.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 8.

47.    With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to matching contributions made by O'Reilly, O'Reilly does provide a contribution for a portion of eligible compensation. *Id.* As detailed in the 2020 Auditor Report, O'Reilly may match "100% of the first 2% of each participant's voluntary contribution and 25% of the next 4% of each participant's voluntary contribution." *Id.*

48.    Like other companies that sponsor 401(k) plans for their employees, O'Reilly enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

49.    O'Reilly also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

50.    Given the size of the Plan, O'Reilly likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

51.     With regard to contributions made by participants to the Plan, such contributions vest immediately. *Id*. Generally, contributions made by O'Reilly are subject to a six-year vesting schedule. *Id.*

**The Plan's Investments**

52.     In theory, the Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reviews total plan and fund costs each year. IPS at 3. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

53.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

54.     The Plan's assets under management for all funds as of December 31, 2020 was $1,193,400,000.  2020 Auditor Report at 4.

**Payment of Plan Expenses**

55.     During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 7.

**VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE**

A.     **The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

56.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

57.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under

ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

58.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

59.     In fact, in an attempt to discover the details of the Plan's mismanagement, on February 18, 2022, Plaintiffs wrote to O'Reilly requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated, March 9, 2022, O'Reilly refused to acknowledge whether or not meeting minutes existed and stated, however, that even if they did exist, O'Reilly would refuse to provide them.

60.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were

any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

61.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

62.     For example, Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

63.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

64.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

65.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

66.     Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

67.     Ten of the Plan's investment options, having more than $43 million dollars in assets under management in 2020 will be analyzed below as an example of imprudently selected funds. The expense ratio for one of these funds during the Class Period was **159%** above the ICI Median (in the case of American Beacon Small Cp Val Inst) and in another case the expense ratio was **143%** above the ICI Median (in the case of T. Rowe Price QM US Small-Cap Gr Eq) in the same category. The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessive expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median[7]** |
| American Beacon Small Cp Val Inst | 0.83 % | Domestic Equity | 0.32% |
| BlackRock Equity Dividend Instl | 0.71 % | Domestic Equity | 0.32% |
| Harbor Capital Appreciation Instl | 0.67 % | Domestic Equity | 0.32% |
| JPMorgan Mid Cap Value L | 0.75 % | Domestic Equity | 0.32% |
| Metropolitan West Total Return Bd Admin | 0.78 % | Domestic Bond | 0.39% |
| Oakmark International Investor | 1.04 % | Int'l Equity | 0.49% |

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.
[7] Here, the more conservative number was used for plans having between $500 million dollars and $1 billion dollars in assets because the Plan didn't reach the $1 billion dollar mark until 2019.

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median[7]** |
| PIMCO Income Instl | 0.62 % | Domestic Bond | 0.39% |
| T. Rowe Price Instl Mid-Cap Equity Gr | 0.61 % | Domestic Equity | 0.32% |
| T. Rowe Price QM US Small-Cap Gr Eq | 0.78 % | Domestic Equity | 0.32% |
| Vanguard Total Intl Stock Index Admiral | 0.11 % | Index | 0.04% |

68.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| American Beacon Small Cp Val Inst | 0.83 % | Domestic Equity | 0.39% |
| BlackRock Equity Dividend Instl | 0.71 % | Domestic Equity | 0.39% |
| Harbor Capital Appreciation Instl | 0.67 % | Domestic Equity | 0.39% |
| JPMorgan Mid Cap Value L | 0.75 % | Domestic Equity | 0.39% |
| Metropolitan West Total Return Bd Admin | 0.78 % | Domestic Bond | 0.30% |
| Oakmark International Investor | 1.04 % | Int'l Equity | 0.50% |
| PIMCO Income Instl | 0.62 % | Domestic Bond | 0.30% |
| T. Rowe Price Instl Mid-Cap Equity Gr | 0.61 % | Domestic Equity | 0.39% |
| T. Rowe Price QM US Small-Cap Gr Eq | 0.78 % | Domestic Equity | 0.39% |
| Vanguard Total Intl Stock Index Admiral | 0.11 % | Index | 0.06% |

69.     It is unlikely the Defendants engaged in a prudent process from 2016 through 2020 since the Plan contained at least seven funds that had excessive expense ratios when compared to their peers from 2016 to 2020.

