EXHIBIT B

2022 WL 4534791
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Todd COYER, Karl Kisner, Lauryn Overbey, Lisa Solomon, and Sonny Pike, individually and as representatives of a class of similarly situated persons, on behalf of the Univar Solutions 401(K) Plan f/k/a the Univar USA Inc. Valued Investment Plan, Plaintiffs,
v.
UNIVAR SOLUTIONS USA INC., Board of Directors of Univar Solutions USA Inc., the Retirement Plan Committee of Univar Solutions USA Inc., and Does No. 1–20, Whose Names are Currently Unknown, Defendants.

Case No. 1:22 CV 0362
|
Signed September 28, 2022

**Attorneys and Law Firms**

Gabrielle P. Kelerchian, Pro Hac Vice, Shook, Hardy & Bacon L.L.P., Philadelphia, PA, James E. Miller, Laurie Rubinow, Pro Hac Vice, Shepherd Finkelman Miller & Shah, LLC, Chester, CT, Alec Jacob Berin, Pro Hac Vice, James C. Shah, Pro Hac Vice, John C. Roberts, Pro Hac Vice, Miller Shah LLP, Philadelphia, PA, Andrew P. Shelby, Patrick A. Fleming, Novack and Macey, LLP, Chicago, IL, Donald Roberts Reavey, Capozzi Adler, P.C., Harrisburg, PA, Kolin Chen-Ting Tang, Pro Hac Vice, Miller Shah LLP, Irvine, CA, Mark K. Gyandoh, Capozzi Adler, Merion Station, PA, for Plaintiffs.

Craig Christopher Martin, Amanda S. Amert, Larue Lawrence Robinson, Sara Kim, Willkie Farr & Gallagher LLP, Chicago, IL, Larue Lawrence Robinson, for Defendants Univar Solutions USA Inc., Board of Directors of Univar Solutions USA Inc., The Retirement Plan Committee of Univar Solutions USA Inc.

**MEMORANDUM OPINION & ORDER**

Robert W. Gettleman, United States District Judge

*\*1* Plaintiffs Todd Coyer, Karl Kisner, Lauryn Overbey, Lisa Solomon, and Sonny Pike (collectively, "plaintiffs") bring this three-count action under 29 U.S.C. § 1132 of the Employee Retirement Income Security Act of 1974 ("ERISA"), both individually and as participants of the Univar Solutions 401(k) Plan f/k/a the Univar USA Inc. Valued Investment Plan ("the Plan"), on behalf of the Plan and a class of similarly situated participants and beneficiaries of the Plan. They bring these claims against defendants Univar Solutions USAQ Inc. ("Univar"), the Univar Board of Directors ("the Board"), Univar's Retirement Plan Committee ("the Committee"), and Does No. 1–20, who are members of the Committee or the Board, or other fiduciaries of the Plan, whose names are currently unknown[1] (collectively, "defendants"). Count I alleges that defendants have breached their fiduciary duties under §§ 404(a)(1)(A), (B), and (D) of ERISA. 29 U.S.C. §§ 1104(a)(1)(A), (B), (D). Count II alleges that Univar and the Committee breached their fiduciary monitoring duties under 29 U.S.C § 1109(a). In the alternative, Count III alleges that each defendant that the court does not deem a fiduciary or co-fiduciary under ERISA should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust. Defendants move to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim. Fed. R. Civ. Pro. 12(b)(6). Defendants also move for dismissal for lack of subject matter jurisdiction based on lack of standing. For the reasons stated below, defendants' motion (Doc. 28) is granted in part and denied in part.

**BACKGROUND**

Univar offers its employees the opportunity to invest in the Plan, which is a defined contribution 401(k) plan with 7,449 participants, and account balances and assets totaling approximately $978 million, as of December 31, 2020.[2] Plaintiffs are former Univar employees and former participants in the Plan under 29 U.S.C. § 1002(7). Univar is the Plan sponsor and maintains the Plan, including selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services. As such, it is undisputed that Univar is a fiduciary under ERISA and owes a series of duties to the Plan and its participants and beneficiaries, including the duty to ensure that the investment options offered through the Plan are prudent and diverse, as well as ensure that Plan expenses are fair and reasonable. Further, the Board and its members—also fiduciaries—appointed the Committee as a

fiduciary to the Plan, and defendants contracted with the Fidelity Management Trust Company ("Fidelity") to serve as the Plan trustee. As trustee, Fidelity holds Plan assets in trust and performs all investments and asset allocations for the plan. According to plaintiffs, the Plan pays its expenses from Plan assets, usually by reducing participants' investment income.