70.     Further, Defendants' failure to obtain reasonably-priced and properly performing investments from 2016 to 2020 is circumstantial evidence of their imprudent process to review and control the Plan's costs and is indicative of Defendants' breaches of their fiduciary duties, relating to their overall decision-making, which resulted in, *inter alia*, the payment of excessive RKA costs that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### (B)     The Plan's Total Plan Costs are Much Higher than Those of Its Peers

71.     "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g*., recordkeeping and transaction processing), participant-focused services (*e.g*., participant communication, education, or advice), regulatory and compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management."[8]

72.     "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst working through its related analytical arm the Investment Company Institute ("ICI") "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios." *Id.*

73.     Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return." Vanguard's Principles for Investing Success, at 17.[9]

74.     The ICI conducted a study in 2018 (*see* fn. 6) which calculated the average total plan costs from hundreds of 401(k) Plans ranging in size from the smallest plans having less than

---

[8] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[9] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

1 million dollars in assets all the way up the nation's largest plans with assets under management of more than 1 billion dollars. Looking at plans that have over 1 billion dollars, the ICI determined that the average asset weighted total plan cost or TPC for 401(k) Plans with over 1 billion dollars in assets under management is .22% of total plan assets.

75. Yet another indication that the Plan was poorly run and lacked a prudent process for selecting and monitoring the Plan's investments is that, as of 2020, it had a TPC of more than .60%, or, in other words, more than 172% higher than the average.

76. The Defendants could not have utilized a prudent process which resulted with the Plan paying a total plan cost 172% higher than average.

**(C) The Plan's Recordkeeping and Administrative Costs Were Excessive During The Class Period**

77. Another clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

78. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

79. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

    A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[10] (excluding the separate fee charged by an independent third-party auditor);

I. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

---

[10]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

80.    This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

81.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

A.  Loan processing;

B.  Brokerage services/account maintenance (if offered by the plan);

C.  Distribution services; and

D.  Processing of qualified domestic relations orders.

82.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

83.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

84.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

85.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

86.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

87.     In this matter, using a combination of a flat recordkeeping charge paid by participants with revenue sharing used to potentially cover additional fees resulted in a worst-case

scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

88. Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans. More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

89. Because the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

90. Looking at all the years during the Class Period, it's clear these unreasonably high recordkeeping costs continued throughout the Class Period. As demonstrated in the chart below, the Plan's per participant RKA costs were significantly above market rates when benchmarked against similar plans:

| | Participants | Direct Comp | Indirect Comp[11] | Forfeitures | Total | $PP |
|---|---|---|---|---|---|---|
| **2020** | 53,561 | $2,609,734 | $48,714 | -$4,000 | $2,654,448 | $49.56 |

[11] Indirect compensation is calculated by using the percent of revenue sharing reported for each fund on Schedule C of the form 5500 for each year at issue relating to indirect revenue. This calculation is detailed in Appendix "A," attached hereto. The vast majority of funds for the Plan

| | Participants | Direct Comp | Indirect Comp[11] | Forfeitures | Total | $PP |
|---|---|---|---|---|---|---|
| **2019** | 52,426 | $2,607,101 | $87,176 | -$27,000 | $2,667,277 | $50.88 |
| **2018** | 49,782 | $2,301,452 | $81,538 | -$11,000 | $2,371,990 | $47.65 |
| **2017** | 51,646 | $2,474,032 | $774,140 | -$85,000 | $3,163,172 | $61.25 |
| **2016** | 51,084 | $4,026,016 | $603,131 | -$163,000 | $4,466,147 | $87.43 |

91.     By way of comparison, we can look at what other plans are paying for RKA costs.

92.     For example, here T.Rowe Price, a nationally-recognized entity was the Plan's recordkeeper during the Class Period. We can compare T.Rowe Price's fees to other nationally recognized recordkeepers, like Fidelity,

93.     In a recent lawsuit where Fidelity's multi-billion dollar plan with over 50,000 (fifty thousand) participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

94.     Specifically, Fidelity stipulated as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).***

which pay revenue sharing are listed there. However, should there be a fund which we believed paid additional revenue sharing not listed in Schedule "C," the information would have been obtained from the funds' prospectus where the amount of revenue sharing is disclosed for a particular share class.