**\*2** When investing in the Plan, participants can choose specific investment options. For example, from at least December 31, 2009, through at least December 31, 2018, participants could choose the Fidelity Freedom Fund target date suite ("the Active Suite"). The Active Suite portfolio offered a mix of actively- and passively managed investments, although Fidelity actively managed 88.8% of its holdings.[3] Moreover, the Active Suite allowed participants to choose a fund with a target year ("target date") close to participants' assumed retirement age, and the fund's investment strategies and asset allocation became more conservative as the target date approached. The Active Suite was the Plan's default investment option.

Plaintiffs have concerns about the Active Suite compared to other investment options under the Plan. Other options include the Fidelity Freedom Index Suite (the "Index Suite"), which is a target date suite that invests exclusively in passively managed funds, and the Fidelity Investment Asset Management ("FIAM") Index Target Date Commingled Pools, which replaced the Active Suite starting in 2019. Among other things, plaintiffs claim that defendants did not "fully disclose" the Plan's investment expenses, and the risks associated with Plan options. In 2013 and 2014, for example, Fidelity authorized Active Suite investment managers to deviate from "glide path"[4] allocations by ten percent and allegedly increase exposure to market volatility. Since then, plaintiffs claim that the Active Suite has "consistently underperformed several of the most popular readily investable alternatives in the [target date fund] marketplace." In 2018, the Active Suite suffered $5.4 billion in net outflows, with nearly $16 billion withdrawn from the fund family from 2014 to 2018.

Fidelity is the Plan's recordkeeper and is compensated for its services through a combination of direct and indirect compensation. Direct compensation is income paid to Fidelity by Plan participants. Indirect compensation is income paid to Fidelity by third parties, not Plan participants, before participants receive their investment option's value. One form of indirect compensation is "revenue sharing," which gives a recordkeeper a portion of a fund's total assets and/or fees.

Direct compensation includes investment management fees and recordkeeping and administrative ("RK&A") fees. Investment management fees compensate for designing and maintaining a fund's investment portfolio. Typically, investment managers calculate these fees as an "expense ratio," which is based on a percentage of the money that a participant invests in a particular fund. On the other hand, RK&A fees compensate for ministerial-type tasks.[5] According to plaintiffs, RK&A fees are either "bundled," meaning offered at one price regardless of services that the plan actually utilizes, or "a la carte," meaning payable by usage. In this case, whether bundled or a la carte, the annual RK&A fees per Plan participant were allegedly $99, $127, and $76 in 2016, 2017, and 2018, respectively. Citing the Plan's 2018 tax filings, plaintiffs claim that the Plan's fees were "much higher" than allegedly comparable plans for "virtually the same package of services." Revenue sharing can decrease RK&A fees because it gives recordkeepers additional income from revenue rather than fees.

## LEGAL STANDARD

**\*3** Congress enacted ERISA in 1974 to protect participants in employee benefit plans, including retirement plans, with standards of conduct for plan fiduciaries. 29 U.S.C. § 1001(b). Fiduciaries have a duty to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This fiduciary duty of prudence includes "a continuing duty to monitor trust investments and remove imprudent ones," as informed by the common law of trusts. Tibble v. Edison Int'l, 575 U.S. 523, 528–29 (2015). Courts evaluate prudence based on "the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question." Restatement (Second) of Trusts, § 174, cmt. b (1959). Such an inquiry is necessarily context specific, Fifth Third Bancorp. v. Dudenhoeffer, 573 U.S. 409, 425 (2014), and courts must give "due regard to the range of reasonable judgments a fiduciary may make

based on her experience and expertise." Hughes v. Nw. Univ., 142 S. Ct. 737, 742 (2022).