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

95.    The Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for recordkeeping and administration fees as low as $14 and up to $21 per participant in recordkeeping and administration fees.

96.    Further, looking at RKA costs for other plans with more than 15,000 participants as of 2018, as an exemplar year indicative of the other years of the Class Period, shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.  As alleged above, the larger the number of plan participants, the lower the RKA costs per participant should be.  Thus, comparing the below plans to the Plan is useful because given the Plan's massive size it should not have higher per participant RKA costs than any of the plans below:

| Plan Name | Number of Participants | Assets Under Management | RKA Costs on Per-Participant Basis[12] | Record-keeper |
|---|---|---|---|---|
| **O'Reilly Automotive, Inc. Profit Sharing and Savings Plan** | **53,561 (2020)** | **$1,193,400,000 (2020)** | **$49.56** | **T.Rowe** |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | $30 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $26 | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | $25 | Great-West |

---

[12] In order to keep this comparator analysis consistent with the O'Reilly analysis above, RKA costs in the chart are derived, in the same manner as for O'Reilly, from each plans' Form 5500 filings. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

| Plan Name | Number of Participants | Assets Under Management | RKA Costs on Per-Participant Basis[12] | Record-keeper |
|---|---|---|---|---|
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | **$23** | T.Rowe |
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | **$28** | Fidelity |
| Deseret 401(k) Plan | 34,357 | $3,381,868,127 | **$25** | Great-West |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | **$28** | Fidelity |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,103,524321 | **$27** | Vanguard |

97.     Additionally, from 2013 to 2019, there were plans ranging in size from 3,000 participants to over 18,000 participants that also paid less than the Plan.  The below chart reflects fees paid by these plans for RKA costs.  As noted in footnote 12, the plans selected here used funds that included either little or no revenue sharing thus making any indirect compensation inconsequential.  Because of economies of scale, the Plan's fiduciaries should have been able to negotiate per participant RKA costs less than the plans below paid:

| Year | Plan Name | Assets | Prtcpnts | Part Fee[12] | Recordkeeper |
|---|---|---|---|---|---|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2014 | HealthFirst Profit Sharing 401(k) | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Vibra Healthcare Retirement Plan | $107,652,510 | 9,750 | $28 | Great-West |

| Year | Plan Name | Assets | Prtcpnts | Part Fee[12] | Recordkeeper |
|---|---|---|---|---|---|
| 2018 | Republic National 401(k) | $671,989,839 | 9,922 | $33 | Great-West |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2019 | Pacific Architects and Engineers, LLC 401(k) Savings Plan | $435,391,716 | 14,698 | $23 | Fidelity |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |

98.     The Plan, with over 53,000 participants and over $1.19 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost anywhere from $14 per participant to the mid $20 range from the beginning of the Class Period to the present.

99.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

100.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

101.     At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

102.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the

assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

103.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the Plan's recordkeeping and administration fees.

104.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan recordkeeping and administration costs.

105.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

106.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

107.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against O'Reilly and the Board Defendants)

108.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

109.    O'Reilly and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

110.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

111.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

112.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's recordkeeping and administration, all to the detriment of the Plan and Plan participants' retirement savings.

113.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

114.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated:  August 12, 2022

**CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
(*Admitted Pro Hac Vice*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Email:  donr@capozziadler.com
Telephone:  (717) 233-4101
Fax:  (717) 233-4103

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
Gabrielle Kelerchian, Esquire
(*Admitted Pro Hac Vice*)
PA Attorney ID # 88587
PA Attorney ID # 324248
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email:  markg@capozziadler.com
Email:  gabriellek@capozziadler.com
Telephone:  (610) 890-0200
Fax:  (717) 233-4103

**FORTMANSPANN, LLC**

*/s/ Kelly M. Spann*
Kelly M. Spann, Esquire
MO Attorney ID #73954
250 St. Catherine Street
Florissant, MO  63031
Email:  kms@fortmanlaw.com
Telephone:  (314) 522-2312
Fax:  (314) 524-1519

Counsel for Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

I certify that, on August 12, 2022, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system and automatically copies to all counsel of record.

*/s/ Mark K. Gyandoh* \
Mark K. Gyandoh