Also under ERISA, fiduciaries have a duty of loyalty to discharge their duties "with respect to a plan solely in the interest of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries, as well as defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

A court, however, may dismiss a complaint that fails to state a claim upon which relief may be granted, under ERISA or otherwise. Fed. R. Civ. Pro. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient facts to state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The court draws all reasonable inferences in the plaintiff's favor, but a plaintiff cannot survive a motion to dismiss with sheer speculation, bald assertions, or unsupported conclusory statements. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 681 (2009). That said, ERISA plaintiffs are not required to plead their breach of fiduciary duty claims with a degree of precision only possible after discovery because they "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." See Allen v. GreatBanc Tr. Co., 835 F.3d 670, 678 (7th Cir. 2016) (internal quotations omitted).

**DISCUSSION**

Plaintiffs bring three claims for relief, on behalf of themselves and a putative class of Plan participants and beneficiaries dating back to January 21, 2016. First, they allege that defendants breached their fiduciary duties under ERISA by: (1) failing to fully disclose the Plan's expenses and risks to its participants and beneficiaries; (2) allowing unreasonable expenses to be charged to participants; and (3) selecting, retaining, and/or otherwise ratifying "high-cost and poorly-performing investments," instead of offering allegedly more prudent alternative investments. Second, plaintiffs allege that Univar and the Committee failed to adequately monitor Committee members as they conducted their fiduciary duties. Third, in the alternative, plaintiffs allege that unspecified defendants knowingly acted in breach of trust. Plaintiffs seek various forms of relief, including injunctive relief.

Defendants counter that plaintiffs allege merely conclusory allegations that do not "push their claims from conceivable to plausible," considering the careful, context-specific inquiry that courts use to evaluate breach of fiduciary duty claims. As a threshold matter, they argue that plaintiffs lack standing to bring certain claims. The court will evaluate each contention in turn, beginning with the standing inquiry.

**I. Standing**

Before reaching the merits of plaintiffs' claims, defendants argue that the court should dismiss the case because plaintiffs lack standing in two ways. According to defendants, plaintiffs cannot establish an injury in fact where they invested in only a subset of Active Suite funds, rather than all funds. Their theory is that plaintiffs cannot be injured by defendants' fiduciary decisions regarding Active Suite funds in which they did not invest. Moreover, according to defendants, plaintiffs cannot establish an injury in fact where they allege hypothetical, rather than "real and immediate," threat of future injury. Defendants argue that plaintiffs do not have standing to seek prospective injunctive relief because they are merely former, rather than present, participants in the Plan.

**\*4** To establish standing in federal court, a plaintiff must present a "case" or "controversy" within the meaning of Article III of the U.S. Constitution. This constitutional minimum requires an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). An injury in fact is an invasion of a legally protected interest that is concrete and particularized, actual and imminent, not conjectural or hypothetical. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016).

In the present case, the court disagrees with defendants and finds that plaintiffs have established standing regarding all Active Suite funds, as consistent with the Seventh Circuit's reasoning in Albert v. Oshkosh Corp., No. 21-2789, 2022 WL 3714638, at \*4–5 (7th Cir. 2022), reh'g denied, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022). Plaintiffs have alleged sufficient injuries to their own Plan accounts, as well as injuries which "seemingly affect all participants in the Plan: excessive recordkeeping fees, ... breach of the duty of loyalty, failure to monitor, ... and breach of the duty to disclose." Id. at \*4. The Seventh Circuit noted, however, that claims for excessive management fees are "more complicated" because "each investment option charges a different expense ratio."

Id. Where plaintiffs did not personally invest in Active Suite funds with allegedly imprudent expense ratios, it is "difficult to see how [they] suffered an injury in fact." Id.

Regardless, the court finds, as the Seventh Circuit found, that plaintiffs can establish standing at the pleading stage with investment management fee claims where they "make[ ] clear that [they] invested in at least some actively managed funds," as here. Id. at *5. Regarding defendants' concerns regarding the absent putative class members who invested in the remaining Active Suite funds, the Seventh Circuit determined that such concerns "might implicate class certification or damages but are distinct from the requirements of Article III." Id. (internal quotations omitted). See also Braden v. Wal-Mart, Inc., 588 F.3d 585, 593 (8th Cir. 2009); Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423 (6th Cir. 1998) (determining that "whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in [Federal Rules of Civil Procedure] Rule 23").

On the other hand, the court agrees with defendants that plaintiffs lack standing to seek prospective injunctive relief because they have not alleged a real or immediate threat of future injury based on defendants' conduct. Plaintiffs were former, not present, Plan participants when they initiated this lawsuit. See Simic v. City of Chicago, 851 F.3d 734, 737–38 (7th Cir. 2017).

**II. Breach of Fiduciary Duty**

The parties' most extensive disagreement stems from defendants' alleged breach of fiduciary duties. As discussed above, plaintiffs allege that defendants breached their fiduciary duties under ERISA in numerous ways. The court will separately evaluate whether each contention is plausible.

**a. Allegedly excessive recordkeeping and administrative fees from 2016 through 2018**

Plaintiffs claim that defendants caused the Plan, and therefore its participants and beneficiaries, to pay excessive RK&A fees. They argue that the Plan charged RK&A fees that "far exceeded the reasonable market rate" given the Plan's size, expected growth, resulting negotiating power, and prudent management and administration.[6] Plaintiffs compare the Plan's fees with publicly available data and information from Form 5500 filings of similarly sized defined-contribution plans from 2016 through 2018. They claim that "[d]efendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan," because the fees were "objectively unreasonable."

**\*5** Defendants counter that these allegations fail to state a claim. To plead sufficient facts to raise an inference of a deficient decision-making process for recordkeeping services, parties must use a "sound basis for comparison—a meaningful benchmark." See Meiners v. Wells Fargo & Company, 898 F.3d 820, 822 (8th Cir. 2018). Defendants argue that plaintiffs fail to use a "like-to-like, "apples-to-apples" comparison to "show a disparity so significant that it suggests a deficient decision-making process," as required to push plaintiffs' claims under ERISA from "conceivable to plausible,"[7] citing Divane v. Northwestern Univ., 953 F.3d 980, 989–91 (7th Cir. 2020), vacated and remanded on other grounds sub nom. Hughes v. Northwestern Univ., 142 S. Ct. 727 (2022). Defendants contend that revenue sharing agreements and bundling impermissibly allow plaintiffs to unfavorably distort the price of the Active Suite's RK&A fees compared to other plans. In the alternative, they claim that the arguably small RK&A fee disparity does not suggest imprudence.

In this case, the court agrees with plaintiffs that they have plausibly alleged that the Active Suite's RK&A fees were unreasonably excessive and suggest an imprudent decision-making process. The court agrees with plaintiffs that they do not need to provide examples of similar plans receiving the same services in the same year where, according to plaintiffs, the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant. The court agrees with plaintiffs' assertion that "[t]he fact that each of the other similarly-sized plans were receiving at least the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence," citing Sweda v. Univ. of Pennsylvania, 923 F.3d 320, 332 (3d Cir. 2019). This finding is consistent with the Seventh Circuit's reasoning in Albert, where the court dismissed the plaintiffs' claim based on excessive recordkeeping fees. 2022 WL 3714638, at \*5–6. In Albert, the court emphasized that plaintiffs must allege "that the recordkeeping fees were excessive relative to the services rendered" and provide comparative context, as plaintiffs provide in the instant case. Id. at \*6.

**b. Selection and retention of the Active Suite**

Next, defendants argue that plaintiffs allege no plausible claim that defendants imprudently selected, retained, and otherwise ratified the Active Suite despite allegedly high investment management fees and underperformance.[8] Plaintiffs counter that they are not arguing that high management fees alone were imprudent, which would be insufficient. Rather, plaintiffs argue that the Active Suite's risk profile and expectation of return were imprudent given its expensive fees, underperformance, notable capital flight, and negative process, as well as other red flags,[9] citing various district courts that have accepted similar arguments. See In re Biogen, Inc. ERISA Litig., No. 20-CV-11325-DJC, 2021 WL 3116331, at *5–6 (D. Mass. July 22, 2021); Jones v. Coca-Cola Consol., Inc., No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551, at *4–5 (W.D.N.C. Mar. 31, 2021); In re Omnicom ERISA Litig., No. 20-cv-4141 (CM), 2021 WL 3292487, at *11–13 (S.D.N.Y. Aug. 2, 2021); In re MedStar ERISA Litig., No. RDB-20-1984, 2021 WL 391701, at *5–6 (D. Md. Feb. 4, 2021).

**\*6** The court agrees with defendants that "underperformance" is not imprudence, given that prudence is evaluated as part of a prudent, whole-portfolio, investment strategy. See 29 C.F.R. § 2550.404a–1(b)(2)(i). Even if, as plaintiffs allege, the Active Suite ranked last against four of the five largest non-Fidelity managers' primary offerings in the target date fund marketplace, "many of which have been attacked as imprudent choices in other lawsuits for breach of fiduciary duty," it is inconsistent with case law to infer imprudence every time a fiduciary retains a fund that fails to turn in best-in-class performance for any specific period. See, e.g., Meiners v. Wells Fargo & Company, 898 F.3d 820, 823 (8th Cir. 2018).

The court likewise agrees with defendants that plaintiffs rely on an improper comparison between index funds and actively managed funds, which is an "apples-to-oranges" comparison. As defendants emphasize, and as plaintiffs seem to admit, there are fundamental differences between index funds and actively managed funds, which have different levels of risk and performance outcomes. In Albert, the Seventh Circuit dismissed the plaintiffs' case for breach of fiduciary duty on similar grounds. 2022 WL 3714638, at *7–8. The Sixth Circuit recently came to the same conclusion in Smith v. CommonSpirit Health, No. 21-5964, 2022 WL 2207557 (6th Cir. 2022). Plaintiffs argue that their case is distinct from CommonSpirit because they compare the Active Suite to both index funds and other actively managed funds. The court, however, finds that plaintiffs' complaint has not plausibly pleaded the active-management component of their comparison. Instead, plaintiffs emphasize only that they compare "suitable alternative TDF[s],"[10] combined with their assertion that "[a]ll TDFs are inherently actively managed"—a statement that plaintiffs themselves contradict in the same paragraph.

Plaintiffs further argue that the Active Suite's underperformance should have led defendants to investigation, and failure to investigate is a breach of duty. According to plaintiffs, "[b]elated replacement of an imprudent investment[, as here with defendants' switch from the Active Suite to the FIAM option,] does not absolve fiduciaries of their failure to do so earlier." The court finds, however, that even if, as plaintiffs allege, the industry had criticized the Active Suite before 2016—giving the defendants notice that they should have investigated their investment options—the fact that defendants eventually switched the Active Suite for the FIAM option cuts equally against imprudence because it shows that defendants assessed their investment options and made appropriate changes.

**c. Ancillary breaches of fiduciary duty**

Defendants next argue that plaintiffs fail to state a claim that defendants failed to fully disclose the Plan's investment expenses and risks, failed to act solely in the Plan's interest, and failed to act in accordance with Plan documents and instruments. First, the court agrees with defendants that plaintiffs allege merely conclusory allegations of non-disclosure. While plaintiffs can rely on circumstantial evidence to plausibly allege breach of duty, Allen v. GreatBanc Tr. Co., 835 F.3d 670, 679 (7th Cir. 2016), conclusory allegations are not enough.

Likewise, the court agrees with defendants that plaintiffs improperly recast their imprudence claims as breaches of the duty of loyalty, without any separate factual allegations. As defendants note, "most courts require something more, such as an allegation supporting an inference of self-dealing, to survive a motion to dismiss." Martin v. CareerBuilder, LLC, No. 19-CV-6463, 2020 WL 3578022, at *6 (N.D. Ill. July 1, 2020). In the present case, plaintiffs allege that:

> **\*7** "[a]s the costs for recordkeeping services have dropped precipitously over the past decade, recordkeepers

like Fidelity have been forced to chase profits elsewhere. The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services. Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it recordkeeps, including the Plan."

The court finds that this allegation is insufficient to support an inference of self-dealing that is sufficiently plausible to survive a motion to dismiss, as consistent with the Seventh Circuit's conclusion in Albert. 2022 WL 3714638, at *8–9.

Lastly, the court agrees with defendants that plaintiffs have not provided factual allegations that defendants failed to act in accordance with Plan documents and instruments. Even if the court found otherwise, the fact that plaintiffs do not respond to defendants' motion on these claims is an effective concession. See Daugherty v. Univ. of Chicago, No. 17 C 3736, 2017 WL 4227942, at *9 (N.D. Ill. Sept. 22, 2017) (dismissing an ERISA duty of loyalty claim where plaintiffs failed to oppose the defendants' arguments for dismissal).

Therefore, as discussed above, regarding Count I, the court grants defendant's motion to dismiss in part and denies in part.

### III. Breach of Duty to Monitor

Plaintiffs also argue that each defendant knowingly participated in the other defendants' breaches, enabled the other defendants to commit breaches by failing to lawfully discharge their own fiduciary duties, and failed to make any reasonable effort under the circumstances to remedy the other defendants' breaches under 29 U.S.C. § 1105(a). When one ERISA fiduciary appoints another fiduciary, the courts have recognized a limited duty to monitor the appointed fiduciary's performance. See Lingis v. Motorola, Inc., 649 F. Supp. 2d 861, 881 (N.D. Ill. 2009), citing Baker v. Kingsley, 387 F.3d 649, 663 (7th Cir. 2004).

Defendants counter that "[i]t is insufficient to invoke hindsight-based, circular logic to contend that, given the alleged misconduct, Univar and the Committee must have failed to satisfy their duty to monitor" under 29 U.S.C. §§ 1109(a) and 1132(a)(2). Moreover, defendants argue that plaintiffs' duty to monitor arguments are derivative, and there can be no breach of the duty to monitor when plaintiffs have not plausibly pled an underlying breach of fiduciary duty. See, e.g., Martin v. CareerBuilder, LLC, No. 19-CV-6463, 2020 WL 3578022, at *6 (N.D. Ill. July 1, 2020). Because the court disagrees with defendants regarding part of Count I, the court denies defendants' motion to dismiss Count II to the extent that plaintiffs have alleged plausible claims under Count I.[11]

### IV. Knowing Breach of Trust

Lastly, plaintiffs argue in the alternative that defendants—should the court find that they are non-fiduciaries—engaged in knowing breaches of trust by participating in breaches of fiduciary duty. Regardless of plaintiffs' breach-of-fiduciary-duty claims, the court agrees with defendants that plaintiffs have not plausibly pleaded allegations of knowledge. Plaintiffs, when confronted with defendants' argument, tellingly claim that "the facts alleged in the Complaint clearly establish knowledge" but do not identify any facts that support their claim. See, e.g., Briscoe v. Health Care Serv. Corp., 281 F. Supp. 3d 725, 739 (N.D. Ill. 2017). Thus, the court grants defendants' motion to dismiss Count III.

### CONCLUSION

*8 For the reasons set forth above, defendants' motion to dismiss the complaint for failure to state a claim under Rule 12(b)(6) (Doc. 28) is granted in part and denied in part. The court grants defendants' motion to dismiss Counts I and II in part and Count III in whole. Under Count I, the court dismisses plaintiff's claims regarding defendants' selection and retention of the Active Suite, in addition to all ancillary breach of fiduciary duty claims. Under Count II, the court dismisses plaintiffs' duty-to-monitor claims to the extent that they are derivative of defendants' selection and retention of the Active Suite, in addition to all ancillary breach of fiduciary duty claims.

Accordingly, the court denies defendants' motion to dismiss Count I and Count II in part. Under Count I, the court denies defendants' motion to dismiss plaintiffs' claims regarding unreasonably excessive RK&A fees. Under Count II, the court denies defendants' motion to dismiss plaintiffs' duty to monitor claims to the extent that they are derivative of defendants' arguably excessive RK&A fees.

Because it would be difficult—if not impossible—for defendants to answer plaintiffs' complaint in its current

state, plaintiffs are directed to file an amended complaint conforming to the court's ruling. Plaintiffs have until October 25, 2022, to file their amended complaint. Defendants have until November 22, 2022, to file their answer. The parties are directed to file a joint status report using the court's joint status report form on or before November 29, 2022.

Attachment

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

,

Plaintiff,

v.

.

Defendants.

No.

Judge Robert W. Gettleman

CORRECTED JOINT STATUS REPORT FOR CASES ASSIGNED TO JUDGE GETTLEMAN

This case has been assigned to the calendar of Judge Robert W. Gettleman. To assist the court in acquiring the requisite knowledge of the case, it is hereby ordered:

1. Counsel and any unrepresented party should obtain a copy of Judge Gettleman's Revised Standing Order Regarding Motion Practice, Briefs and Protective Orders in Civil Cases, which is available in chambers or on the court website (www.ilnd.uscourts.gov).

2. Counsel are to confer, prepare and file a brief, joint[1] status report, not to exceed five pages. As with all filings, a hard copy should be submitted to the court within one day of any electronic filing. If defendant's counsel has not yet filed an appearance, the status report should be prepared by plaintiff's counsel. The report shall contain a full caption showing all parties and shall provide the following information in the order set forth below in the following format:

A. The date and time this case is set for a status report before the Court.

B. The attorneys of record for each party, indicating which attorney is expected to try the case.

C. The basis of federal jurisdiction.

D. Whether a jury has been requested and by which party.

E. The nature of the claims asserted in the complaint and any counterclaim, including a brief statement of the factual context of the case.

F. The relief sought by any party, including computation of damages, if available.

G. The name of any party who or which has not been served, and any fact or circumstance related to service of process on such party.

H. The principal legal issues (including the citation to any key legal authority related to such issue).

I. The principal factual issues, including the parties' respective positions on those issues.

J. A brief description of all anticipated motions.

K. A proposed discovery plan pursuant to F. R. Civ. P. 26(f), including a brief description of what discovery has been taken, if any, what remains to be taken, a schedule for expert designations and discovery, and a proposed discovery cutoff.

L. The earliest date the parties would be ready for trial and the probable length of trial.

*9 M. The status of any settlement discussions and whether a settlement conference would be appropriate. In this regard, counsel are directed to consider and discuss with their respective clients and each other the possibility of attempting to resolve this matter through alternative dispute resolution (ADA), and to briefly set forth the results of such consideration and discussion. For Lanham Act cases, the parties must comply fully with Local General Rule 16.3.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.    7

N. Whether the parties will consent to jurisdiction and trial before a magistrate judge.

3. The principal trial attorney for each party, or an attorney with sufficient familiarity with and responsibility for the case, shall appear at that time prepared to discuss all aspects of the case.

**Dated:**

**All Citations**

Slip Copy, 2022 WL 4534791

## Footnotes

| | |
|---|---|
| 1 | These Defendants are named "Does" as placeholders. Plaintiffs claim that they are unable to determine the membership of the Administrative Committee or the identity of other fiduciaries of the Plan, despite reasonable and diligent efforts, because their identities are not publicly available. Plaintiffs will move to amend the complaint if and when plaintiffs discover their identities. |
| 2 | According to plaintiffs, this puts the Plan in the top 0.2% of 401(k) plans by plan size. |
| 3 | Active management means that fund managers decide which securities to buy and sell and in what quantities, resulting in higher fees. Passive management, on the other hand, simply tracks market indices and has lower fees. |
| 4 | A glide path, or equity glide path, is an investment plan's allocation strategy over time. |
| 5 | RK&A services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services. |
| 6 | Plaintiffs allege that the fees here were double to triple the fees challenged in CommonSpirit, for example. See Smith v. CommonSpirit Health, No. 21-5964, 2022 WL 2207557, at *6 (6th Cir. 2022) (noting flat annual RK&A fees of between $30 and $34 per person). |
| 7 | The parties agree that ERISA's fiduciary duty of prudence "focuses on process," which requires an evaluation of a party's conduct preceding a challenged decision rather than the results of that decision. See Hecker v. Deere & Co., 556 F.3d 575, 581 (7th Cir. 2009). |
| 8 | Plaintiffs claim that "[o]f the 26 actively managed Fidelity Series Funds in the Active Suite portfolio, half ... trail their respective benchmarks over their respective lifetimes." |
| 9 | Defendants argue that plaintiff did allege imprudence based on high management fees alone in their complaint but later reframed their argument in response to defendants' motion to dismiss. The court does not resolve this dispute because it grants defendants' motion. |
| 10 | "TDF" is an acronym for target date funds. |
| 11 | To the extent the court denies defendants' motion to dismiss Count II, the court agrees with plaintiffs that the duty to monitor encompasses monitoring at "regular intervals," not all business decisions. See Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015). |

1   There should be no reason why a joint status report cannot be prepared. If the parties disagree on any issue, such disagreement should be noted in the report.

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.