EXHIBIT 1

| | | |
|---|---|---|
| ERICA R. BARRETT, KATHLEEN D. VINCENT, CONNIE ENDERLE, EDWARD Q. INGERSON, II, PENNY M. KENOYER and GILBERT J. ONTIVEROS, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 6:22-cv-03111-JAM |
| Plaintiffs, | ) | |
| v. | ) ) | |
| O'REILLY AUTOMOTIVE, INC., THE BOARD OF DIRECTORS OF O'REILLY AUTOMOTIVE, INC., O'REILLY AUTOMOTIVE 401(K) PLAN INVESTMENT COMMITTEE and JOHN DOES 1- 30. | ) ) ) ) ) ) | |
| Defendants. | | |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITIES

Plaintiffs, Erica R. Barrett, Kathleen D. Vincent, Connie Enderle, Edward Q. Ingerson, Penny M. Kenoyer and Gilbert J. Ontiveros, individually and on behalf of all others similarly situated (collectively, "Plaintiffs") respectfully submit this Notice of Supplemental Authorities notifying the Court of the decisions (1) *Hughes v. Northwestern University*, No. 18-2569 No. 1:16-cv-08157, (7th Cir. Mar. 23, 2023) (attached as Exhibit A); (2) *Brown et al. v. Mitre Corp.*, No. 22-cv-10976-DJC (D. Mass. Mar. 6, 2023) (attached as Exhibit B); (3) *Lucero et al v. Credit Union Ret. Plan Ass'n et al.,* No. 1:22-cv-00099-LM (W.D. Wis. Mar. 9, 2023) (attached as Exhibit C); (4) *Norton et al v. Mass General Brigham Inc. et al*, No. 1:22-cv-10045-AK (D. Mass. Mar. 15, 2023) (attached as Exhibit D); (5) *Monteiro et al v. The Children's Hospital Corp. et al,* No: 1:22-cv-10069 (D. Mass Mar. 15, 2023) (attached as Exhibit E); and (6) *Stengl et.al. v. L3Harris Technologies, Inc. et. al*., No: 6:22-cv-572-PGB-LHP (M.D. Fla. Mar. 24, 2023) (attached as

Exhibit F).  Plaintiffs in *Hughes*, *Brown, Lucero, Norton, Monteiro,* and *Stengl* advanced analogous breaches of fiduciary duty in violation of ERISA § 502, 29 U.S.C. §1132.  These holdings support Plaintiffs' Suggestions in Support of their Opposition to Defendants' Motion to Dismiss the First Amended Class Action Complaint (ECF No. 33).

### *Hughes v. Northwestern University*

*Hughes* is the long-awaited decision from the Seventh Circuit involving nearly identical recordkeeping fee allegations. In *Hughes*, the court reversed the district court's dismissal of the plaintiffs' recordkeeping fee allegations after the case was remanded from the Supreme Court. *See Hughes v. Northwestern University*, 142 S. Ct. 737 (2022). The court applied the Supreme Court's instruction that ERISA retirement fund cases do not have a higher pleading standard and "[a] court's role in evaluating pleadings is to decide whether the plaintiff's allegations are plausible—not which side's version is more probable." *Hughes*, No. 18-2569 at *20. The court instructed "only obvious alternative explanations should be accounted for." *Id.*

The court was unpersuaded by many of the arguments Defendants here make. The court held that although ERISA does not require soliciting bids for lower recordkeeping arrangements, nor is it not a *per se* violation to use revenue sharing, they may be factors in inferring imprudence because "a fiduciary who fails to monitor the reasonableness of plan fees and fails to take action to mitigate excessive fees may violate the duty of prudence." *Id*. at 22. Additionally, the court differentiated the recordkeeping claims in *Albert v. Oshkosh Corp., et al.,* 47 F.4th 570 (7th Cir. 2022) because "[u]nlike in *Albert*, plaintiffs here assert '[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the Plans.' So, plaintiffs maintain that the quality or type of recordkeeping services provided by competitor providers are comparable to that provided by Fidelity and TIAA."

*Id*. at 24 (emphasis in original). Plaintiffs' claims are similarly distinguishable from *Albert* because they allege "the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service." Am. Compl. (ECF No. 24), ¶89. Plaintiffs also allege "the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost." *Id*., ¶99. Thus, when applying the Supreme Court's ERISA Retirement Plan pleading standard, like the court in *Hughes*, Plaintiffs have plausibly alleged recordkeeping fee claims notwithstanding any nonobvious alternative explanations Defendants may offer.

### **_Brown et al. v. Mitre Corp._**

The *Brown* court upheld the Plaintiffs' excessive recordkeeping fees and imprudent investment claims after being unpersuaded by the defendants' arguments that the plaintiffs did not provide enough details about the services obtained by the plan or the comparator plans listed in the complaint. The court held "Plaintiffs have plausibly alleged that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the Committee failed to use its substantial bargaining power to obtain these same services at a lower cost." *Brown,* No. 22-cv-10976-DJC at 10. The court further instructed "Here, given that the Plans remained with the same two recordkeepers for at least fourteen years despite an alleged increase in recordkeeping costs, it is plausible that the Committee was imprudent for not conducting an RFP at reasonable intervals during that time period." *Id*. at 12 (collecting cases finding failure to monitor claims were sufficiently pled where Defendants failed to solicit competitive bids for recordkeeping fees). Plaintiffs here make nearly identical allegations regarding Defendants' failure to conduct RFPs and failure to leverage the Plan's size to lower fees in a marketplace where recordkeepers offer the same services at a lower cost. Am. Comp. (ECF No. 24), ¶¶ 83- 99.

The court also distinguished three of the same cases Defendants here rely on, *Matousek v. MidAmerican Energy Co.,* 51 F.4th 274, 278 (8th Cir. 2022), *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022), and *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022)). (See Defendants' Motions ECF Nos 36 and 41). The court held *Matousek*, *Smith*, and *Albert* contained materially different allegations than the case at issue. Plaintiffs here have also distinguished their claims from the less robust claims in *Matousek*, *Smith*, and *Albert*. (ECF Nos. 51 and 43). Thus, the authorities Defendants rely on are not persuasive to the instant case.

### *Monteiro et al v. The Children's Hospital Corporation et al.*

In *Monteiro* the court relied on the Eighth Circuit decision in *Davis v. Washington Univ. St. Louis*, 960 F.3d 478 (8th Cir. 2022) when denying dismissal. The court held "[e]ven if there are alternative, reasonable explanations for Defendants' conduct, at this stage of the litigation, the facts alleged 'provide a sound basis for comparison—a meaningful benchmark'—suggesting that the Active Suite underperformed and that the Plan was needlessly more expensive than similar plans, which supports a plausible claim that the Defendants' actions breached their fiduciary duties." *Monteiro*, No: 1:22-cv-10069 (citing *Davis*, 960 F.3d at 484). The court found the plaintiffs' comparison chart of seven similarly sized plans paying less in recordkeeping fees was sufficient support for their allegations that defendants breached their duty of prudence "as a result of unreasonable fees". *Id*. Although *Monteiro* is a case from the First Circuit, its reliance on Eighth Circuit precedent makes it persuasive, especially because Plaintiffs' allegations include more than double the number of comparator plans than in *Monteiro*. ¶¶ 96-98.

### *Lucero et al v. Credit Union Ret. Plan Ass'n et al.*

The court in *Lucero* rejected the Defendants' arguments that the plaintiffs did not support their recordkeeping fee allegations with sufficient facts about the recordkeeping services obtained

by the plan or the comparator plans in the allegation. The court gives several reasons applicable to the instant case: "First, plaintiffs allege in their complaint that there isn't a meaningful difference in the recordkeeping services offered by large plans and that whatever differences there are 'do not affect the amount charged by recordkeepers.'" *Lucero,* No. 1:22-cv-00099-LM at 6. Like the instant matter, the fees in *Lucero* were not simply higher than similarly situated plans, but rather, "the difference is so significant that it provides some basis for inferring that defendants are using an imprudent process to choose investments." *Id*. at 7. Also like the instant matter, the *Lucero* complaint alleged recordkeeping costs should decrease with a larger number of participants, and demonstrated how the plan's fees were higher than plans a lot smaller in size. *Id*.

The *Lucero* court also held there were enough details about the defendants' processes to survive dismissal because it could be inferred "that the fees were so excessive that the other defendants should have known that they needed to intervene." *Id*. at 12. The court instructed the plaintiffs alleged the imprudence "persisted for years, so it is reasonable to infer at the pleading stage that defendants knew about the problem and failed to do anything." *Id*. at 13. Indeed, here Plaintiffs provide circumstantial evidence that for years Defendants failed to intervene on behalf of participants paying excessive recordkeeping and investment management fees. ¶¶ 67-90.

### *Norton et al v. Mass General Brigham Inc. et al.*

The *Norton* court denied dismissal because "[e]xcessive record keeping fees and the failure to negotiate lower fees in comparison to smaller plans are some factors that may permit a court to make a 'reasonable inference' of breach of fiduciary duties based on the facts that are available." *Norton et al v. Mass General Brigham Inc. et al*, No. 1:22-cv-10045-AK (D. Mass. Mar. 15, 2023). The court instructed this is especially true in cases where, like here, a large plan

paid higher fees than comparator plans with less assets. *Id*. The court reasoned that when allegations include a fiduciary's failure to leverage the plan's size to negotiate a fee reduction, and plaintiffs are denied meeting minutes that would contradict their allegations, imprudent processes are sufficiently pled because "In ERISA cases, plaintiffs may not have access to the information that would otherwise enable them to make well-pleaded factual allegations." *Id*. Thus, Plaintiffs here have sufficiently pled excessive recordkeeping fee allegations after being denied meeting minutes. ¶¶ 58-60, 97. Lastly, the court agreed with the reasoning in *Brown,* distinguishing "*Matousek*, *Smith*, and *Albert* because they contained materially different allegations." *Id*.

### *Stengl et.al. v. L3Harris Technologies, Inc. et. al.*

The holding in *Stengl* reinforces the totality of the circumstances requirement for evaluating pleadings under ERISA. The court held "[w]hile many of these allegations in isolation are insufficient, taken as a whole and interpreted in the light most favorable to Plaintiffs, it is at least plausible that Defendants breached their fiduciary duty of prudence." *Stengl*, No: 6:22-cv-572-PGB-LHP at 20. The case instructed "while the ICI Study cannot carry the day by itself even at the motion to dismiss stage, it at least piques the Court's interest that something may be amiss in the management of the Plan due to the contrasting picture it paints" and are worth considering alongside other allegations. *Id*. at 22. Likewise, here plaintiffs' use of the ICI Study is one factor of many creating the inference of Defendants' imprudence.

The *Stengl* court was also unpersuaded the defendants fact-based arguments: "[t]he Court agrees with its sister court in a similar ERISA fiduciary duty case which found that the defendants' arguments, which contended that the plaintiffs' claims were 'factually incorrect' or relied on 'inapt comparators,' were inappropriate at the motion to dismiss stage." *Id*. at 28 (citing *Huang v. TriNet*

*HR III, Inc.*, No. 8:20-cv-2293, 2022 WL 93571, at *8–9 (M.D. Fl. Jan. 10, 2022)). Here too, the court should disregard Defendants' fact-based arguments regarding Plaintiffs' alleged comparators and method for calculating fees.

***

For these reasons, and for the reasons Plaintiffs set forth in their Opposition, Plaintiffs respectfully request that the Court deny Defendants' Motion to dismiss.

Dated:                                          **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com

Donald R. Reavey
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that _____ on a true and correct copy of the foregoing document was filed

with the Court utilizing its ECF system, which will send notice of such filing to all counsel of

record.

By: /s/ *Mark K. Gyandoh*_____
  Mark K. Gyandoh, Esq.

EXHIBIT A

In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-2569

APRIL HUGHES, *et al.*,

*Plaintiffs-Appellants,*

*v.*

NORTHWESTERN UNIVERSITY, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-08157 — **Jorge L. Alonso**, *Judge.*

_____

ARGUED NOVEMBER 29, 2022 — DECIDED MARCH 23, 2023

_____

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN,
*Circuit Judges.*

BRENNAN, *Circuit Judge.* On remand from *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022), we reexamine plaintiffs' allegations that plan fiduciary Northwestern breached its duty of prudence under the Employee Retirement Income Security Act, 29 U.S.C. § 1104(a). Following *Hughes*, we discern three claims of breach that require reconsideration: that Northwestern (1) failed to monitor and incurred excessive

recordkeeping fees, (2) failed to swap out retail shares for cheaper but otherwise identical institutional shares, and (3) retained duplicative funds. We conclude that the first two claims survive dismissal and remand them for further proceedings. For all other claims and issues, we reinstate this court's prior judgment in *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020).

## I. Background

### A. Factual Background

Plaintiffs are individuals who participate in two defined-contribution plans subject to ERISA: the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan (the "Plans"). Subject to I.R.C. § 403(b), the Plans provide for tax-deferred contributions to retirement accounts by employees of I.R.C. § 501(c)(3) non-profits like defendant Northwestern University. As defined-contribution plans, the Plans allow participants to direct the investment of their contributions. But the investment options included in the Plans are selected by the Plans' fiduciary. Northwestern University, as the employer, is the administrator and fiduciary of the Plans. The university assigned some of its fiduciary administrative duties to two Northwestern officers, the Northwestern University Retirement Investment Committee, and its members. We refer to these fiduciary defendants collectively as "Northwestern" or "the university."

Northwestern selected various investment options offered by the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA") and the Fidelity Management Trust Company ("Fidelity") to be included in the Plans. Before October 2016, the Retirement Plan

and the Savings Plan offered over 240 and 180 investment options, respectively, from TIAA and Fidelity. For example, the TIAA Traditional Annuity, a fixed annuity contract that returns a contractually specified minimum interest, is a popular investment option in the Plans. This annuity has restrictions and penalties for withdrawal, including a 2.5% surrender charge if a participant withdraws the investment in a lump sum sooner than 120 days after the termination of her employment. TIAA's policy also requires any plan offering the Traditional Annuity to use TIAA as a recordkeeper for its products.

In October 2016, Northwestern streamlined its investment options by greatly reducing the Plans' offerings to 32 investment options spread across four tiers: target date mutual funds, index funds, actively managed funds, and a self-directed brokerage window. Leading up to this change, Northwestern informed its plan participants that this new tiered structure would "enable simpler decisionmaking," "[r]educe[] administration fees," "increase[] participant returns," and provide "[a]ccess to lower cost share classes when available." Northwestern acknowledged that this restructuring better aligned it with its peers who had reduced their investment line-ups.

### B. Procedural Background

Plaintiffs filed suit alleging various ERISA violations. The First Amended Complaint—the operative pleading—asserts three violations of the duty of prudence under 29 U.S.C. § 1104(a)(1) (Counts I, III, & V), three counts of ERISA-prohibited transactions under 29 U.S.C. § 1106(a)(1) (Counts II, IV, & VI), and a claim against Northwestern University and two officers for failure to monitor fiduciaries (Count VII).

Count III alleges a breach of fiduciary duty by Northwestern for incurring unreasonable recordkeeping fees. Among other things, plaintiffs aver that Northwestern paid about four to five times a reasonable per-participant recordkeeping fee for the Plans in aggregate by paying for recordkeeping services through uncapped revenue-sharing arrangements. Revenue sharing allows fund providers to take a percentage of the revenue from plan participants' investments to defray the participants' recordkeeping and other administrative costs. Per plaintiffs, Northwestern should have lowered its expenses by consolidating from two recordkeepers to one, soliciting bids from competing providers, and using the massive size and correspondent bargaining power of the Plans to negotiate for fee rebates.

Count V alleges a breach of fiduciary duty by Northwestern's failure to monitor the Plans' investments and to remove imprudent ones. As part of this claim, plaintiffs maintain that the Plans contained too many funds and caused investor confusion, and that Northwestern should have removed duplicative funds that did nothing but add expenses to the Plans. According to plaintiffs, Northwestern should have used its size and bargaining power to replace retail-class shares of funds with cheaper but otherwise identical institutional-class shares of the same funds.

The district court granted Northwestern's motion to dismiss plaintiffs' First Amended Complaint. Relevant to this remand, the court dismissed Count III (excessive recordkeeping fees) finding that, under Seventh Circuit precedent, Northwestern did not violate ERISA by using revenue sharing for plan expenses. The court observed that it was not apparent that the Plans could have arranged for lower fees. In any case,

the court found that plan participants had options to keep their expenses low by investing in low-expense funds that were available in the Plans. The district court also dismissed Count V (imprudent funds retention) because the Plans offered the low-expense funds desired by plaintiffs and found irrelevant that the Plans offered additional funds plaintiffs did not want to choose. In the same order, the district court denied plaintiffs' April 2018 motion for leave to amend their complaint, concluding that the proposed amendments were untimely and futile.

Following this dismissal, the district court also denied plaintiffs' June 2018 motion to amend judgment and, in the alternative, for leave to file a proposed Second Amended Complaint. The proposed complaint largely mirrored the First Amended Complaint, but it added certain alleged admissions from Northwestern's executives and an outside consultant. These additions bolstered the plausibility of the existing Counts III and V. The new Count VII repackaged pleadings in Count V and claimed breach of fiduciary duty by Northwestern's failure to replace retail-class shares with institutional-class shares. Otherwise, Counts III and V remained identical in the operative and proposed complaints.

This court affirmed the district court's dismissal and denial of leave to amend in *Divane*, 953 F.3d 980, largely adopting its reasoning. The dismissal on Count III was affirmed because plaintiffs failed to support their claim that a flat-fee structure—as opposed to revenue-sharing—is required by ERISA or would benefit plan participants. *Id.* at 989. This court also held that ERISA does not require Northwestern to use a single recordkeeper and observed that plaintiffs had failed to allege that participants would have been better

off in such an arrangement. *Id.* at 990. Plaintiffs had also failed to identify an alternative low-cost recordkeeper who would supply comparable recordkeeping services. *Id.* at 991.

Similarly, this court affirmed the dismissal on Count V because the Plans offered some low-expense funds that "eliminat[ed] any claim that plan participants were forced to stomach an unappetizing menu." *Id.* Prior Seventh Circuit cases— *Loomis v. Exelon Corp.*, 658 F.3d 667, 673–74 (7th Cir. 2011), and *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)—were relied upon for the proposition that "plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty." *Divane*, 953 F.3d at 992. The district court's dismissal of other claims, denial of leave to amend, and rejection of Plaintiffs' jury demand were also affirmed. *Id.* at 993–94.

Plaintiffs petitioned for certiorari on only Counts III and V of the First Amended Complaint.[1] The certiorari petition did not include plaintiffs' other claims, the jury demand issue, or the denial of leave to amend. Petition for Writ of Certiorari, *Hughes v. Nw. Univ.*, No. 19-1401. The Supreme Court granted certiorari, vacated the judgment, and remanded the case for reconsideration. *Hughes*, 142 S. Ct. 737. The Court rejected this court's reliance on a "categorical rule" that providing some low-cost options eliminates concerns about other investment options being imprudent. *Id.* at 740. We were directed to reevaluate plaintiffs' allegations based on the duty of prudence articulated in *Tibble v. Edison International*, 575 U.S. 523

---

[1] Laura Divane did not participate in this petition and is no longer pursuing this appeal. So, April Hughes became the lead plaintiff and appellant, resulting in the changed caption.

(2015), applying the pleading standard discussed in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *Hughes*, 142 S. Ct at 742.

## II. Impact of *Hughes*

### A. Scope of Remand

The Supreme Court identified three ways in which plaintiffs pleaded that Northwestern violated the duty of prudence: (1) "respondents allegedly failed to monitor and control the fees they paid for recordkeeping"; (2) "respondents allegedly offered a number of mutual funds and annuities in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments"; and (3) "respondents allegedly offered too many investment options … and thereby caused participant confusion and poor investment decisions." *Id.* at 741. The first allegation relates to Count III, and the second and third to Count V.

Plaintiffs acknowledge that they are not rearguing the jury demand issue. In their briefs on remand, they ask to relitigate only Counts III and V of the First Amended Complaint, stating: "Northwestern imprudently incurred excessive recordkeeping fees" (Count III); "Northwestern provided higher-cost retail-class shares when identical lower-cost institutional-class shares of the same funds were available" (Count V); and "Northwestern imprudently retained excessively duplicative funds" (Count V).

Grounds not argued on appeal are waived. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 991 (7th Cir. 2016) (citation omitted). And generally, issues that were not argued before the Supreme Court are not encompassed within a

remand from the Court. *See United States v. Husband*, 312 F.3d 247, 250 (7th Cir. 2002) (citations omitted) ("[A]ny issue that could have been but was not raised on appeal is waived and thus not remanded."); *Buckley v. Fitzsimmons*, 952 F.2d 965, 967 (7th Cir. 1992) ("But this topic was not raised in the Supreme Court … and so is not encompassed within the remand."), *rev'd on other grounds*, 509 U.S. 259 (1993); 18B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4478.3 (3d ed. 2022) (explaining the "Law of the Case—Mandate Rule"). But if the opinion on appeal identifies an error that implicates and requires redetermination of other issues not raised on appeal, we may consider them. *See Husband*, 312 F.3d at 251.

Because plaintiffs did not petition for certiorari on and have not reargued the following issues on remand, we do not reconsider them: the TIAA products claim (Count I), the prohibited transactions claims (Counts II, IV, and VI), and the jury demand issue. Nothing in *Hughes* undercuts the bases on which this court previously resolved these claims and issue, so we reinstate this court's prior decisions on them. *See generally United States v. Romero*, 528 F.3d 980, 981 (7th Cir. 2008) (reinstating holdings not implicated by the Supreme Court's remand).

Plaintiffs do ask us to remand for reconsideration their request for leave to file their Second Amended Complaint. While we agree that *Hughes* may strengthen the plausibility of the recordkeeping, share-class, and duplicative funds claims in the proposed Second Amended Complaint, ultimately, we need not grant this request because we rule that the analogous counts in the First Amended Complaint state plausible claims for relief. The other counts in the proposed Second Amended

Complaint[2] are not implicated by *Hughes*, so we do not reconsider granting leave to amend for those claims. For those counts, we reinstate this court's former decision affirming the district court's denial of leave to amend.

## B. Impact on *Loomis* and *Hecker*

*Hughes* abrogated a line of reasoning derived from *Loomis*, 658 F.3d 667, and *Hecker*, 556 F.3d 575. The Supreme Court rejected this court's reliance on a categorical rule that Count V failed because plaintiffs' "preferred type of low-cost investments were available as plan options." *Hughes*, 142 S. Ct. at 740; *see Divane*, 953 F.3d at 991–92. Put another way, "ERISA does not allow the soundness of investments A, B, and C to excuse the unsoundness of investments D, E, and F." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 575 (7th Cir. 2022). The duty of prudence requires a fiduciary to assess the prudence of each investment both individually and relative to the entire plan.

*Hughes* negates some of the reasoning developed in *Hecker* and *Loomis* and employed in *Divane*. *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 452 (6th Cir. 2022) ("*Hecker* and *Loomis* dismissed imprudence claims in part because the retirement plan under review offered a range of options, including some that

---

[2] "Aside from … four new counts, the second amended complaint mirrored the causes of action and claims in the amended complaint. The four new counts alleged that Northwestern: (1) offered retail class funds as investment options instead of using their bargaining power to offer institutional class shares at lower prices; (2) violated Northwestern's Investment Policy Statement by failing to monitor investment performance and recordkeeping costs; and (3) allowed TIAA to access and use participant information to market its services to participants." *Divane*, 953 F.3d at 985. *Hughes* does not impact the district court's findings of futility and undue delay as to Counts VIII, IX, and X.

were less expensive than the challenged retail mutual fund shares. *Hughes* rejected that bright-line rule, precluding us from evaluating these employees' claims under it."). *Hecker* relied in part on the "wide range of expense ratios" in a plan to dismiss a claim that a plan fiduciary provided investment options with excessive fees. 556 F.3d at 586. *Loomis*, too, employed this reasoning to reject a share-class claim. 658 F.3d at 670. In *Divane*, this court also depended on the fact that Northwestern had provided a "wide range of investment options" in rejecting Count V. 953 F.3d at 992. As this court has recognized in recent decisions, *Hughes* says providing a diverse menu of investments alone is not dispositive that a plan fiduciary has fulfilled the duty of prudence. *Albert*, 47 F.4th at 579-80; *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 548–49 n.4 (7th Cir. 2022).

Still, *Hughes* left untouched three principles from *Loomis* and *Hecker*. The first is that the use of revenue sharing for plan expenses does not amount to a per se violation of fiduciary duty under ERISA. *Hecker*, 556 F.3d at 585. This goes to Count III (excessive recordkeeping fees). But this principle does not foreclose the possibility of violating a fiduciary duty by failing to monitor and incur only reasonable expenses. Plan fiduciaries have a continuing duty to monitor their expenses to make sure that they are not excessive with respect to the services received. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("[A] trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'"(quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3))); *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).[3]

---

[3] The *Tibble* litigation has a lengthy procedural history. For our purposes, its two most relevant opinions are the Supreme Court's decision

Switching from a revenue-sharing to a per capita expense model may in some cases be a proper means of reining in excessive expenses. But *Hughes* does not state that revenue sharing is an impermissible expense arrangement.

The second principle is that "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *Hecker*, 556 F.3d at 586; *Loomis*, 658 F.3d at 670. This primarily goes to Count V (imprudent fund retention) but does not account for the share-class claim embedded within Count V. This principle does not address the duty of a fiduciary when it has access to a cheaper but otherwise identical fund from the same fund provider. ERISA requires a fiduciary to assess whether a given fund is prudent in light of other investment options in a plan, comparable funds, and the expenses charged, among other factors. *See Tibble*, 575 U.S. at 529–30.

Also, the second principle accords with this court's prior conclusion about Count III that "Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked." *Divane*, 953 F.3d at 990–91. In *Albert*, this court read this portion of *Divane* as "reject[ing] the notion that a failure to regularly solicit quotes or competitive bids from service providers breaches the duty of prudence." 47 F.4th at 579. *Albert*

---

vacating the judgment of the Ninth Circuit in *Tibble v. Edison International*, 575 U.S. 523 (2015), and the Ninth Circuit's en banc decision following remand from the Court in *Tibble v. Edison International*, 843 F.3d 1187 (9th Cir. 2016). The former explained the continuing duty to monitor investments within the duty of prudence, and the latter expounded upon this duty with regards to plan expenses. We distinguish the cases by their reporter designations.

determined that *Hughes* left this portion of *Divane* untouched. *See id.* at 579–80. While true, *Hughes* directed us to reconsider plaintiffs' allegations concerning excessive recordkeeping fees in light of the continuing duty to monitor such fees stated in *Tibble*, 575 U.S. 523. *Hughes*, 142 S. Ct at 742. We reaffirm that a fiduciary need not constantly solicit quotes for record-keeping services to comply with its duty of prudence. But fi-duciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing record-keepers, or other means—may violate their duty of prudence.

The third principle is that plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty. *Loomis*, 658 F.3d at 673–74; *Hecker*, 556 F.3d at 586. Nothing in *Hughes* undercuts this general proposition, but as mentioned earlier, the Supreme Court rejected this court's reliance on a categorical rule that a plan fiduciary may avoid liability by assembling a diverse menu of investment options that includes the types of investments a plaintiff de-sires. *Hughes*, 142 S. Ct. at 741–42.

### III. Pleading Standard

Before evaluating whether plaintiffs have stated a claim in Counts III and V, we must specify the correct pleading stand-ard for a breach of the duty of prudence under ERISA. *Hughes* offers some guidance but stops short of pronouncing a con-crete standard. The Court directed us to "consider whether petitioners have plausibly alleged a violation of the duty of prudence as articulated in *Tibble*," 575 U.S. 523, applying the pleading standard from *Iqbal* and *Twombly*. *Hughes*, 142 S. Ct. at 742. The Court then quoted *Fifth Third Bancorp v.*

*Dudenhoeffer*, 573 U.S. 409, 425 (2014), stating that the inquiry into the duty of prudence is "context specific." *Id.* The Court concluded with a sentence, the meaning of which the parties debate. We first address the duty of prudence articulated in *Tibble*, 575 U.S. 523, and then determine the pleading standard.

### A. Duty of Prudence

Under the duty of prudence mandated in ERISA, a plan fiduciary is required to "discharge his duties with respect to a plan … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones … separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes*, 142 S. Ct. at 742 (citing *Tibble*, 575 U.S. at 529–30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and includes two related components.

First, the duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment. *Id.* at 529 ("[T]he trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are

appropriate." (quoting AMY MORRIS HESS, GEORGE GLEASON
BOGERT, & GEORGE TAYLOR BOGERT, BOGERT'S LAW OF TRUSTS
AND TRUSTEES § 684, at 147–48 (3d ed. 2009) ("BOGERT'S LAW
OF TRUSTS")); AUSTIN WAKEMAN SCOTT, MARK L. ASCHER, &
WILLIAM FRANKLIN FRATCHER, SCOTT AND ASCHER ON TRUSTS
§§ 19.3, 19.4 (6th ed. 2022) ("SCOTT ON TRUSTS"). "'Managing'
embraces monitoring, that is, the trustee's continuing respon-
sibility for oversight of the suitability of investments already
made as well as the trustee's decisions respecting new invest-
ments." UNIF. PRUDENT INVESTOR ACT § 2, cmt. (UNIF. L.
COMM'N 1995); *Tibble*, 575 U.S. at 529. "When the trust estate
includes assets that are inappropriate as trust investments, the
trustee ordinarily has a duty to dispose of them within a rea-
sonable time." SCOTT ON TRUSTS § 19.3.1; *see also* BOGERT'S LAW
OF TRUSTS § 685; *Tibble*, 575 U.S. at 529–30.

Second, the duty of prudence requires a plan fiduciary to
"incur only costs that are reasonable in amount and appropri-
ate to the investment responsibilities of the trusteeship." *Tib-
ble*, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS
§ 90(c)(3)); *see also Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d
Cir. 2019) ("Fiduciaries must also understand and monitor
plan expenses."); *Davis v. Washington Univ. in St. Louis*, 960
F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to
keep plan expenses under control). "Expenses, such as man-
agement or administrative fees, can sometimes significantly
reduce the value of an account in a defined-contribution
plan." *Tibble*, 575 U.S. at 525. So "cost-conscious management
is fundamental to prudence in the investment function," and
should be applied "not only in making investments but also
in monitoring and reviewing investments." RESTATEMENT
(THIRD) OF TRUSTS § 90, cmt. B; *see also id.* § 88, cmt. A ("Im-
plicit in a trustee's fiduciary duties is a duty to be cost-

conscious."). "Wasting beneficiaries' money is imprudent." UNIF. PRUDENT INVESTOR ACT § 7, cmt. (UNIF. L. COMM'N 1995).

The duty to monitor stated in *Tibble*, 575 U.S. 523, will inform our analysis of Counts III and V. But *Tibble* "express[ed] no view on the scope of … fiduciary duty" and identified no pleading standard for a violation of that duty. *Id.* at 531. *Tibble* involved summary judgment and findings following a bench trial—not a motion to dismiss—so its relevance is limited in determining what allegations survive a motion to dismiss. *Id.* at 523.

## B. *Dudenhoeffer*'s Reach

The parties dispute the meaning of the last sentence in *Hughes*: "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." 142 S. Ct. at 742. This sentence is preceded by the citation to *Dudenhoeffer*, 573 U.S. at 425, quoting that the content of the duty of prudence is "context specific." *Hughes*, 142 S. Ct. at 742. Plaintiffs read *Hughes*'s last sentence as dicta and not as a part of the standard to plead a violation of the duty of prudence. In contrast, Northwestern reads the sentence as incorporating *Dudenhoeffer*'s heightened pleading standard, namely that "a plaintiff must plausibly allege an alternative action that the defendant could have taken … that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." 573 U.S. at 428. For Northwestern, that means plaintiffs must plead that an alternative prudent action which the fiduciary should have taken was "actually

available" and that plaintiffs must "rule out reasonable explanations" for failure to take that action.

*Dudenhoeffer* involved an employee stock ownership plan (ESOP) in which fiduciaries allegedly had negative inside information about the stock the plan contained. *Id.* at 412–13. The duty of prudence there involved a conflict between the fiduciary's knowledge of negative inside information about the stock versus the fiduciary's adherence to insider trading laws and a reasonable belief that halting stock purchases "would do more harm than good to the fund by causing a drop in the stock price." *Id.* at 428–30. This unique tradeoff caused the Supreme Court to set a heightened pleading standard for that case. The Court also limited the higher standard to claims for breach of the duty of prudence based on inside information by fiduciaries of an ESOP. 573 U.S. at 428. Since *Dudenhoeffer*, the Court has reaffirmed that the case "set forth the standards for stating a claim for breach of the duty of prudence against fiduciaries who manage employee stock ownership plans (ESOPs)." *Amgen Inc. v. Harris*, 577 U.S. 308, 309 (2016).

Northwestern overreads the reference in *Hughes* to *Dudenhoeffer* as adopting that case's heightened pleading standard. Rather, the citation in *Hughes* to *Dudenhoeffer* signals that the duty of prudence inquiry is "context specific," but no more. Because this case does not involve an ESOP, *Dudenhoeffer*'s standard does not apply. But the context specific inquiry is key. It is in this light that we read the Supreme Court's directive to recognize the "difficult tradeoffs" that an ERISA fiduciary faces, and the "range of reasonable judgments" that may be made, and to consider alternative explanations for the fiduciary conduct complained of. But as we discuss next,

these alternative explanations need not be conclusively ruled out at the pleadings stage.

### C. Contours of the Pleading Standard

Plausibility is the basic test for pleadings on a motion to dismiss. A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (citations and footnote omitted). Plaintiffs must provide "some further factual enhancement" to take a claim of fiduciary duty violation from the realm of "possibility" to "plausibility." *Id.* at 557. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. So for Counts III and V, plaintiffs must have alleged enough facts to show that a prudent fiduciary would have taken steps to reduce fees and remove some imprudent investments.

A fiduciary's actions may give rise to different inferences—some that suggest a breach of fiduciary duty and others that do not. While *Hughes* did not expressly address how we are to resolve such varying inferences on a motion to dismiss, the Court directed us to apply the pleading standard discussed in *Iqbal* and *Twombly*. *Hughes*, 142 S. Ct. at 742. The alternative inference that can arise from fiduciary conduct is analogous to the "obvious alternative explanation" that the Court in *Twombly* accounted for when assessing telephone carriers' parallel conduct in an antitrust action. 550 U.S. at 567–68. There, the Court highlighted "[t]he inadequacy of showing parallel conduct or interdependence," which "without more" would be equally "consistent with conspiracy" as

it is with a "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. This suggests that something "more," *id.*, is necessary to survive dismissal when there is an obvious alternative explanation that suggests an ERISA fiduciary's conduct falls within the range of reasonable judgments a fiduciary may make based on her experience and expertise. *Hughes*, 142 S. Ct. at 742.

In *Iqbal*, the Supreme Court reaffirmed that obvious alternative explanations should be accounted for when considering constitutional claims alleging that federal officials unlawfully discriminated against the plaintiff by detaining him. 556 U.S. at 682. There, too, the Court ruled that the Pakistani Muslim plaintiff had not overcome the obvious alternative explanation that he had been arrested because of his suspected link to the 9/11 attacks rather than because of "purposeful, invidious discrimination." *Id. Twombly* and *Iqbal* establish that an obvious alternative explanation for a defendant's conduct that precludes liability can undermine the claim's plausibility. *Id.* at 682; *Twombly*, 550 U.S. at 567. But neither do these cases say a plaintiff must conclusively rule out every possible alternative explanation for a defendant's conduct, no matter how implausible. Only *obvious* alternative explanations must be overcome at the pleadings stage, and only by a plausible showing that such alternative explanations may not account for the defendant's conduct. Accordingly, whether a claim survives dismissal necessarily depends on the strength or obviousness of the alternative explanation that the defendant provides.

Other circuits are in accord that every possible alternative explanation for an ERISA fiduciary's conduct need not be

ruled out at the pleadings stage. *Forman*, 40 F.4th at 452–53 ("The theory merely provides a competing inference for why TriHealth offered retail-class funds," but "the facts of another complaint might suggest an alternative explanation that renders implausible an inference of imprudence."); *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 (2d Cir. 2021); *Davis*, 960 F.3d at 483 ("WashU has identified one plausible inference, but it is not the only one."); *Sweda*, 923 F.3d at 326; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009).

Northwestern contends that we should not rely on *Sacerdote* and *Sweda* because in those cases the courts failed to require the plaintiffs to rule out every possible alternative explanation for an ERISA fiduciary's conduct. *See Sacerdote*, 9 F.4th at 108; *Sweda*, 923 F.3d at 326 (citing *Braden*, 588 F.3d at 597). For this reason, Northwestern suggests those cases were not decided under the *Twombly* pleading standard. But *Twombly* and *Iqbal* provide that only obvious alternative explanations should be accounted for at the dismissal stage. *See Twombly*, 550 U.S. at 567; *Iqbal*, 556 U.S. at 682. These cases did not hold that *every possible* alternative explanation must be conclusively ruled out on the pleadings to state a claim. The Third Circuit in *Sweda* and the Second Circuit in *Sacerdote*—as well as the other circuits cited above—rejected the reading of *Twombly* and *Iqbal* that Northwestern advances here. *Sweda*, 923 F.3d at 326; *Sacerdote*, 9 F.4th at 108.

Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss. *See Forman*, 40 F.4th at 450 ("Equally reasonable inferences … could exonerate TriHealth … [b]ut at the pleading stage, it is too early to make these judgment calls."). This is because, at the pleadings stage, we

must accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor. *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) (citation omitted); *Davis*, 960 F.3d at 483. A court's role in evaluating pleadings is to decide whether the plaintiff's allegations are plausible—not which side's version is more probable. *See Twombly*, 550 U.S. at 556. Thus, on a motion to dismiss, courts must give due regard to alternative explanations for an ERISA fiduciary's conduct, *Hughes*, 142 S. Ct. at 742, but they need not be overcome conclusively by the plaintiff.

Sometimes an alternative explanation for an ERISA fiduciary's conduct may be patently more reasonable and better supported by the facts than any theory of fiduciary duty violation pleaded by a plaintiff. In such a scenario, courts should not hesitate to dismiss an ERISA claim for breach of the duty of prudence. This will often be the case where a plan fiduciary has actually performed the requisite diligence in monitoring plan expenses and fund prudence. If a plan fiduciary sufficiently monitors funds and expenses, its informed course of action is much more likely to be within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. 737 at 742.

To plead a breach of the duty of prudence under ERISA, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness. *See Hughes*, 142 S. Ct. at 742. How wide that range of reasonableness is will depend on "'the circumstances ... prevailing' at the time the fiduciary acts." *Dudenhoeffer*, 573 U.S. 409, 425 (citing 29 U.S.C. § 1104(a)(1)(B)). The discretion accorded to an ERISA fiduciary "will necessarily be context specific." *Id.*

Often, as here, the ERISA fiduciary will defend against allegations of breach of duty by arguing that the course of action the plaintiff says the fiduciary should have taken was not available. Under this reasoning, Northwestern argues plaintiffs must plead that a prudent alternative action was "actually available." This is a variant of the alternative explanation defense. That a prudent alternative action was unavailable, of course, can explain the fiduciary's failure to take that action.

We see no reason to treat this alternative explanation differently than any other. To the extent that the prudent course of action was unavailable, that will foreclose the claim. But if a course of action was only possibly unavailable, further factual development on the pleadings will be necessary to resolve the claim on that explanation. The actual availability that Northwestern asks us to incorporate into the pleading standard goes beyond the plausibility standard of *Iqbal* and *Twombly*. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable … ." *Twombly*, 550 U.S. at 556. At the pleadings stage, a plaintiff must provide enough facts to show that a prudent alternative action was plausibly available, rather than actually available.

## IV. Analysis

We now evaluate Counts III and V of the First Amended Complaint under the pleading standard for the duty of prudence.

### A. Count III—Excessive Recordkeeping Fees

Plaintiffs pleaded that Northwestern incurred unreasonable recordkeeping fees by failing to monitor and control those expenses. Per plaintiffs, the university should have reduced

its fees by soliciting bids from competing providers, negotiating with existing recordkeepers for fee reductions, and consolidating to a single recordkeeper.

This court previously affirmed dismissal on Count III because: (1) ERISA does not require a flat-fee structure; (2) Northwestern explained that it retained TIAA as a separate recordkeeper so it could continue offering TIAA's popular Traditional Annuity; and (3) plan participants could keep recordkeeping expenses low by selecting low-cost funds, which were made available through the Plans. *Divane*, 953 F.3d at 989–90, 991 n.10. As discussed earlier, *Hughes* forecloses the third reason for the prior decision. 142 S. Ct. at 742 (rejecting this court's reliance on plan participant control over funds selection). As for the second, the desire to retain the Traditional Annuity among plan offerings is an alternative explanation that we assess under our newly formulated pleading standard. On the first, *Hughes* left untouched the holding in *Hecker* that the use of revenue sharing for plan expenses does not amount to a per se violation of fiduciary duty under ERISA. *Hecker*, 556 F.3d at 585. But just because a revenue-sharing fee arrangement does not amount to a per se ERISA violation does not also mean that using such an arrangement in every case fulfills the plan fiduciary's duty of prudence. Further analysis is warranted in light of the ERISA fiduciary's continuing duty to monitor plan expenses stated in *Tibble*, 575 U.S. 523.

Recall that the duty of prudence includes a continuing duty to monitor plan expenses and "incur only costs that are reasonable in amount and appropriate" with respect to the services received. *Tibble*, 843 F.3d at 1197. So, Count III's survival depends on whether plaintiffs have pleaded sufficient

facts to render it plausible that Northwestern incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees.

To begin, plaintiffs alleged that the Plans together paid between four to five million dollars a year in recordkeeping fees when, based on a $35 flat fee per participant, a more reasonable amount would have been about one million dollars. Plaintiffs assert that $35 was a reasonable per participant fee "[b]ased on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the number of participants in the Plans (approximately 30,000), and the recordkeeping market." In *Albert*, this court affirmed dismissal of a similar claim in which the plaintiff pleaded that the relevant ERISA plan paid an average of $87 per participant in recordkeeping fees despite a reasonable fee being $40 per participant based on what comparator funds paid. 47 F.4th at 579. This court in *Albert* depended in large part on the previous holding in *Divane* that the defendant "was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked." *Id.* (citing *Divane*, 953 F.3d at 990–91). This holding remains correct, but *Hughes* directs us to reconsider plaintiffs' allegations concerning excessive recordkeeping fees given the continuing duty to monitor such fees stated in *Tibble*, 575 U.S. 523. We reaffirm that a fiduciary need not constantly solicit quotes for recordkeeping to comply with his duty of prudence with respect to plan expenses. *See Hecker*, 556 F.3d at 586; *Loomis*, 658 F.3d at 670. But a fiduciary who fails to monitor the reasonableness of plan fees and fails to take action to mitigate excessive fees may violate the duty of prudence.

Further, *Albert* emphasized the lack of "allegations as to the quality or type of recordkeeping services the comparator plans provided." *Id.* at 579. This court cited two Sixth Circuit cases, *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022), and *Forman*, 40 F.4th at 449, for the rule that claims alleging excessive recordkeeping fees fail when ERISA plaintiffs do not plead that the fees were excessive in relation to the services provided. *Albert*, 47 F.4th at 580. But in affirming dismissal, *Albert* left open the possibility "that recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss." *Id.* (citing *Dudenhoeffer*, 573 U.S. at 425). The pleadings here lead us down that different path.

Unlike in *Albert*, plaintiffs here assert "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the Plans." So, plaintiffs maintain that the quality or type of recordkeeping services provided by competitor providers are comparable to that provided by Fidelity and TIAA. Plaintiffs also plead that because recordkeeping services are "commoditized … recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plans." In short, plaintiffs allege that recordkeeping services are fungible and that the market for them is highly competitive. Plaintiffs also contend that $35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the Plans' features. Unlike the plaintiffs in *CommonSpirit Health*, plaintiffs plead that the fees were excessive relative to the recordkeeping services rendered. *See* 37 F.4th at 1169.

Plaintiffs also provide examples of several other university I.R.C. § 403(b) plans that successfully reduced recordkeeping fees by soliciting competitive bids, consolidating to a single recordkeeper,[4] and negotiating rebates. Plans offered by Loyola Marymount University, Pepperdine University, Purdue University, and California Institute of Technology successfully lowered recordkeeping fees by consolidating recordkeepers, according to plaintiffs. Purdue and CalTech leveraged plan assets to lower fees by negotiating for a flat administrative fee structure and revenue-sharing rebates, respectively. Plaintiffs also cite industry experts who recommended soliciting bids for recordkeeping and consolidating to a single recordkeeper to reduce overall fees.

Per plaintiffs, despite these recognized benefits, Northwestern neglected to monitor its recordkeeping fees under its revenue-sharing fee arrangement. Instead, the university continued to contract with TIAA and Fidelity instead of consolidating, did not conduct competitive bidding for recordkeeping services, and failed to use the Plans' size to negotiate rebates from existing providers. Plaintiffs also pleaded that Northwestern successfully lowered the Plans' administrative fees (including recordkeeping fees) in the October 2016 restructuring, which suggests that Northwestern's recordkeeping fees were unreasonably high and that means to lower such fees were available. Under the context-specific pleading standard specified above, all these factual averments lead us to conclude that plaintiffs have plausibly alleged that

---

[4] Consolidation of recordkeepers was not at issue in *Albert*, 47 F.4th 570.

Northwestern violated its duty of prudence by incurring un-reasonable recordkeeping fees.

Northwestern responds that these pleadings fail to state a claim because plaintiffs have not demonstrated that consolidating to a single recordkeeper was an available alternative or that an alternative recordkeeper would have accepted a lower fee than that paid to Fidelity or TIAA. But under the pleading standard, plaintiffs have sufficiently alleged that recordkeeper consolidation and soliciting an equally capable but lower-cost recordkeeper were available options. Plaintiffs point to other institutions that had successfully consolidated and reduced fees. And they maintain that the market is competitive with equally capable recordkeepers who can provide comparable services for less.

Requiring plaintiffs to prove that another recordkeeper would have offered a lower fee or that consolidation was actually available would apply *Dudenhoeffer*'s heightened pleading standard, rather than the lower *Twombly* and *Iqbal* plausibility requirement. The Supreme Court in *Hughes* directed us to examine the duty of prudence in light of context, *Hughes*, 142 S. Ct. at 742 (citing *Dudenhoeffer*, 573 U.S. at 425), but *Dudenhoeffer*'s pleading standard does not extend beyond ESOPs. At the pleadings stage, plaintiffs were required to plausibly allege that Northwestern's failure to obtain comparable recordkeeping services at a substantially lesser rate was outside the range of reasonable actions that the university could take as plan fiduciary. They have done so.

Northwestern offers alternative explanations for its failure to consolidate recordkeepers and to switch to a per capita fee arrangement. The university posits that dropping TIAA as a recordkeeper would remove the popular Traditional Annuity

from the Plans and that retaining TIAA as sole recordkeeper would have compromised the Plans' ability to offer Fidelity investments. Northwestern also highlights that TIAA imposes a penalty for withdrawing investments in the Traditional Annuity. Although these are reasonable alternative explanations, they do not explain why the university did not negotiate with TIAA and Fidelity to lower fees for plan participants, whether through rebates or a modified fee arrangement. Count III is not limited to a failure to consolidate recordkeepers. It includes a claim that Northwestern failed to mitigate excessive recordkeeping fees in several ways.

Northwestern also argues that plaintiffs failed to address the fact that a per capita fee would discourage small investor participation. But neither has the university shown why encouraging small participant investment is worth charging an alleged four to five times in recordkeeping fees to plan participants. An equally, if not more, plausible inference would be that the university neglected to keep its recordkeeping fees paid through revenue sharing at a reasonable level. Northwestern's alternative explanations are not strong enough to justify dismissal of the recordkeeping claim on the pleadings. *See Forman*, 40 F.4th at 450; *Davis*, 960 F.3d at 483. So, we hold that plaintiffs have pleaded a plausible claim in Count III.

*                    *                    *

We are not alone in our conclusion on this type of claim. Two circuits have ruled against dismissing similar claims that alleged a failure to lower recordkeeping expenses. *See Davis*, 960 F.3d at 482–83; *Sweda*, 923 F.3d at 330–31. The Second Circuit also recognized that consolidating recordkeepers may reduce fees, but that court affirmed dismissal of a similar claim

because the plan fiduciary consolidated recordkeepers within a reasonable time. *Sacerdote*, 9 F.4th at 119–20.

In reaching this conclusion, we reiterate that the inquiry into the duty of prudence is in all cases "context specific." *Hughes*, 142 S. Ct. at 742 (quoting *Dudenhoeffer*, 573 U.S. at 425). Claims for excessive recordkeeping fees in a future case may or may not survive dismissal based on different pleadings and the specific circumstances facing the ERISA fiduciary. But here, plaintiffs have pleaded enough to cross the line from possibility to plausibility.

### B. Count V—Imprudent Fund: Share-Class Claim

Plaintiffs also contend Northwestern "selected and retained for years as the Plans' investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times." At bottom, Count V alleges imprudent fund retention. As part of this claim, plaintiffs said Northwestern retained multiple duplicative funds that caused plan participant confusion and inaction. We address that contention separately in Section IV.C. Plaintiffs also allege that the Plans included "mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plans." To plaintiffs, this and other pleadings state a claim that Northwestern breached its duty of prudence by failing to replace retail-class shares of funds with cheaper but otherwise identical institutional-class shares.

Northwestern disputes that Count V includes such a share-class claim. But the university construes Count V too narrowly and skips over many allegations in plaintiffs' First

Amended Complaint that support a share-class claim. In addition to the pleadings already cited, plaintiffs maintain that institutional and retail shares differ only in that retail shares have higher expenses. They allege that although institutional shares have minimum investment thresholds, it is common for large plans to obtain waivers for such requirements. Plaintiffs claim that jumbo defined-contribution plans like Northwestern's had "massive bargaining power" that enabled them to obtain such a waiver from fund managers. In support, plaintiffs state that other fiduciaries had successfully negotiated for including institutional-class shares in their plans despite not meeting the minimum investment requirements.

Importantly, in *Hughes* the Supreme Court identified a share-class claim in Count V, namely that Northwestern had "offered a number of mutual funds and annuities in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments." 142 S. Ct. at 741. That share-class claim is separate from the duplicative funds claim, also in Count V, that we discuss later in Section IV.C. This court previously affirmed dismissal of Count V because Northwestern provided some of the low-cost index funds that plaintiffs sought. *Divane*, 953 F.3d at 991. The Supreme Court rejected that reasoning, *Hughes*, 142 S. Ct. at 740, so we reexamine the pleadings in light of the continuing duty to monitor plan investments outlined in *Tibble*, 575 U.S. 523. Under that standard, we conclude that the share-class claim survives.

Plaintiffs' share-class pleadings are similar to those in *Tibble*. Plaintiffs alleged that Northwestern retained more expensive retail-class shares of 129 mutual funds when, by using Northwestern's size and correspondent bargaining

power, less expensive but otherwise identical institutional-class shares were available to the Plans. Similarly, in *Tibble* petitioners "argued that respondents acted imprudently by offering six higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available." 575 U.S. at 525–26. "[E]xpress[ing] no view on the scope of respondents' fiduciary duty," the Court remanded the case. *Id.* at 531.

On remand, the Ninth Circuit restated much of the Supreme Court's clarification on the continuing duty to monitor and remanded for reconsideration of the district court's bench trial findings on the share-class claim. *Tibble*, 843 F.3d at 1199. In turn, the district court found, for all mutual funds at issue, that "no prudent fiduciary would purposefully invest in higher cost retail shares" and granted judgment for the plaintiffs. *Tibble v. Edison Int'l*, No. CV 07-5359 SVW (AGRx), 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017). It follows from the similarity of the share-class claim in *Tibble* with the allegations here that this claim should survive dismissal.

Northwestern argues plaintiffs have not pleaded that institutional-class shares were *actually* available to the Plans. The university points out that access to institutional-class shares often requires significant minimum investment by investors. To Northwestern, plaintiffs provide merely naked assertions that the university could have obtained waivers of these investment minimums. But as described above, under *Twombly* and *Iqbal*, a plaintiff is required to show only that such cheaper institutional shares were plausibly available. Northwestern has contended that the institutional shares are only possibly unavailable. We cannot determine on the pleadings, for example, whether the university had tried to bargain

with existing fund providers for access to institutional-class shares but failed. Nor can we discern whether Northwestern ever considered the possibility of access to institutional shares for its plan participants.

To the contrary, plaintiffs plausibly allege that waivers of investment minimums were possible, and that Northwestern could have negotiated for institutional-class shares. These allegations are substantiated by statements from industry experts that jumbo retirement plans like Northwestern's have massive bargaining power. Plaintiffs noted the district court's finding in the proceedings prior to *Tibble*, 575 U.S. 523, that it is "common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares." *Tibble v. Edison Int'l*, No. CV 07-5359 SVW(AGRx), 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010). They also highlighted how other large I.R.C. § 403(b) plans had leveraged plan assets to bargain for access to institutional-class shares and cited one specific example of a plan doing so. These allegations render it plausible that institutional-class shares were available to Northwestern.

Northwestern also contends that retail-class shares are superior to institutional-class shares because their higher fees allow plans, through revenue sharing, to pay for recordkeeping and other administrative expenses—a feature, it argues, that encourages small plan participants to invest. In *Loomis*, this court considered a similar alternative explanation in favor of revenue sharing over per capita fee arrangements. *See* 658 F.3d at 672 ("[F]or … others with small investment balances, a capitation fee could work out to more, per dollar under management … ."). This is just one possible explanation

for why Northwestern chose to retain such a large number of retail-class shares. But this explanation is not so much more obvious than plaintiffs' account that this issue can be resolved on the pleadings. Plaintiffs allege that Northwestern failed to consider bargaining for cheaper institutional-class shares with existing fund providers to the detriment of plan participants. Plaintiffs' version is especially plausible in light of their allegation that the Plans collectively paid about four to five times as much in recordkeeping fees as they should have.

In *Loomis*, this court also noted other advantages that retail-class shares could offer in contrast to institutional-class shares: Pooled investment in institutional shares "lacks the mark-to-market benchmark provided by a retail mutual fund" and so imposes greater difficulties in valuing the investment relative to market. *Id.* Further, institutional shares are less liquid than retail shares, which allow daily transfers. *Id.* Even more, this court observed that the average expense ratio of institutional shares in equity funds was higher than any of the retail shares offered to the plaintiff plan participants. *Id.* This was to show that the relevant plan in *Loomis* had competitively priced retail shares compared to institutional shares on average.

These other claimed advantages of retail shares appear nowhere in the pleadings or the parties' briefs. Instead, plaintiffs maintain that the institutional shares in question are identical to corresponding retail shares in terms of investment and management. The only difference, plaintiffs allege, is that retail shares charge significantly higher fees.

In this respect, plaintiffs' share-class claim is special in that the comparator action that a prudent fiduciary should have taken—replacing retail shares with institutional shares—is

baked into the claim. *See Forman*, 40 F.4th at 451 ("Different ERISA claims have different requirements, to be sure. But this claim has a comparator embedded in it."); *Sacerdote*, 9 F.4th at 108 (observing that the plaintiffs alleged that a "superior alternative investment"—institutional shares—was apparent by simply reviewing the fund prospectus); *Davis*, 960 F.3d at 483–87 (analyzing comparator benchmark funds for an allegedly underperforming fund but not for a share-class claim on the same fund).

Northwestern's alternative explanations about the unavailability of institutional-class shares or the advantages of using higher revenue-sharing payments in retail shares to defray recordkeeping costs, could explain Northwestern's failure to swap out its retail for institutional shares. But based on the facts pleaded, these alternative inferences are not strong enough to overcome the equally, if not more, reasonable inference that Northwestern failed to use its size to bargain for cheaper institutional shares. Drawing these reasonable inferences in plaintiffs' favor, they have plausibly alleged that Northwestern's failure to swap out retail-class for institutional-class shares was outside the range of reasonable decisions a fiduciary could take. So, we hold that plaintiffs have stated a share-class claim in Count V.

                    *            *            *

Five other circuits—four since *Divane*—have joined in this conclusion to uphold similar share-class claims against dismissal. *See Forman*, 40 F.4th at 450 (recognizing "[e]qually reasonable inferences" from the facts on why a fiduciary would choose retail over institutional shares, but acknowledging that "at the pleading stage, it is too early to make these judgment calls"); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL

1125667, at *1 (9th Cir. Apr. 15, 2022); *Sacerdote*, 9 F.4th at 108; *Davis*, 960 F.3d at 483 (observing that a failure to negotiate aggressively enough or to negotiate at all for lower-cost alternatives is enough to state a claim for a breach of the duty of prudence); *Sweda*, 923 F.3d at 331–32.

### C. Count V—Imprudent Fund: Duplicative Funds Claim

As stated earlier, we see a separate claim in Count V that Northwestern breached its duty of prudence by retaining multiple duplicative funds. Plaintiffs claim that the excessive options in the Plans caused "decision paralysis" and led to investor confusion.

To the extent investor confusion is the injury pleaded, the First Amended Complaint does not identify how plaintiffs were confused and personally injured by the multiplicity of funds. This court's prior opinion affirmed that plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty. *Divane*, 953 F.3d at 992 (citing *Loomis*, 658 F.3d at 673–74; *Hecker*, 556 F.3d at 586). *Hughes* left this general principle untouched. Unspecific allegations that a fiduciary provided too many funds, without more, do not state a claim for breach of the duty of prudence. So, we affirm dismissal of the duplicative funds claim in Count V that is based on a theory of investor confusion.

Plaintiffs also maintained that consolidating duplicative investments of the same style into a single investment option would have allowed the Plans to obtain lower-cost investments—such as low-cost institutional shares of the fund. Indeed, the pleadings on the October 2016 restructuring suggest that Northwestern accomplished just that. To the extent the allegations for the duplicative funds claim support the share-

class claim, on remand the district court may consider them on the Count V share-class claim.

## V. Conclusion

For the reasons stated, we REVERSE the district court's dismissal of the excessive recordkeeping fees claim in Count III and the share-class claim in Count V of the First Amended Complaint, and REMAND for further proceedings. For all other claims and issues, we reinstate this court's judgment in *Divane*, 953 F.3d 980, and we AFFIRM the district court's dismissal of Plaintiffs' First Amended Complaint on all other counts and AFFIRM the denial of Plaintiffs' requests for leave to further amend the complaint and for a jury trial.

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ) | |
| **AARON L. BROWN et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 22-cv-10976-DJC** |
| ) | |
| **THE MITRE CORPORATION et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                    **March 6, 2023**

## I.      Introduction

Plaintiffs Aaron Brown ("Brown"), Peter Young ("Young"), Nina Daniel ("Daniel"), Kimberly Nesbitt "(Nesbitt"), Russell Crabtree ("Crabtree") and Erin Wheeler ("Wheeler"), on behalf of themselves and a purported class (collectively, "Plaintiffs") have filed this lawsuit against The MITRE Corporation, its Board of Trustees and its Investment Advisory Committee (collectively, "Defendants") and John Doe defendants 1-30 for alleged breach of fiduciary duty of prudence to participants in MITRE retirement plans (Count I) and "failure to adequately monitor other fiduciaries" (Count II) in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132. D. 1. Before the Court is Defendants' motion to dismiss. D. 16. For the reasons set forth below, the Court ALLOWS the motion as to Plaintiff Brown and DENIES it as to both Count I and II as asserted by the other Plaintiffs.

## II.     Standard of Review

A defendant may move to dismiss for a plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To withstand a Rule 12(b)(6) challenge, the Court must determine if the complaint "plausibly narrate[s] a claim for relief."  <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012) (citing <u>Ocasio-Hernandez v. Fortuño-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011)).   Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013) (citation omitted).   First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  <u>Id.</u> (citing <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012)).  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  <u>Id.</u> (citing <u>Morales-Cruz</u>, 676 F.3d at 224).   Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).   In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  <u>García-Catalán</u>, 734 F.3d at 103 (quoting <u>Iqbal</u>, 556 U.S. at 678).

## III.     Factual Background

The following facts are drawn from Plaintiffs' complaint, D. 1, and are accepted as true for the consideration of the pending motion to dismiss.

The MITRE Corporation ("MITRE") is a not-for-profit organization that sponsors, and is a named fiduciary for the Tax Sheltered Annuity Plan ("the TSA") and the Qualified Retirement Plan ("the QRP") (collectively, "the Plans").  D. 1 ¶ 28.  The TSA is intended to qualify under Section 403(b) of the Internal Revenue Code, while the QRP is intended to qualify under Section

401(a).  Id. ¶ 46.  Regular full-time employees of MITRE are generally eligible to participate in the Plans, which provide retirement benefits based solely on the amounts allocated to each individual's account.  Id. ¶¶ 46–48.  Plaintiffs are individuals who participated and invested in the options offered by one or both of the Plans during their employment at MITRE.  See id. ¶¶ 20–25.  MITRE, acting through its Board of Trustees ("the Board"), appointed its Investment Advisory Committee ("the Committee") to, among other things, ensure that the investments available to the Plans' participants were appropriate, had no more expenses than reasonable and performed well as compared to their peers.  Id. ¶¶ 29, 32, 35.

At all times since June 22, 2016 ("the Class Period"), the Plans combined had at least $3.5 billion dollars in assets under management that were entrusted to the care of the Plans' fiduciaries.  See id. at 2 n.2 & ¶ 10.  The Plans' assets under management, among the largest in the United States, qualified them as "jumbo plans" in the defined contribution plan marketplace.  Id. ¶ 11.  From 2016 to 2020, the QRP had between 10,798 and 12,366 participants with account balances and the TSA had between 12,225 and 14,190 participants with account balances.  Id. ¶ 12.  Combined, the Plans had over 20,000 participants with account balances during the Class Period.  Id.  In 2020, there were 198 defined contribution plans (401k, 401a and 403b) in the country with 15,000 to 19,999 participants and 194 such plans with 20,000 to 29,999 participants.  Id.

Plan participants were required to pay recordkeeping or administrative service fees.  Id. ¶ 64.  The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Id. ¶ 65.  There are two types of essential recordkeeping services provided by all national recordkeepers for large plans.  Id. ¶ 66.  One option is an overall suite of recordkeeping services provided to large plans as part

of a "bundled" fee for an "all-you-can-eat" style service offered at one price regardless of the services chosen or utilized by a plan.  Id. ¶¶ 66–67.  The other option is an "a la carte" style service that often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  Id. ¶ 68.  As jumbo plans, both in terms of assets and participants, the Plans had "substantial bargaining power regarding the fees and expenses that were charged against participants' investments."  Id. ¶ 13.  The Plans' "massive size in terms of the number of participants also afforded it the luxury to leverage its scale to obtain low recordkeeping and administration costs."  Id.

MITRE had agreements with TIAA and Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") to provide recordkeeping services for the Plans beginning in 2006, through the Class Period.  Id.  ¶¶ 69–70, 93.  TIAA provided recordkeeping services based on a percentage of the assets in the Plans ("the Revenue Requirement").  Id. ¶ 70.  TIAA compared the Revenue Requirement to the revenue generated by the Plans on a quarterly basis to determine if the Plans generated sufficient revenue to meet the Revenue Requirement.  Id. ¶ 96.  In 2015, the Revenue Requirement was 0.10 basis points of the Plans' total assets, in 2016 it was 0.07 basis points and from 2018 through at least 2020 it was 0.039 basis points.  Id. ¶ 71.  Under the Agreement, the Revenue Requirement of 0.039 basis points will remain in effect until June 30, 2023.  Id.  The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account.  Id. ¶ 72.  Accordingly, large plans get lower effective rates per participant than smaller plans.  Id.

In 2018, at least ten plans, ranging from 13,248 to 33,116 participants, paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers.  Id. ¶ 86.  By comparison, in 2018 the QRP and TSA Plans paid approximately $59 and $80, respectively.  Id. ¶ 78.

Between 2013 to 2019, at least eleven plans, ranging in size from 3,146 to 15,246 participants, paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers.  Id. ¶ 87.  By comparison, between 2016 to 2020, the Plans paid between $60 to $220 per participant in record keeping fees.  Id. ¶ 78.  Additionally, in a 2020 survey of 121 plans, where the average plan had $1.1 billion in assets and 12,437 participants, the majority of them with over 15,000 participants paid a little over $40 per participant in recordkeeping, trust and custody fees.  Id. ¶¶ 89–90.

In 2021, the Plans offered the retail version of the Cohen and Steers Real Estate Securities fund (A Class), which has a published expense ratio of 1.12%.  Id. ¶ 100.  The institutional version of this fund, the Cohen and Steers Real Estate Securities I, had an expense ratio of 0.86%.  Id.  The difference between the two ratios is considered revenue sharing and is what MITRE used to pay its recordkeeping costs.  Id.  As another example, also in 2021, the Fidelity Freedom K 2020 and Fidelity Freedom K 2030 funds, which Plaintiffs invested in with expense ratios of 0.60% and 0.68%, respectively, also had lower share classes of the same funds available at 0.44% and 0.47%, respectively.  Id. ¶ 101.

## IV.    Procedural History

Plaintiffs commenced this action on June 22, 2022.  D. 1.  Defendants have moved to dismiss for failure to state a claim upon which relief can be granted.  D. 16.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 45.

## V.    Discussion

### A.    Fiduciary Duty of Prudence (Count I)

"ERISA provides that any person who exercises discretionary authority or control in the management or administration of an ERISA plan (or who is compensated in exchange for

investment advice) is a fiduciary." Barchock v. CVS Health Corp., 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)). "ERISA further provides that such a fiduciary has a duty to act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" Id. (quoting 29 U.S.C. § 1104(a)(1)(B)). "[W]ith respect to whether a complaint states a claim of imprudence under ERISA, 'the appropriate inquiry will necessarily be context specific.'" Id.; see Hughes v. Nw. Univ., __ U.S. __, 142 S. Ct. 737, 740 (2022) (concluding that "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires"). "Therefore, to determine whether a fiduciary acted in accordance with its duty of prudence, a court will evaluate conduct under the 'totality of the circumstances' and assess a fiduciary's procedures, methodology and thoroughness." Sellers v. Trustees of Coll., No. 22-cv-10912-WGY, 2022 WL 17968685, at *5 (D. Mass. Dec. 27, 2022) (citing Barchock, 886 F.3d at 44; Glass Dimensions, Inc., ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 931 F. Supp. 2d 296, 305 (D. Mass. 2013)).

"Fiduciaries have a general duty to monitor recordkeeping expenses and, more generally, they have a prudential duty to be cost-conscious in the administration of a plan." Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 136 (D. Mass. 2021) (citing Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 213 (D. Mass. 2020)) (second citation omitted). "ERISA fiduciaries breach their duty of prudence by failing diligently to investigate and monitor recordkeeping expenses as well as other administrative expenses." Id. (citations and internal quotation marks omitted). Plaintiffs allege that Defendants, as a fiduciary of the Plans, breached its duty of prudence by causing Plaintiffs to incur unreasonable fees during the Class Period. D.

1 ¶¶ 14–16.  "Under the totality of the circumstances," <u>Sellers</u>, 2022 WL 17968685, at *5, the Court finds that the complaint's factual allegations are sufficient to state a plausible claim of imprudence.

### 1.    *Revenue Sharing Approach*

Plaintiffs allege that the Committee's use of "a revenue sharing approach," whereby a fixed percentage of the Plans' assets paid for recordkeeping fees, had a detrimental effect on participants' retirement savings.  D. 1 ¶¶ 73–74, 76.  Because of the large amount of assets held by the Plans, Plaintiffs contend that the Committee's decision to use this fixed percentage approach resulted in unreasonably high per participant fees ranging from approximately $60 to $220 between 2016 to 2020.  <u>See id.</u> ¶ 78, particularly in comparison to twenty-one plans, with either less or a similar number of plan participants as the Plans, that paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers between 2013 to 2019.  <u>See id.</u> ¶¶ 86–87.  Plaintiffs maintain that due to economies of scale, plans with large numbers of participants should pay less per participant than plans with fewer participants.  <u>Id.</u> ¶ 72.  In Plaintiffs' view, therefore, the Committee was imprudent because it failed to negotiate lower recordkeeping fees based on a fixed dollar amount rather than a fixed percentage of assets.  <u>Id.</u> ¶¶ 75–76.

Defendants argue that Plaintiffs' claims fail as a matter of law because the complaint offers no facts that the Plans' "fees were outside the range of fees other plans paid, or even that they were above average."  D. 17 at 14.  Defendants specifically take issue with Plaintiffs' "laser-like focus on cost" without regard to the extent and quality of services provided.  D. 17 at 12–13.  Defendants further argue that the First Circuit in <u>Barchock</u> "rejected these same sorts of fiduciary breach allegations based on these same types of comparisons."  <u>Id.</u> at 6.

As a preliminary matter, <u>Barchock</u> is distinguishable from the case at bar.  In <u>Barchock</u>, the plaintiffs sought to infer imprudence "solely from their complaint's charge that [a fiduciary's] cash-equivalent allocation 'departed radically' from both industry averages and the underlying financial logic of stable value management."  <u>Barchock</u>, 886 F.3d at 52.  Notably, the plaintiffs in that case did not "directly criticize the process by which the Fund's investment allocation was selected" nor did the plaintiffs allege "that defendants had something to gain from managing the fund conservatively, which could raise doubts about the prudence of [the fiduciary's] investment process."  <u>Id.</u> at 49 (internal quotation marks omitted).  Here, Plaintiffs "directly criticize the process" by which the Plans' investment allocation was elected.  <u>See id.</u>  Specifically, Plaintiffs allege that Defendants failed to leverage its substantial bargaining power, due to the Plans' size, to obtain the same recordkeeping services at a lower cost.  D. 1 ¶¶ 66–69, 94.  This allegation is sufficient to give rise to the inference that the Defendants' "overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plans and the assets of participants."  <u>Id.</u> ¶¶ 13, 63; <u>see Matousek v. MidAmerican Energy Co.</u>, 51 F.4th 274, 278 (8th Cir. 2022) (stating that "[a] plaintiff typically clears the pleading bar by alleging enough facts to '*infer* . . . that the process was flawed'") (citing <u>Davis v. Washington Univ. in St. Louis</u>, 960 F.3d 478, 482-83 (8th Cir. 2020)) (emphasis and omission in original).

Defendants also rely upon other cases for their position that Plaintiffs have not pleaded sufficient "facts relating to the specific services provided to the Plans (by either TIAA or Fidelity), let alone the services provided to their handful of proffered comparator plans."  D. 30 at 2 & n.1 (citing <u>Matousek</u>, 51 F.4th at 278;  <u>Smith v. CommonSpirit Health</u>, 37 F.4th 1160 (6th Cir. 2022); <u>Albert v. Oshkosh Corp.</u>, 47 F.4th 570 (7th Cir. 2022)).

In <u>Matousek</u>, the defendants provided the court with sufficient allegations to allow it to identify the types of services provided by the recordkeeper and calculate the approximate fees for each type.  <u>Matousek</u>, 51 F.4th at 279 (using participant-disclosure forms to calculate fees of $32 to $48 per participant for "basic recordkeeping services").  The Court then compared the fees for those services to the industry-wide benchmarks proffered by the plaintiffs, concluding that the plan in question "compare[d] favorably" to the benchmarks.  See <u>id.</u>; <u>Rodriguez et al. v. Hy-Vee, Inc. et al.</u>, No. 22-cv-00072-SHLHCA, 2022 WL 16648825, at *11–12 (S.D. Iowa Oct. 21, 2022) (applying <u>Matousek</u> and concluding that the defendants did not give the court "enough information to understand the difference (if there is one) in the scope of recordkeeping services provided in connection with the [plan] versus those provided in the proffered benchmarks").  As in <u>Rodriguez</u>, here, the Court has no basis at this stage "to doubt the plausibility" of Plaintiffs' allegations that there are "two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plans)" and that "the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost."  D. 1 ¶¶ 66–69, 94; <u>see Rodriguez</u>, 2022 WL 16648825, at *12 (finding "no reason to doubt the plausibility of [the plaintiffs'] allegation that 'all' recordkeepers in large 401(k) plans provide the same suite of recordkeeping services, and thus the [plan] paid too much") (citing <u>Davis</u>, 960 F.3d at 483); <u>Garnick v. Wake Forest Univ. Baptist Med. Ctr.</u>, No. 21-cv-454, 2022 WL 4368188, at *8 (M.D.N.C. Sept. 21, 2022) (concluding that plaintiffs plausibly stated a claim of imprudence by alleging that plan had the leverage to bargain for more reasonable fees without utilizing revenue sharing).

Smith is distinguishable because, in that case, the plaintiff "failed to allege that the fees were excessive relative to the services rendered" and had, for example, compared a large plan's fees to "some of the smallest plans on the market." Smith, 37 F.4th at 1169 (citation and internal quotation marks omitted). As discussed above, here, Plaintiffs have plausibly alleged that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the Committee failed to use its substantial bargaining power to obtain these same services at a lower cost. D. 1 ¶¶ 66–69, 94; cf. Forman v. TriHealth, Inc., 40 F.4th 443, 449 (6th Cir. 2022) (concluding that plaintiffs failed to state a claim as to "overall plan fees" where "the employees never alleged that these fees were high in relation to the services that the plan provided"). Furthermore, given that the Plans each had approximately 10,000 to 14,000 participants throughout the Class Period and the complaint includes over ten comparator plans of similar sizes, see D. 1 ¶¶ 12, 86–87, unlike in Smith, Plaintiffs here have compared the Plans' fees to a sufficient number of similarly-sized plans. See Peck v. Munson Healthcare et al., 2022 WL 17260807, at *6 (W.D. Mich. Nov. 9, 2022) (rejecting defendants' reliance on Smith because plaintiff "compared sufficiently similar plans for the purpose of stating a claim under ERISA").

Finally, Albert can be distinguished because, there, the plaintiff's recordkeeping claim was based on the allegation that the fiduciary "fail[ed] to regularly solicit quotes and/or competitive bids." Albert, 47 F.4th at 579. Although the court concluded that the plaintiff failed to allege that the recordkeeping fees were excessive relative to the services rendered, id. at 580 (citing Smith, 40 F.4th at 449), the plaintiff in Albert does not appear to have alleged, as Plaintiffs do here, that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the fiduciary failed to use its substantial bargaining power

to obtain these same services at a lower cost.  See D. 1 ¶¶ 66–69, 94.  As the Albert court noted, "recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss should it 'provide the kind of context that could move this claim from possibility to plausibility.'"  47 F.4th at 580 (citing Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014); Smith, 37 F.4th at 1169).

Although there are rulings from other Circuits to consider, the First Circuit has not "foreclosed plaintiffs' complaint."  Adams et al. v. Dartmouth-Hitchcock Clinic et al., No. 22-cv-00099-LM, D. 33 (D.N.H. Feb. 10, 2023) (acknowledging the holdings in Matousek, Albert and Smith but denying motion to dismiss).  For one example in this Circuit, a group of plaintiffs provided sufficient context for their recordkeeping claim to survive a motion to dismiss in another session of this court.  Coviello et al v. BHS Management Services, Inc. et al., No. 20-cv-30198-MGM, D. 77 (D. Mass. June 9, 2022).[1]  The court then, noting that the defendants' "issue with plaintiffs' lack of factual specificity," concluded that the plaintiffs' allegations, including the allegation that "[d]espite the [p]lan's large size . . . [d]efendants saddled [p]lan participants with above-market recordkeeping fees and comparatively high investment management fees benchmarked against similar and even smaller plans" stated a claim of imprudence.  Coviello,

---

[1] Since the hearing on the pending motion, the parties have submitted multiple supplemental notices of authority addressing similar allegations.  D. 49; D. 53; D. 56.  As these notices indicate, district courts around the country have addressed such claims with mixed results.  See, e.g., Singh v. Deloitte LLP, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (dismissing complaint); Probst v. Eli Lilly and Company, 2023 WL 1782611, at *9-12 (S.D. Ind. Feb. 3, 2023) (dismissing complaint); McNeilly et al. v. Spectrum Health Systems, et al., No. 20-cv-00870, D. 62 (W.D. Mich. Dec. 20, 2022) (denying motion to dismiss); In re Sutter Health ERISA Litig., No. 20-cv-01007-JLT, 2023 WL 1868865, at *10 (E.D. Cal. Feb. 9, 2023) (denying motion to dismiss); Adams, No. 22-cv-00099-LM, D. 33 (same).  Having considered these authorities, the Court finds persuasive the reasoning of other  sessions of this Court that have allowed complaints that are substantially like this complaint to proceed.  See Coviello, No. 20-cv-30198-MGM, D. 77; Sellers, 2022 WL 17968685, at *6–7; Turner v. Schneider Elec. Holdings, 530 F. Supp. 3d 127, 136-37 (D. Mass. 2021).

20-cv-30198-MGM, D. 77 (internal quotation marks omitted).   As discussed above, here, Plaintiffs have made comparable allegations regarding the Plan's failure to leverage its size to obtain lower recordkeeping fees for the same services.   See In re Sutter Health, 2023 WL 1868865, at *10 (ruling that it was sufficient at the motion to dismiss stage for plaintiffs to allege specific facts supporting their claims that the a plan's fees and total cost were excessive for its size); see also Ybarra v. Bd. of Trustees of Supplemental Income Tr. Fund, 2018 WL 9536641, at *4 (C.D. Cal. Nov. 5, 2018) (stating that the court must take plaintiffs' factual allegations as true, including the claim that $40 would be a reasonable recordkeeping fee, particularly where plaintiffs "attack the Plan's method for selection not merely the difference between retail and institutional class funds").

Accordingly, the Court finds that Plaintiffs' revenue sharing allegations are sufficient to infer imprudence.

### 2.    *Failure to Solicit RFPs*

Plaintiffs also plausibly allege that the Committee was imprudent because it did not conduct a Request for Proposal ("RFP") at reasonable intervals.   See D. ¶ 93.   "Failure to conduct RFPs further demonstrates a plausible breach of the duty of prudence by" a fiduciary. Sellers, 2022 WL 17968685, at *7 (citing Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 137 (D. Mass. 2021); Tracey v. Massachusetts Inst. of Tech., No. CV 16-11620-NMG, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017)).   In Sellers, the plaintiffs alleged that a plan fiduciary "failed to look externally to the marketplace to determine what comparable plans are paying their service providers to help in determining a reasonable recordkeeping fee."   Id.   Here, given that the Plans remained with the same two recordkeepers for at least fourteen years despite an alleged increase in recordkeeping costs, it is plausible that the Committee was imprudent for

not conducting an RFP at reasonable intervals during that time period.  See id. ¶ 93; Turner, 530 F. Supp. 3d at 137 (concluding that allegations that a fiduciary "did not solicit competitive bids for managed account services and subsequently failed to monitor and control the fees for such services . . . adequately state[d] a claim for a breach of fiduciary duty"); see also George v. Kraft Foods Glob., Inc., 641 F.3d 786, 800 (7th Cir. 2011) (holding that "a trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that [recordkeeper's] fees were reasonable" where plan fiduciaries failed to solicit competitive bidding for more than fifteen years); Kendall v. Pharm. Prod. Dev., LLC, No. 7:20-cv-71-D, 2021 WL 1231415, at *10 (E.D.N.C. Mar. 31, 2021) (noting that a "plan fiduciary's failure to reduce recordkeeping costs through negotiation or the solicitation of competing bids may in some cases breach the duty of prudence") (citation and internal quotation marks omitted); cf. White v. Chevron Corp., No. 16-cv-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (dismissing claim of breach of fiduciary duty under ERISA and noting that plaintiffs did not allege that a competitive bid would have benefited a plan and its participants "because they do not allege any facts from which one could infer that the same services were available for less on the market").

Accordingly, the Court finds that Plaintiffs' allegations that the Committee failed to conduct an RFP at reasonable intervals are sufficient to infer imprudence.

### 3.    Retention of Multiple Recordkeepers

Plaintiffs also plausibly allege that the Committee's decision to retain multiple recordkeepers caused the Plans to incur excessive fees.  D. 1 ¶ 74 (alleging that the Plans could not take advantage of its economies of scale to get the best possible record-keeping fees by utilizing two recordkeepers, "a job which is traditionally handled by only one").  Id.  A fiduciary's decision to retain multiple recordkeepers may give rise to an inference of

imprudence.  See, e.g., Santiago v. Univ. of Miami, No. 20-cv-21784, 2021 WL 1173164, at *5 (S.D. Fla. Mar. 1, 2021) (denying motion to dismiss where plaintiffs alleged that "it is well known that plans with multiple record keepers causes high investment and administrative costs and that the market rate for such fees are $35 per participant, and here, participants had paid an excess of $100 in fees"); Henderson v. Emory Univ., 252 F. Supp. 3d 1344, 1353 (N.D. Ga. 2017) (denying a motion to dismiss and explaining that plaintiffs had sufficiently alleged a breach of fiduciary duty of prudence by alleging that "[d]efendants have continued to contract with three separate recordkeepers" and that this caused plan participants to pay excessive and unreasonable recordkeeping and administrative fees).

While the Committee's use of two recordkeepers alone is not sufficient to state a claim of imprudence, see Divane v. Nw. Univ., 953 F.3d 980, 990 (7th Cir. 2020), vacated on other grounds and remanded sub nom. Hughes v. Nw. Univ., 142 S. Ct. 737 (2022), the Court finds, in light of the complaint's other allegations, that the use of the same two recordkeepers for at least fourteen years despite relatively high recordkeeping fees is sufficient to infer imprudence.

### 4.   Use of Higher Cost Share Classes of Identical Funds

Plaintiffs also plausibly allege that the Committee breached its duty of prudence by failing to investigate the availability of lower-cost share classes of certain mutual funds in the Plans.  D. 1 ¶¶ 99–104, 108.  "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones."  Tibble v. Edison Int'l, 575 U.S. 523, 530 (2015).  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."  Turner, 530 F. Supp. 3d at 136 (quoting Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009)) (internal quotation marks omitted). Nevertheless, "cost-conscious management is fundamental to prudence in the investment

function." Id. (citing Tibble v. Edison Int'l, 843 F.3d 1187, 1197–98 (9th Cir. 2016)) (internal quotation marks omitted).  Accordingly, "[c]ourts have found that plaintiffs stated a claim for breach of fiduciary duty where the chosen investments were more expensive than other available funds." Id.; see Jones v. Coca-Cola Consol., Inc., No. 320CV00654FDWDSC, 2021 WL 1226551, at *5 (W.D.N.C. Mar. 31, 2021) (ruling that plaintiffs' allegations regarding defendants' alleged failure to utilize cheaper investments that offered identical underlying investments stated a claim for breach of fiduciary duty); Smith v. Shoe Show, Inc., No. 20-cv-813, 2022 WL 583569, at *6 (M.D.N.C. Feb. 25, 2022) (noting that if a lower cost alternative is identical and offers the same benefits as the higher cost fund, then a plausible breach of a plan fiduciary's duty of prudence has been alleged) (citation omitted).

According to Plaintiffs, the Committee "maintained many funds in the Plans which had significant expense ratios above a standard fund management fee" to pay for "over-priced" recordkeeping services through revenue sharing.  D. 1 ¶¶ 97, 99.  Plaintiffs allege that the Committee decided to invest in the more expensive versions of at least three funds—Cohen and Steers Real Estate Securities A, Fidelity Freedom 2020 K and Fidelity Freedom K 2030—even though less expensive versions of these funds were available.  Id. ¶¶ 100–102.  Plaintiffs further allege that "[t]he use of higher cost share classes of Plan funds, including the addition of required revenue to the Plans' funds, caused millions of dollars of damages for the Plan and its participants." Id. ¶ 104.

These allegations are sufficient to infer that the Committee was imprudent.  See Sellers, 2022 WL 17968685, at *8-9 (determining that similar allegations, when combined with other plausible allegations of unreasonable recordkeeping fees, were sufficient to state a claim of imprudence); see also Smith, 2022 WL 583569, at *6 (denying motion to dismiss where

plaintiffs alleged that defendants offered share classes that were composed of the same underlying investments as funds with lower cost structures and accepting as true plaintiff's allegation that revenue sharing was a detriment that did not justify the more expensive shares). While alleging that a fiduciary selected a more expensive version of a fund is insufficient alone, see Sellers, 2022 WL 17968685, at *8, such allegations, when combined with other plausible allegations that a fiduciary caused plan participants to pay excessive recordkeeping fees, is sufficient to state a claim of imprudence.  See id. at *9.  As discussed above, Plaintiffs have made several plausible allegations that the Committee breached the duty of prudence by causing them to pay excessive recordkeeping fees.  See D. 1 ¶¶ 73–74, 76, 104.

For all of these reasons, the Court denies Defendants' motion to dismiss Count I.

**B.      Failure to Monitor (Count II)**

Plaintiffs allege that MITRE and the Board breached their fiduciary monitoring duties by, *inter alia*, "[f]ailing to monitor and evaluate the performance of the Committee . . . to the detriment of the Plans and Plans' participants' retirement savings."  Id. ¶ 116.

> . . . ERISA Sections 409 and 502 require monitoring fiduciaries to ensure that fiduciaries are satisfying their obligations.  These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents.  Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

Sellers, 2022 WL 17968685, at *15 (citing 29 U.S.C. §§ 1109(a); 29 U.S.C. §§ 1132(a)(2), 1132(a)(3)).  "To the extent that plaintiffs have plausibly alleged that defendants breached their fiduciary duties directly, plaintiffs have also plausibly alleged that defendants have breached their duty to monitor."  Id.  Here, given that the Court has already determined that Plaintiffs alleged sufficient facts to infer that Defendants breached the duty of prudence, the Court concludes that Plaintiffs have also plausibly alleged that they breached their monitoring duties.

Accordingly, the Court denies Defendants' motion to dismiss Count II.

**C.    Plaintiff Aaron Brown's Article III Standing**

Defendants argue that Plaintiff Aaron Brown ("Brown") is barred from pressing his claims in this action because he previously filed an action against Defendants for similar claims that was dismissed for lack of subject matter jurisdiction based on standing in <u>Brown v. The MITRE Corp. et al.</u>, No. 21-cv-11605-RGS, D. 32 (D. Mass. April 28, 2022).  The Court agrees that the doctrine of issue preclusion bars Brown's claim.

Issue preclusion or collateral estoppel "bar[s] relitigation of an issue decided in an earlier action where: (1) the issues raised in the two actions are the same; (2) the issue was actually litigated in the earlier action; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was necessary to that judgment."  <u>Manganella v. Evanston Ins. Co.</u>, 700 F.3d 585, 591 (1st Cir. 2012) (citations omitted).  Plaintiffs rely on <u>Pace v. Town of Erving</u>, 294 F. Supp. 3d 5, 8 (D. Mass. 2018) to argue that "dismissal for lack of subject matter jurisdiction permits a second action on the same claim that corrects the deficiency found in the first action."  D. 20 at 28.  <u>Pace</u>, however involved rejecting that a plaintiff's claim was barred by res judicata where his initial case was dismissed for lack of subject matter jurisdiction for failure to exhaust the administrative process.  <u>Pace</u>, 294 F. Supp. 3d at 8.  That case does not change  the rule that dismissal for lack of subject matter jurisdiction "precludes relitigation of the issues determined in ruling on the jurisdictional question."  <u>Muniz Cortes v. Intermedics, Inc.</u>, 229 F.3d 12, 14 (1st Cir. 2000) (noting that "even assuming arguendo that res judicata does not bar the federal district court from adjudicating appellants' claims, the doctrine of collateral estoppel prevents the court from rehearing the *issue* of preemption") (emphasis in original).

Article III standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). Furthermore, a named plaintiff in representative ERISA claims must himself have a "concrete stake" in the outcome of the lawsuit.  Thole v. U. S. Bank N.A., __ U.S. __, 140 S. Ct. 1615, 1619 (2020); see Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005) (stating "[t]he prudential aspects of standing include, among other things, 'the general prohibition on a litigant's raising another person's legal rights'") (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  Applying these standards, another session of this Court (Stearns, J.) determined that Brown had not established Article III standing because he had invested only in a single fund in the relevant time period, which "belonged to the lowest cost class, and critically, paid no revenue-sharing fees (facts not disputed in Brown's opposition).  Brown's theory of damages, premised on the revenue sharing model, cannot explain how he was personally injured by MITRE's allegedly unreasonable fee practices."  Brown, No. 21-cv-11605-RGS, D. 32. Accordingly, the court "actually" and "necessar[ily]" determined the issue of Brown's Article III standing in its order of dismissal.  See id.; Manganella, 700 F.3d at 591.  Given this prior dismissal, issue preclusion bars "relitigation of the issues determined in ruling on the jurisdictional question"—namely, whether Brown satisfies the Article III standing requirements based upon the facts alleged in his prior complaint.  See Muñiz Cortes, 229 F.3d at 14.

Accordingly, the Court allows Defendants' motion to dismiss as to Brown.

## VI.  Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 16, as to Plaintiff Aaron Brown and DENIES the motion as to all other Plaintiffs.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRENDA L. LUCERO, HEATHER BARTON, ILONA
KOMPANIIETS and CYNTHIA HURTADO,
individually and on behalf of all others similarly
situated,

Plaintiffs,

v.

CREDIT UNION RETIREMENT PLAN
ASSOCIATION, THE BOARD OF DIRECTORS OF
THE CREDIT UNION RETIREMENT PLAN
ASSOCIATION, THE BOARD OF TRUSTEES OF
THE CREDIT UNION RETIREMENT PLAN
ASSOCIATION and JOHN DOES 1-30,

Defendants.

OPINION and ORDER

22-cv-208-jdp

---

Plaintiffs are four participants in the Credit Union Retirement Plan Association 401(k) Plan, a multiple-employer plan with more than 20,000 participants and $1.5 billion in assets. Plaintiffs contend that the entities responsible for investing the Plan's assets are violating the Employee Retirement Income Security Act (ERISA) by breaching their fiduciary duties to plan participants. Specifically, plaintiffs say that defendants are failing to control the Plan's recordkeeping and administrative costs. Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), contending that plaintiffs haven't alleged enough facts to support their claims. For the reasons explained below, the court concludes that plaintiffs have stated a plausible claim, so the motion to dismiss will be denied.

ANALYSIS

**A. Standing**

A threshold jurisdictional requirement in every federal lawsuit is standing, which requires the plaintiff to show three things: (1) she suffered an "injury in fact"; (2) the injury is "fairly traceable" to the challenged conduct of the defendant; and (3) the injury "is likely to be redressed" if the plaintiff succeeds on the lawsuit. by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In this case, the parties agree that excess fees qualify as an injury in fact, that the fees are traceable to defendants' conduct, and that the fees would likely be reduced if plaintiffs prevail on this lawsuit. But defendants contend that plaintiffs' standing is limited to the fees charged to the plaintiffs themselves and does not extend to the fees charged to participants of another employer's plan.

This argument is premature. Courts do not dismiss *parts* of claims at the pleading stage. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). Plaintiffs have standing to challenge any excessive fees charged to them, and that's all that matters for the purpose of defendants' motion to dismiss. Defendants rely on *Albert v. Oshkosh Corporation*, 47 F.4th 570, 577 (7th Cir. 2022), but the question in that case was about standing to assert particular claims; it wasn't about the scope of available relief on the claim. That issue may be relevant to deciding what the scope of any proposed class should be, but the court need not decide the issue now.

**B. Merits**

Plaintiffs are asserting two claims: (1) the Board of Trustees of the Credit Union Retirement Plan Association breached its duty of prudence by charging the Plan excessive

recordkeeping and administration fees;[1] and (2) the other defendants breached their duty to monitor the trustees by doing nothing to stop the trustees from acting imprudently. Defendants seek dismissal of both claims.[2] Plaintiffs refer to the Board of Trustees as the "Committee" throughout their complaint, so the court will do the same for the purpose of consistency. Plaintiffs define "recordkeeping" to cover of a wide range of administrative services.[3]

On a motion to dismiss, the question is whether the plaintiffs provided defendants with fair notice of their claims and alleged facts plausibly suggesting that they are entitled to relief. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020). The court concludes that plaintiffs have met that standard on both claims.

### 1. Duty of Prudence

The parties agree for the purpose of the motion to dismiss that the Committee is a plan fiduciary that may be sued under ERISA and that the Committee has a duty to act prudently.

---

[1] Plaintiffs refer generally in their complaint and brief to "Defendants" breaching the duty of prudence, but plaintiffs assert the claim against the Board of Trustees (and its members) only, presumably because the board was responsible for managing the Plan's investments. *See* Dkt. 1, ¶¶ 31–32, 94.

[2] In their opening brief, defendants observe that the complaint makes "a passing reference" to defendants' duty of loyalty under 29 U.S.C. § 1104(a), but plaintiffs don't allege any facts suggesting a breach of that duty. Plaintiffs say nothing about this theory in their opposition brief, so the court will assume that plaintiffs aren't asserting a claim for a breach of the duty of loyalty.

[3] Plaintiffs identify the following services as examples of recordkeeping: transaction processing, administrative services related to converting a plan from one recordkeeper to another, participant communications, maintenance of an employer stock fund, plan document services, plan consulting services, accounting and audit services, including the preparation of annual reports, compliance support, compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules, loan processing, brokerage services/account maintenance, distribution services, processing of qualified domestic relations orders. Dkt. 1, ¶¶ 73–76.

That duty is set forth in 29 U.S.C. § 1104(a)(1)(B), and it requires the fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." The duty includes "choosing wise investments and monitoring investments to remove imprudent ones." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

The parties also agree that the duty of prudence under ERISA doesn't require the fiduciary to limit fees below a predetermined threshold. *See Albert*, 47 F.4th at 579 ("[T]he ultimate outcome of an investment is not proof of imprudence." (internal quotation marks omitted)). Rather, "courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits." *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 680 (7th Cir. 2014).

In this case, like many cases involving claims for breach of fiduciary duty, plaintiffs don't know what process the fiduciary used to determine the fees paid for recordkeeping and administration, so plaintiffs must rely on circumstantial allegations to support a plausible claim. Plaintiffs rely on the following allegations in their complaint:

1) The Plan's total costs are higher than plans of a similar size. During the class period, the Plan had assets between $633 million and nearly $1.6 billion, and there were between 9,249 and 20,728 participants in the Plan. Dkt. 1, ¶¶ 53, 88. The Plan's total costs were .33 percent of total assets in 2020 and .43 percent in 2018. Dkt. 1. ¶¶ 53, 70. According to a study by the Investment Company Institute, the average asset-weighted total plan costs of plans worth more than $1 billion was .24 percent in 2019 and the median total plan cost for the same group was .28 percent in 2018. *Id.*, ¶ 69.[4]

---

[4] The complaint says that the average asset-weighted total plan cost was .22 percent, but, as defendants point out, the study says .24 percent. Dkt. 20-3, at 56. The 10th percentile was .15 percent and the 90th percentile was .45 percent. *Id.* at 57. The study says that "total plan costs" include "asset-based investment management fees, asset-based administrative and advice fees, and other fees (including insurance charges) from the Form 5500 and audited financial statements of 401(k) plans covered by ERISA." *Id.* at 54.

2) The Committee did not conduct requests for proposal at reasonable intervals during the class period. *Id.*, ¶ 84.

3) The Plan's "per participant" fees were between $235 and $271 from 2016 to 2021. *Id.*, ¶ 86. If individual employer members of the Plan had approached Vanguard, they could have obtained "per participant" fees of $100. *Id.*

4) The Plan's fees are higher than other large plans. Plaintiffs list six plans that have between 31,330 and 48,353 participants and between $2.7 billion and $10.9 billion in assets. *Id.*, ¶ 89. The recordkeeping and administrative costs of those plans ranged from $21 and $33 per participant in 2019. *Id.*

5) The cost of providing services "often" depends on the number of participants in a plan. *Id.*, ¶ 78.

From this, plaintiffs say that reasonable recordkeeping fees for the Plan would be between $35 and $100. *Id.*, ¶ 91.

While the parties were briefing defendants' motion to dismiss, the Court of Appeals for the Seventh Circuit decided *Albert*, 47 F.4th 570, another case in which the plaintiff asserted a claim against a plan fiduciary for excessive fees. As in this case, the plaintiff relied on allegations in the complaint that the defendant paid higher recordkeeping fees than similar plans. Specifically, the comparator plans paid an average annual recordkeeping fee of $32 to $45 per plan participant, but the defendant paid an average annual recordkeeping fee of $87 per participant. *Id.* at 579. The court held that identifying similar plans that charged lower fees wasn't enough to state a plausible claim that the defendant breached its duty of prudence. *Id.* The court agreed with the defendant that the comparison wasn't sufficient because the complaint was "devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided." *Id.* The court relied on *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022), which held that an ERISA plaintiff failed to state a duty-of-

prudence claim because the complaint "failed to allege that the [recordkeeping] fees were excessive relative to the services rendered."

Defendants say that *Albert* requires dismissal of plaintiffs' duty-of-prudence claim because plaintiffs' complaint doesn't identify the services that defendants or the comparator plans offer. The question is a close one, but the court concludes that *Albert* is distinguishable for multiple reasons and that defendants' objections are better addressed in a motion for summary judgment rather than at the pleading stage.[5] The court of appeals "emphasize[d] that recordkeeping claims in a future case could survive the context-sensitive scrutiny of a complaint's allegations" if the complaint "provide[s] the kind of context that could move this claim from possibility to plausibility." *Albert*, 47 F.4th at 580. Plaintiffs have provided the necessary context.

First, plaintiffs allege in their complaint that there isn't a meaningful difference in the recordkeeping services offered by large plans and that whatever differences there are "do not affect the amount charged by recordkeepers." Dkt. 1, ¶ 75. Those allegations were missing in *Albert,* and other district courts in the Seventh Circuit have concluded since *Albert* that similar allegations are enough to infer that the services rendered by the cheaper plans are comparable. *See Coyer v. Univar Solutions USA Inc.*, No. 22 CV 362, 2022 WL 4534791, at *2 (N.D. Ill. Sept. 28, 2022) (allegation that defendant charged higher fees than comparable plans with "virtually the same package of services" was sufficient to state a claim); *Guyes v. Nestle USA,*

---

[5] The court agrees with defendants that the Committee's alleged failure to solicit bids was not in itself a breach of fiduciary duty. *Albert* reaffirmed the court's holding from *Divane v. Northwestern Univ.*, 953 F.3d 980, 990–91 (7th Cir. 2020), "reject[ing] the notion that a failure to regularly solicit quotes or competitive bids from service providers breaches the duty of prudence." But plaintiffs rely on more than just a failure to solicit bids to support their claim.

*Inc.*, No. 20-CV-1560, 2022 WL 18106384, at *8 (E.D. Wis. Nov. 21 2022) (allegation that "services are essentially the same no matter who provides them . . . provides the necessary context to make this claim plausible."), *report and recommendation adopted Guyes v. Nestle USA Inc.,* No. 20-CV-1560, 2023 WL 22629, at *1 (E.D. Wis. Jan. 3, 2023).

Second, the plaintiffs allege in this case that defendants' recordkeeping fees are approximately 10 times higher than the fees of plans with a similar number of participants. That difference is much larger than the disparity alleged in *Albert*. A cheaper plan isn't necessarily better, *see Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009), but the difference is so significant that it provides some basis for inferring that defendants are using an imprudent process to choose investments.

Third, plaintiffs allege that the Plan's fees per participant are substantially higher even than much smaller plans of fewer than 1,000 participants. Plaintiffs also allege that the cost per participant should decrease as the number of participants increases, so it is reasonable to infer that the Plan's fees per participant should not be higher than plans that a fraction of the size.

Fourth, plaintiffs allege that the Plan's total costs are substantially higher than the average plan of a similar size. This case is about recordkeeping fees, not costs generally, so total costs provide limited insight. But the higher total costs suggest that higher recordkeeping costs are not offset by lower costs elsewhere, so the allegation supports a plausible inference that the Committee is acting imprudently.

Defendants challenge the strength of plaintiffs' allegations on several grounds. First, defendants submit the tax documents (Form 5500) that plaintiffs relied on in their complaint

to compare the Plan's fees with other plans.[6] Specifically, plaintiffs used the figure entered in Schedule C, Section 2(d), which is for "direct compensation paid by the plan." Defendants point out that Section 2(b) lists the codes for the services that are covered by Section 2(d) and that the service codes listed in defendants' form are not the same as the service codes for the other plans. For example, defendants listed services for recordkeeping, information management, consulting, participant loan processing, participant communication, investment management, direct payments from the plan, and investment management fees paid indirectly by the plan, Dkt. 20-1, at 11; the WPP Group plan listed services for recordkeeping, information management, consulting, directed trustee services, participant loan processing, investment management fees paid indirectly by plan, and "other fees," Dkt. 20-7, at 7; and the Deseret plan listed services for recordkeeping only, Dkt. 20-5, at 7.[7]

Defendants say that the different codes show that plaintiffs are comparing apples and oranges. But the court must draw all reasonable inferences in plaintiffs' favor at this stage of the case. *Vesuvius USA Corporation v. American Commercial Lines LLC*, 910 F.3d 331, 333 (7th Cir. 2018). The codes listed by the other plans are not identical to defendants' codes, but there is substantial overlap in the services listed by plans such as the WPP Group plan, which has fees of $27 per participant. Defendants don't explain how the few differences between the services provided by the plans account for approximately $200 per participant in fees.

---

[6] The court can consider these documents without converting the motion to dismiss into a motion for summary judgment because plaintiffs relied on the documents in their complaint. *See Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014). Plaintiffs do not object to considering these documents.

[7] Plaintiffs cite the Form 5500 instructions in their complaint, and defendants provided a copy of those instructions with their motion. Dkt. 20-10. The instructions identify the services that correspond with the codes printed in the schedule. *Id.* at 28.

Furthermore, the Deseret plan lists only the recordkeeping code, and that plan has fees of $22 per participant, a similar amount to the WPP Group plan, which lists several other codes. This supports plaintiffs' allegation that differences in services don't have a substantial impact on the fees charged by recordkeepers.

Second, defendants say that all the comparators that plaintiffs identify are single-employer plans rather than multiple-employer plans like the plan at issue in this case. Citing a rule-making notice in the Federal Register, defendants say that "the scale efficiencies of [multiple-employer plans] catering to small businesses would . . . likely be smaller than the scale efficiencies enjoyed by very large single-employer plans" because multiple-employer plans incur costs related to each employer member. 84 Fed. Reg. 31,777, 31,784 (July 3, 2019).

This argument cannot carry the day in the context of a motion to dismiss. Plaintiffs allege that the number of participants in a plan has the greatest effect on fees per participant, and the court must accept that allegation as true. *See Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.,* 179 F.3d 523, 526 (7th Cir. 1999). The same notice that defendants cite repeatedly states that multiple-employer plans can reduce their fees because of their larger size.[8] It is true that the notice also states that the savings of multiple-employer plans would likely be smaller than large single-employer plans, but nothing in the notice cited by defendants supports

_____

[8] 84 Fed. Reg. 31777, 31,783 ("Most MEPs could be expected to benefit from scale advantages that small businesses do not currently enjoy and to pass on some of the savings to participating employers and employees."); *id.* at 31,784 ("As scale increases, MEPs would spread fixed costs over a larger pool of participating employers and employee participants. Scale efficiencies can be very large with respect to asset management and may be smaller, but still meaningful, with respect to recordkeeping."); *id.* ("[I]n most cases, the savings from the scale efficiency of [multiple-employer plans] would be greater than the savings from scale efficiencies that other providers of bundled financial services may offer to small employers.").

the view that a multiple-employer plan should have recordkeeping costs that are 10 times higher than a single-employer plan with a similar number of participants.

Third, defendants make a similar argument that Vanguard recordkeeping fees charged to smaller employer plans aren't comparable because multiple-employer plans must comply with regulatory requirements that don't apply to smaller plans. Defendants again cite the Federal Register notice for this proposition, but the central premise of that notice is that multiple-employer plans have advantages over smaller, single-employer plans, including lower fees. Defendants also say that the $100 figure from Vanguard is misleading because the brochure plaintiffs cite offers fees ranging from $50 to $231 per participant. Dkt. 20-2. But the higher fees are for plans with fewer than 15 participants, so that does not undermine plaintiffs' theory that more participants generally translate into lower fees per participant.

Defendants have raised fair points about the probative value of the evidence cited in plaintiffs' complaint to show a violation of defendants' duty of prudence. If plaintiffs had presented the same evidence in response to a summary judgment motion, the court would grant the motion. But at the pleading stage, plaintiffs' burden is to allege facts that raise their right to relief "above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Plaintiffs have met that relatively low burden, so the court will deny defendants' motion to dismiss the claim against the Committee.

### 2.  Duty to monitor

Plaintiffs contend that the Credit Union Retirement Plan Association and the Board of Directors for the Credit Union Retirement Plan Association breached their fiduciary duty to plaintiffs in the following ways:

1) failing to monitor and evaluate the performance of the Committee or have a system in place for doing so while the Plan suffered significant losses as a result of the Committee's imprudent conduct;

2) failing to monitor the processes by which Plan investments were evaluated; and

3) failing to remove Committee members who maintained investments with excessive fees.

Dkt. 1, ¶ 105.

Defendants acknowledge that a failure to monitor is a valid theory for breach of fiduciary duty under ERISA, and they agree that the Association and the Board of Directors had a duty to monitor the Committee. The court of appeals recognized the duty in *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011), relying on the following guidance from the Department of Labor:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of procedure.

*Id.* at 573 (quoting 29 C.F.R. § 2509.75–8 at FR–17).

Defendants challenge this claim on two grounds. First, they say that plaintiffs haven't alleged any facts supporting the claim. Second, they say that a claim for failing to monitor is derivative of a claim for failing to invest prudently, so the duty-to-monitor claim fails for the same reasons that the duty-of-prudence claim fails. The court need not consider the second argument because the court has rejected defendants' argument that the duty-of-prudence claim should be dismissed.

As for defendants' argument that plaintiffs haven't pleaded enough facts, this is another close question, but the court concludes that plaintiffs have stated a plausible claim for breach of the duty to monitor. Defendants say that plaintiffs should have included allegations about what an appropriate monitoring process would have been, how defendants should have known that the Committee was breaching its fiduciary duty, or how better monitoring would have prevented plaintiffs' alleged losses. But these facts are either not required or can be reasonably inferred from the complaint.

The specificity required to state a claim depends on context, especially the complexity of the claim. *See McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010). Plaintiffs' claim for breach of the duty to monitor is relatively straightforward. It is essentially a failure-to-intervene theory: the Association and the Board of Directors failed to use their supervisory authority over the Committee to stop the Committee from continuing with investments that charged obviously exorbitant fees. In this context, plaintiffs' allegations against the Committee are doing most of the work. A claim that the other defendants should have stopped the Committee doesn't add a significant amount of complexity. And it is reasonable to infer from plaintiffs' allegations about the breach of fiduciary duty that the fees were so excessive that the other defendants should have known that they needed to intervene. Plaintiffs didn't identify specific facts about any monitoring process that defendants had in place, but defendants identify no way that plaintiffs would know facts about an internal process. *See Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015) ("Plaintiffs' pleading burden should be commensurate with the amount of information available to them.").

Defendants cite three cases in which district courts dismissed failure-to-monitor claims for the plaintiff's failure to allege enough facts. But the problem in all of those cases was that it wasn't reasonable to infer from the allegations in the complaint that the defendants would have known that another fiduciary was breaching its duties. *See Szalanski v. Arnold,* No. 19-cv-940-wmc, 2022 WL 2315593, at *6 (W.D. Wis. June 28, 2022) (failure-to-monitor claim based on another fiduciary's decision to approve a single transaction); *Bartnett v. Abbott Laboratories,* 492 F. Supp.3d 787, 797–98 (N.D. Ill., 2020) (failure-to-monitor claim based on a failure to prevent a scam); *Neil v. Zell,* 677 F. Supp. 2d 1010, 1023–24 (N.D. Ill. 2009) (failure-to-monitor claim based solely on "the short amount of time between [the fiduciary's] appointment and the deal" being challenged in the lawsuit). In this case, plaintiffs' claim is based on an alleged problem that persisted for years, so it is reasonable to infer at the pleading stage that defendants knew about the problem and failed to do anything about it.

## ORDER

IT IS ORDERED that defendants' motion to dismiss, Dkt. 18, is DENIED.

Entered March 9, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

13

EXHIBIT D

| From: | ECFnotice@mad.uscourts.gov |
| Sent: | Wednesday, March 15, 2023 3:36 PM |
| To: | CourtCopy@mad.uscourts.gov |
| Subject: | Activity in Case 1:22-cv-10045-AK Norton et al v. Mass General Brigham Incorporated et al Order on Motion to Dismiss |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

United States District Court

District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 3/15/2023 at 3:35 PM EDT and filed on 3/15/2023

| Case Name: | Norton et al v. Mass General Brigham Incorporated et al |
| Case Number: | 1:22-cv-10045-AK |
| Filer: | |
| Document Number: | 69(No document attached) |

Docket Text:
**District Judge Angel Kelley: ELECTRONIC ORDER entered.**

**Defendants' [26] motion to dismiss is DENIED.**

**Plaintiffs allege that during their employment at Massachusetts General Hospital, Defendants, as fiduciaries of their pension fund, the Consolidated 403(b) Program of Mass General Brigham and Member Organizations (the "Plan"), did not prudently manage the Plan's administration and recordkeeping fees. The Plan's assets under management, as of September 30, 2020, were $10,264,028,000, making it a "jumbo" plan. [Dkt. 22 ("Am. Cmplt.") at ¶¶ 10, 52]. Participants were charged an annual recordkeeping fee, which covered the Plan's services related to transaction processing, administrative services, participant communications, plan document services, and compliance support, among other areas. [Id. at ¶ 65]. This fee, which ranged from $76 in 2016 to $54 in 2020, was collected directly from plan assets and indirectly from revenue sharing. [Id. at ¶¶ 71, 78].**

**First, Plaintiffs allege that the Plan's range of fees is excessively high compared to similar jumbo pension funds. [Id. at ¶¶ 78, 84]. Specifically, Plaintiffs list seven similar plans having more than 30,000 participants and approximately $3 billion in assets, whose 2019 direct recordkeeping fees range from $21 to $30. [Id. at ¶ 84]. Second, Plaintiffs allege that the recordkeeping costs should have been lower because of the large number of participants and**

the Plan's greater ability to negotiate for lower fees.  [Id. at ¶¶ 70, 85 n.13].  Third, Plaintiffs allege that to reveal the Plan's mismanagement, Plaintiffs requested meeting minutes from Mass General and the Plan's Committee prior to filing the lawsuit but received no such documentation or acknowledgment of whether it existed.  [Id. at ¶ 57].  Plaintiffs argue that the totality of this circumstantial evidence points to the Defendants' mismanagement of the fund under ERISA.  Because of this mismanagement, Plaintiffs allege that the Plan and its participants have lost millions of dollars in retirement savings.  On May 16, 2022, Defendants filed their motion to dismiss Plaintiffs ' amended complaint for failure to state a claim.  [Dkt. 26].

Viewed "as a whole," Plaintiffs' amended complaint states a plausible claim of breach of fiduciary duty.  See García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  In ERISA cases, plaintiffs may not have access to the information that would otherwise enable them to make well-pleaded factual allegations, but "allegations are sufficient so long as they make 'reasonable inferences'... based on the information available to them."  Sellers v. Trustees of Coll., No. CV 22-10912-WGY, 2022 WL 17968685, at *7 (D. Mass. Dec. 27, 2022) (comparatively high recordkeeping fees gave rise, in part, to plausible claim of breach of duty of prudence).  Excessive record keeping fees and the failure to negotiate lower fees in comparison to smaller plans are some factors that may permit a court to make a "reasonable inference" of breach of fiduciary duties based on the facts that are available.  Id.; see In re Sutter Health ERISA Litig., 2023 WL 1868865, at *10 (E.D. Cal. Feb. 9, 2023) (denying motion to dismiss in part because it was "unclear why" the larger plan "could not negotiate a much lower fee.").  This is especially pertinent where the plan in question is a jumbo plan with assets larger than many of its comparators, as is the case here, and still charges higher recordkeeping fees.  [See Am. Cmplt. at ¶¶ 9-10, 52, 84].

Defendant highlights cases from other circuits in which claims of a breach of prudence based on excessive recordkeeping fees required more precise factual allegations to demonstrate that the services of the comparator plans are like the plan at issue.  See Smith v. CommonSpirit Health, 37 F.4th 1160, 1169 (6th Cir. 2022); Albert v. Oshkosh Corp., 47 F. 4th 570, 579-80  (7th Cir. 2022), reh'g en banc denied,No. 21-2789, 2022 WL 4372363, (7th Cir. Sept. 21, 2022); Matousek v. MidAmerican Energy Company, 51 F.4th 274, 279-80 (8th Cir. 2022).  In the absence of First Circuit authority that directly addresses the question, this Court is persuaded by the trend within the First Circuit's district courts of allowing similar complaints to survive motions to dismiss and proceed to discovery.  See, e.g., Sellers, 2022 WL 17968685, at *7;  Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 137 (D. Mass. 2021) (finding that the claim that fees were excessive relative to similar plans was sufficient to deny motion to dismiss); Short v. Brown Univ., 320 F. Supp. 3d 363, 371 (D.R.I. 2018) (denying motion to dismiss in part because "[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss" (alteration in original) (quoting Cassell v. Vanderbilt Univ., 285 F.Supp.3d 1056, 1064 (M.D. Tenn. 2018))); Brown et al. v. Mitre Corp., No. 22-cv-10976-DJC, 2023 WL 2383772 at *3-5, (D. Mass. Mar. 6, 2023) (denying motion to dismiss excessive fee claim and distinguishing Matousek, Smith, and Albert because they contained materially different allegations and conflicted with other District Courts in the First Circuit for pleading standards in an ERISA case); Adams et al v. Dartmouth-Hitchcock Clinic, No. 1:22-cv-00099-LM, (D.N.H. Feb. 10, 2023) (Same).

Accordingly, Plaintiffs have sufficiently stated their claims of breach of duty of prudence and failure to monitor.  Defendants' motion to dismiss [Dkt. 26] is thus DENIED.

**(Pacho, Arnold)**

**1:22-cv-10045-AK Notice has been electronically mailed to:**

Jeffrey R. Hellman     jeff@jeffhellmanlaw.com, jeffreyhellman@me.com

Jeremy Blumenfeld     jeremy.blumenfeld@morganlewis.com, bocalendardepartment@morganlewis.com, sandra.moore@morganlewis.com

Mark K. Gyandoh     markg@capozziadler.com, lindag@capozziadler.com

Keri L. Engelman     keri.engelman@morganlewis.com, BOCalendarDepartment@morganlewis.com, nycalendardepartment@morganlewis.com, shane.ohalloran@morganlewis.com, yasmina.zaharian@morganlewis.com

Donald R. Reavey     donr@capozziadler.com

Lakeisha R. Andress     lakeisha.andress@morganlewis.com

**1:22-cv-10045-AK Notice will not be electronically mailed to:**

EXHIBIT E

**Linda Gussler**

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Wednesday, March 15, 2023 3:40 PM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:22-cv-10069-AK Monteiro et al v. The Children's Hospital Corporation et al Order on Motion to Dismiss for Failure to State a Claim |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

United States District Court

District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 3/15/2023 at 3:39 PM EDT and filed on 3/15/2023

| | |
|---|---|
| **Case Name:** | Monteiro et al v. The Children's Hospital Corporation et al |
| **Case Number:** | 1:22-cv-10069-AK |
| **Filer:** | |
| **Document Number:** | 56(No document attached) |

**Docket Text:**
District Judge Angel Kelley: ELECTRONIC ORDER entered.

Defendants' [27] motion to dismiss is DENIED. As a threshold matter, Plaintiffs have standing to pursue their claims. Defendants argue that Plaintiffs cannot challenge funds in which they did not invest. [Dkt. 28 at 19]. That argument has been rejected by several courts. See, e.g., Velazquez v. Mass. Fin. Servs. Co., 320 F. Supp. 3d 252, 257 (D. Mass. 2018). Here, Plaintiffs allege that they invested in four specific target date funds and Defendants' actions as to those funds (and others) affected the Plan as a whole, including recordkeeping fees. [See Dkt. 1 at ¶¶ 5-6]. That is sufficient to establish Article III standing at this juncture. Defendants also argue that Plaintiffs lack standing because they do not allege that the funds in which they did invest underperformed any of the comparator funds during the period Plaintiffs held those investments. [Dkt. 28 at 20]. Such an allegation is not required to establish standing here. Plaintiffs' allegations that they each "maintained an investment through the Plan" in specific target date funds "[d]uring the Class Period" that were "subject to the excessive recordkeeping and administrative costs alleged below" [Dkt. 1 at ¶¶ 1, 9-12] were sufficient to claim an "injury in fact, as they allege that they personally paid excessive fees in connection with their own investments," In re Biogen, Inc. ERISA Litig., No. 21-CV-11325-DJC, 2021 WL 3116331, at \*4 (D. Mass. July 22, 2021).

Viewed "as a whole," Plaintiffs' complaint states a plausible claim of breach of fiduciary duties.  See García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013); see also Sellers v. Trus. of Coll., -- F. Supp. 3d --, No. 22-CV-10912-WGY, 2022 WL 17968685, at *1 (D. Mass. Dec. 27, 2022).  The duty of prudence requires ERISA fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The duty of loyalty requires ERISA fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1)(A).  There is a "continuing duty to monitor trust investments and remove imprudent ones."  Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015).

Plaintiffs allege several facts in support of their claim that Defendants breached their fiduciary duties by offering actively-managed target date funds (the "Active Suite") as investment options.  Plaintiffs compare the Active Suite to passively-managed target date funds (the "Index Suite") offered by the same company and to other similarly-sized, actively-managed target date funds offered by various companies, such as by providing data on annualized returns.  [Dkt. 1 at ¶¶ 60-82].  Plaintiffs also allege that Defendants "never undertook a review of the performance of the funds comprising" the Active Suite and that several of the funds "lacked a sufficient performance history to enable fiduciaries to perform a meaningful analysis."  [Id. at ¶¶ 69-70]; see Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 133-34 (D. Mass. 2021) (denying motion to dismiss where the plaintiffs alleged, in part, that "the funds had insufficient performance histories upon which they could be evaluated").  Plaintiffs further claim that Defendants failed to offer available, lower-cost share classes for many of the Plan's funds.  [Dkt. 1 at ¶¶ 84-85]; see Sellers, 2022 WL 17968685, at *13 (denying a motion to dismiss where the plaintiffs included "non-speculative allegations that cheaper share classes were available"); Brown v. Mitre Corp., No. 22-CV-10976-DJC, 2023 WL 2383772, at *7 (D. Mass. Mar. 6, 2023); see also Davis v. Salesforce.com, Inc., No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022) (holding that allegations that "'more expensive share classes chosen by [the] [d]efendants were the same in every respect other than price [as] their less expensive counterparts'. . . plausibly suggest that defendants acted imprudently by failing to switch to lower-cost alternatives").

Plaintiffs buttress their claims of underperformance by describing various articles that were critical of the Active Suite and by noting net outflows from the Active Suite to other investments.  [Dkt. 1 at ¶¶ 74 & n.13, 75-76]; see In re Biogen, 2021 WL 3116331, at *6.  Plaintiffs also allege Defendants allowed recordkeeping and administrative fees "that far exceeded the reasonable market rate," listing the average per person fees paid by seven other "similarly sized" and "comparable" defined contribution plans.  [Dkt. 1 at ¶¶ 52, 54-56]; see Brown, 2023 WL 2383772, at *3-5.  "Taking into account the totality of the circumstances," Plaintiffs have pleaded "sufficient factual allegations to state a plausible claim against [Defendants] for breach of the duty of prudence as a result of unreasonable fees and/or imprudent investment options."  Sellers, 2022 WL 17968685, at *14.

Even if there are alternative, reasonable explanations for Defendants' conduct, at this stage of the litigation, the facts alleged "provide a sound basis for comparison—a meaningful benchmark"—suggesting that the Active Suite underperformed and that the Plan was needlessly more expensive than similar plans, which supports a plausible claim that the Defendants' actions breached their fiduciary duties.  See Davis v. Washington Univ. St. Louis, 960 F.3d 478, 484 (8th Cir. 2022).  Because the remaining claims are derivative of the breach-of-fiduciary-duty claim, they also survive dismissal.  [See Dkt. 28 at 18 n.21]; see also Kruger

**v. Novant Health, Inc.**, 131 F. Supp. 3d 470, 474-80 (M.D.N.C. 2015) (denying a motion to dismiss where the allegations of the defendants' breach of the duty of loyalty were tied to allegations of their breach of the duty of prudence).

**(Pacho, Arnold)**

**1:22-cv-10069-AK Notice has been electronically mailed to:**

John J. Roddy     jroddy@baileyglasser.com, john-roddy-1508@ecf.pacerpro.com, mmcclay@baileyglasser.com, wjohnson@baileyglasser.com

Jeremy Blumenfeld     jeremy.blumenfeld@morganlewis.com, bocalendardepartment@morganlewis.com, sandra.moore@morganlewis.com

Mark K. Gyandoh     markg@capozziadler.com, lindag@capozziadler.com

James E. Miller     jemiller@millershah.com

Laurie Rubinow     lrubinow@millershah.com, baferling@millershah.com, pleadings@millershah.com

Kolin C. Tang     kctang@millershah.com

James C. Shah     jcshah@millershah.com, pleadings@millershah.com

Keri L. Engelman     keri.engelman@morganlewis.com, BOCalendarDepartment@morganlewis.com, joshua.adler@morganlewis.com, nycalendardepartment@morganlewis.com, yasmina.zaharian@morganlewis.com

Stephanie Rosel Reiss     stephanie.reiss@morganlewis.com

Donald R. Reavey     donr@capozziadler.com

Alec J. Berin     ajberin@millershah.com, jadilger@millershah.com, pleadings@millershah.com

John C. Roberts     jcroberts@millershah.com, pleadings@millershah.com, smoss@millershah.com

**1:22-cv-10069-AK Notice will not be electronically mailed to:**

EXHIBIT F

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROBERT J. STENGL, DANIEL WILL, RONALD F. KOSEWICZ, GARY K. COLLEY, LESLIE D. DIAZ, AMAYA JOHNSON, WILLIAM A. MCKINLEY and JOHN KARIPAS,**

                **Plaintiffs,**

**v.**                                       **Case No: 6:22-cv-572-PGB-LHP**

**L3HARRIS TECHNOLOGIES, INC., THE BOARD OF DIRECTORS OF L3HARRIS TECHNOLOGIES, INC. and THE INVESTMENT COMMITTEE OF L3HARRIS TECHNOLOGIES, INC.,**

                **Defendants.**

_____/

## <u>ORDER</u>

This cause comes before the Court on Defendants L3Harris Technologies, Inc., the Board of Directors of L3Harris Technologies, Inc., and the Investment Committee of L3Harris Technologies, Inc.'s Motion to Dismiss (Docs. 43, 46 (the "**Motion**")),[1] Plaintiffs Robert Stengl, Daniel Will, Ronald F. Kosewicz, Gary K. Colley, Leslie D. Diaz, Amaya Johnson, William A. McKinley, and John Karipas's

---

[1] Doc. 43 is a redacted version of the Motion which was filed as an unredacted version under seal at Doc. 46.

response in opposition (Doc. 49), and Defendants' reply thereto (Doc. 53). Upon consideration, the Motion is due to be denied.

## I.    BACKGROUND[2]

This putative class action stems from alleged fiduciary duty violations with respect to a company's employee retirement plan governed by the Employee Retirement Income Security Act of 1974 ("**ERISA**").   Specifically, Plaintiffs Robert J. Stengl, Daniel Will, Ronald F. Kosewicz, Gary K. Colley, Leslie D. Diaz, Amaya Johnson, William A. McKinley and John Karipas ("**Plaintiffs**") are all employees or former employees of Defendant L3Harris Technologies, Inc. ("**Defendant L3**"), a leading defense and aerospace contractor with billions in annual revenue, tens of thousands of employees, and customers across the globe. (Doc. 40, ¶¶ 26–34, 36). As employees of Defendant L3, the Plaintiffs participated in Defendant L3's ERISA-governed retirement savings benefit plan (the "**Plan**"). (*Id.* ¶¶ 26–35).

> Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits. When Congress enacted ERISA it wanted to make sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it. Accordingly,

---

[2]   This account of the facts comes from the Plaintiffs' Amended Complaint. (Doc. 40). The Court accepts the well-pled factual allegations therein as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007). The Court will highlight, however, where the force of some of these claims are weakened by other documents properly under consideration at the motion to dismiss stage.

> ERISA tries to make as certain as possible that pension fund
> assets will be adequate to meet expected benefits payments.

*Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).

Defendant L3's Plan is a defined contribution plan with a 401(k) feature covering eligible employees of Defendant L3 and some of its subsidiaries; the Plan allows each participant to choose specific amounts to contribute to individual accounts which are invested in selected funds from a menu of options available to the Plan. (Doc. 40, ¶¶ 19, 37, 44, 48–49, 58). Starting on November 23, 2015 through at least June 14, 2022, the Plan had at least $4.5 billion dollars in assets under management. (*Id.* ¶ 16). At the end of 2019, the Plan had over $13.5 billion dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. (*Id.*). The Plan also has a large number of participants: from 2015 to 2019, the Plan's participants with account balances ranged from 47,000 to 76,240. (*Id.* ¶ 17). For comparison, in 2020 there were only 198 defined employer ERISA contribution plans with 15,000 to 19,999 participants with account balances. (*Id.*). For plans with 20,000 to 29,999 participants with account balances there were only 194 of such plans. (*Id.*). For plans with 30,000 to 39,000 participants with account balances, only 90 of those plans existed. (*Id.*). And there were only 123 plans with more than 50,000 participants with account balances in 2020. (*Id.*).

Defendant L3 through its Board of Directors (the "**Defendant Board**") selected and appointed an Investment Committee (the "**Defendant Investment Committee**") and its members to oversee, manage, and achieve

the goals of the Plan as defined in the Plan's Investment Policy Statement (the "**IPS**") and in alignment with ERISA rules and regulations. (*Id.* ¶¶ 37–43, 113). From a 30,000-foot view, this means that the Defendant Investment Committee must determine the appropriateness of the Plan's investment fund offerings, monitor the performance of these investment fund options in absolute and relative terms as compared with their peers, and ensure the Plan incurs no more expenses than is reasonable to achieve the Plan's goals. (*Id.* ¶¶ 37, 58). More specifically, the Plan's IPS requires that the Defendant Investment Committee "establish, and modify, as appropriate, the investment policies for the Plan and the investment objectives and performance goals for the management of Plan investment options, and monitor the performance of investment options against performance criteria;" "select, evaluate, retain, terminate and approve the fees and other retention terms of investment consultants, or other legal, finance or other experts or advisors, including approving, entering into or amending the terms of the related service agreement;" and "establish, suspend, terminate or modify separate investment options and allocate assets into appropriate options of the Plan." (*Id.* ¶ 44).

Contrary to these mandates, though, Plaintiffs allege that in sum total the following actions or omissions by Defendants resulted in the selection and maintenance of several funds with high management, administration, and recordkeeping fees that wasted the assets of the Plan because of unnecessary costs. (*Id.* ¶ 74).

*1.  Excessive Fees*

Plaintiffs allege that many of the Plan's funds had investment management fees in excess of fees for similar funds in similarly sized plans. (*Id.* ¶ 75). In a recent ERISA case regarding similar allegations of fiduciary duty violations the Supreme Court provided background information on investment management fees and their "expense ratios:"

> [I]nvestment options typically offered in retirement plans, such as mutual funds and index funds, often charge a fee for investment management services. Such fees compensate a fund for designing and maintaining the fund's investment portfolio. These fees are usually calculated as a percentage of the assets the plan participant chooses to invest in the fund, which is known as the expense ratio.

*Hughes v. Northwestern University*, 142 S. Ct. 737, 740 (2022). "For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets." (Doc. 40, ¶ 76). Because the expense ratio is deducted from a participant's periodic return for any given fund, the compounded return of any given investment is concomitantly reduced over time. (*Id.*). Plaintiff provides a snapshot comparison of several of the 2021 expense ratios for some Plan Funds chosen by the Defendant Investment Committee and compares them to an Investment Company Institute study[3] of both median and average expense ratios for similarly styled defined contribution ERISA funds:

---

[3]   (Doc. 40, ¶ 79 n.8) (citing *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018*, (July 2021) https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf (last visited Mar. 9, 2023) (hereafter "(the **ICI Study**").

5

| ICI Median Chart (*Id.* ¶ 79) | | | |
|---|---|---|---|
| **Plan Fund** | **Expense Ratio("ER")** | **Investment Style** | **ICI ER Median** |
| Fid Fr 2015 K | 0.50% | Target-date | 0.40% |
| Fid Fr 2020 K | 0.54 % | Target-date | 0.40% |
| Fid Fr 2025 K | 0.57 % | Target-date | 0.40% |
| Fid Fr 2030 K | 0.61 % | Target-date | 0.40% |
| Fid Fr 2035 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2040 K | 0.64% | Target-date | 0.40% |
| Fid Fr 2045 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2050 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2055 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2060 K | 0.64 % | Target-date | 0.40% |
| Fid Magellan K | 0.59 % | Domestic Equity | 0.31% |
| T. Rowe SC Stk I | 0.59% | Domestic Equity | 0.31% |
| Dodge & Cox Stock | 0.59% | Domestic Equity | 0.31% |
| Am Growth Fd Am R6 | 0.59% | Domestic Equity | 0.31% |
| Fidelity Balanced K | 0.59% | Non-Target-date Balanced | 0.17% |
| Fidelity Div Int'l K | 0.59% | International Equity | 0.49% |
| Fidelity Div Int'l K6 | 0.59% | International Equity | 0.49% |
| Dodge & Cox Inc. | 0.59% | Domestic Bonds | 0.37% |
| Fid Fr K Inc. | 0.42 % | Target-date | 0.40% |
| Fid Fr 2005 K | 0.44 % | Target-date | 0.40% |
| Fid Fr 2010 K | 0.47 % | Target-date | 0.40% |

| ICI Average Chart (*Id.* ¶ 80) | | | |
|---|---|---|---|
| **Plan Fund** | **Expense Ratio** | **Investment Style** | **ICI ER Average** |
| Fid Fr 2015 K | 0.50 % | Target-date | 0.41% |
| Fid Fr 2020 K | 0.54 % | Target-date | 0.41% |
| Fid Fr 2025 K | 0.57 % | Target-date | 0.41% |
| Fid Fr 2030 K | 0.61 % | Target-date | 0.41% |
| Fid Fr 2035 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2040 K | 0.64% | Target-date | 0.41% |
| Fid Fr 2045 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2050 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2055 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2060 K | 0.64 % | Target-date | 0.41% |
| Fid Magellan K | 0.59 % | Domestic Equity | 0.37% |
| T. Rowe SC Stk I | 0.59% | Domestic Equity | 0.37% |
| Dodge & Cox Stock | 0.59% | Domestic Equity | 0.37% |
| Am Growth Fd Am R6 | 0.59% | Domestic Equity | 0.37% |
| Fidelity Balanced K | 0.59% | Non-Target-date Balanced | 0.30% |
| Fidelity Div Int'l K | 0.59% | International Equity | 0.47% |
| Fidelity Div Int'l K6 | 0.59% | International Equity | 0.47% |
| Dodge & Cox Inc. | 0.59% | Domestic Bonds | 0.32% |
| Fid Fr K Inc. | 0.42 % | Target-date | 0.41% |
| Fid Fr 2005 K | 0.44 % | Target-date | 0.41% |
| Fid Fr 2010 K | 0.47 % | Target-date | 0.41% |

2.   *Lower Available Fee Share Classes*

Plaintiffs further allege that several of the Plan's funds with substantial assets were not in the lowest fee share class available to the Plan. (*Id.* ¶ 83). This is allegedly an issue because many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors, but there is no difference between share classes other than cost—the funds hold identical investments and have the same manager. (*Id.* ¶ 84). If institutional share classes are otherwise identical to the other share classes but with lower fees, not switching into the lower cost identical option thus allegedly harms Plan participants' bottom line.  (*Id.* ¶¶ 84, 88–91). Additionally, Plaintiffs allege the Plan qualifies as a jumbo plan by asset size such that the Investment Committee should have leveraged this size to obtain access to otherwise identical share classes with these lower fees. (*Id.* ¶¶ 17–18, 85). Plaintiffs cite the following Plan funds as ones in which identical share classes with lower fees were available but not utilized by the Defendant Investment Committee:

| Fund in the Plan (*Id.* ¶ 86). | ER | Less Expensive Share Class | Lower Cost ER | Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom K | 0.42% | Fidelity Freedom K6 | 0.37% | 13.51% |
| Fidelity Freedom 2005 K | 0.42% | Fidelity Freedom 2005 K6 | 0.37% | 13.51% |
| Fidelity Freedom 2010 K | 0.46% | Fidelity Freedom 2010 K6 | 0.39% | 17.95% |
| Fidelity Freedom 2015 K | 0.49% | Fidelity Freedom 2015 K6 | 0.41% | 19.51% |
| Fidelity Freedom 2020 K | 0.53% | Fidelity Freedom 2020 K6 | 0.43% | 23.26% |
| Fidelity Freedom 2025 K | 0.56% | Fidelity Freedom 2025 K6 | 0.45% | 24.44% |
| Fidelity Freedom 2030 K | 0.60% | Fidelity Freedom 2030 K6 | 0.47% | 27.66% |
| Fidelity Freedom 2035 K | 0.63% | Fidelity Freedom 2035 K6 | 0.49% | 28.57% |
| Fidelity Freedom 2040 K | 0.65% | Fidelity Freedom 2040 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2045 K | 0.65% | Fidelity Freedom 2045 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2050 K | 0.65% | Fidelity Freedom 2050 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2055 K | 0.65% | Fidelity Freedom 2055 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2060 K | 0.65% | Fidelity Freedom 2060 K6 | 0.50% | 30.00% |

### 3.     Failure to Investigate Lower Cost Collective Trusts

Plaintiffs further allege that the Defendant Investment Committee failed to investigate the availability of lower cost collective investment trusts ("**CITs**") causing Plan participants to pay higher fees than necessary. (*Id.* ¶¶ 92–99). CITs are allegedly similar to low-cost share classes because some mutual funds are simultaneously available in a CIT format, and although otherwise identical, they frequently cost less as measured by management fees. (*Id.* ¶¶ 92–96). Plaintiffs identify two funds in the Plan which were available as otherwise identical CITs but with lower expense ratios:

| Fund in the Plan (*Id.* ¶ 97). | 2021 ER | CIT Version | 2021 ER |
|---|---|---|---|
| Fidelity Diversified International Fund K11 | 0.69% | Fidelity Diversified International Fund CIT | 0.58% |
| Fidelity Magellan K | 0.68% | Fidelity Magellan CIT | 0.43% |

### 4.     Failure to Utilize Modern Portfolio Theory Tools

Plaintiffs further alleged that the Defendant Investment Committee failed to utilize the tools of Modern Portfolio Theory ("**MPT**") in selecting the best investments for the Plan. (*Id.* ¶¶ 101–12). Plaintiffs identify various investment metrics frequently employed by funds managers and allege that these metrics show that several better performing less expensive alternatives were available to the Plan but not chosen by the Plan's fiduciaries. (*Id.* ¶¶ 103–06). In short, Plaintiffs allege that had the Defendant Investment Committee utilized MPT it would have replaced some funds in the Plan with the less expensive but better performing alternatives. (*Id.* ¶¶ 107–12).

5. *Violations of the Plan's Investment Policy Statement*

Relatedly, Plaintiffs allege the Defendant Investment Committee violated the Plan's IPS by allowing these same funds, which had historically underperformed other similar funds in some cases as measured by some of the highlighted MPT metrics, to remain as part of the Plan. (*Id.* ¶ 113). In other words, although the IPS required the Defendant Investment Committee to "modify, as appropriate, the investment policies for the Plan . . . and monitor the performance of investment options against performance criteria," the Defendant Investment Committee failed to do so by continuing to offer these funds which had underperformed according to certain investment metrics. (*Id.* ¶ 113–15).

6. *Actively Managed Funds Over Passively Managed Funds*

Plaintiffs allege that Defendants consistently favored actively managed funds when passive funds outperformed them by a significant margin. (*Id.* ¶¶ 116–35). Plaintiffs cite various studies which purport to show that, particularly when the normally higher fees for actively managed funds are considered, various passively managed index funds outperformed many actively managed funds from a period covering 2014 to early 2020. (*Id.* ¶¶ 116–30). Nevertheless, at least 81.48% of the "designated investment alternatives" of the Plan were actively managed. (*Id.* ¶¶ 131–33). Consequently, the Defendant Investment Committee's alleged overreliance on actively managed funds demonstrates a lack of adherence to a prudent monitoring process that should have considered lower-cost passively managed alternatives that seek to achieve the same goal as actively managed

funds and that accordingly costed the Plan and its participants millions of dollars in costs and lost investment gains. (*Id.* ¶¶ 134–35).

### 7.   *Insufficient Diversification*

Plaintiffs next allege that the Defendant Investment Committee failed to make enough funds available such that the Plan lacked sufficient diversification options which created unnecessary additional concentration risk for Plan participants. (*Id.* ¶¶ 136–44). Plaintiff focuses on the Plan's availability of growth-focused funds with a blend of different large and mega-cap companies and which contained a large percentage of the Plan's assets. (*Id.* ¶¶ 139–43). These various growth-focused funds allegedly "drifted into one another and also had the tendency to drift down to the same styles in mid cap investments" in terms of the corporations offered within them "[e]ven though the investments claimed to be focused on a specific style." (*Id.* ¶ 142). As a result, Plan participants allegedly took on undue concentration risk. (*Id.* ¶ 144).

### 8.   *Excessive Recordkeeping and Administrative Costs*

Finally, Plaintiffs allege that the Defendant Investment Committee improperly tolerated excessive recordkeeping and administrative costs for the Plan.[4] (*Id.* ¶¶ 145–68). The Supreme Court has explained that:

> retirement plans also pay fees for recordkeeping services. Recordkeepers help plans track the balances of individual accounts, provide regular account statements, and offer

---

[4]   Plaintiffs note in the Amended Complaint that "[t]he term 'recordkeeping' is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper.' Recordkeeping and administrative services fees are one and the same and the terms are used synonymously [in the Amended Complaint.]" (Doc. 40, ¶ 146).

> informational and accessibility services to participants. Like
> investment management fees, recordkeeping fees may be
> calculated as a percentage of the assets for which the
> recordkeeper is responsible; alternatively, these fees may be
> charged at a flat rate per participant account.

*Hughes*, 142 S. Ct. 737, 740 (2022). Specifically, Plaintiffs allege here that the

Plan's recordkeeper, Fidelity, consistently charged "the same relative amount in

recordkeeping and administration fees" to the Plan during the time period in

question but that this fee rate was much higher than that charged to similarly

sized peer plans.[5] (*Id.* ¶¶ 157–58, 165).  Moreover, Plaintiffs allege that some of

these fees were hidden to participants because the Plan used revenue sharing, or

a combination of revenue sharing and a flat fee, to pay for recordkeeping

resulting in recordkeeping fees that were above the market. (*Id.* ¶ 155). Taken in

combination with Plaintiffs' allegation that plans with large numbers of

participants can take advantage of economies of scale by negotiating a lower per-

participant recordkeeping fee as the participants in a plan increase, Plaintiffs aver

that the Defendant Investment Committee failed to either negotiate lower fees

from Fidelity or seek out alternative bids from recordkeepers other than Fidelity

at reasonable intervals.  (*Id.* ¶¶ 151, 155–56). Plaintiffs allege this is particularly

the case because although the recordkeeping fees stayed relatively flat for the

---

[5]  Plaintiffs allege that Fidelity has admitted to charging a lower fee to a different plan for
services no broader or more valuable those offered to the Plan. (*Id.* ¶ 163). In support,
Plaintiffs note that in a recent lawsuit where a multi-billion dollar plan with over fifty
thousand participants, just like the Plan here, was sued, the "parties stipulated that if
Fidelity were a third party negotiating this fee structure at arms-length, the value of services
would range from $14-$21 per person per year over the class period, and that the
recordkeeping services provided by Fidelity to this Plan are not more valuable than those
received by other plans of over $1,000,000,000 in assets where Fidelity is the
recordkeeper." *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020).

Plan, recordkeeping fees for similarly sized plans fell across the recordkeeping industry during the relevant time period. (*Id.* ¶¶ 166–67). In any event, Plaintiffs allege that at the very least the flat recordkeeping fees suggest the Defendant Investment Committee engaged in an insufficient process when reviewing and monitoring the Plan's fees. (*Id.* ¶¶ 157, 168).

### 9. Procedural History

Prior to filing suit in an attempt to obtain further details regarding the Plans' management, the Plaintiffs wrote to Defendant L3 and the Defendant Board on February 25, 2021, requesting, *inter alia*, meeting minutes of the Defendant Investment Committee during the applicable period, but Defendants denied Plaintiffs' request. (*Id.* ¶ 71). Based on the foregoing, Plaintiffs filed this two-count putative class action seeking relief in Count I for the Defendant Investment Committee's alleged breach of its fiduciary duty of prudence causing loss to the Plan and thus Plaintiffs, (*Id.* ¶¶ 169–75), and in Count II for Defendant L3 and the Defendant Board's alleged failure to adequately monitor the fiduciaries they appointed (i.e., the Defendant Investment Committee and its members) causing loss to the Plan and thus to Plaintiffs. (*Id.* ¶¶ 176–82). Defendants now move to dismiss the Amended Complaint for failure to state a claim (Docs. 43, 46). After Plaintiffs' response (Doc. 49) and Defendants' reply (Doc. 53), this matter is ripe for review.

## II.   STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Furthermore, in ruling on a motion to dismiss, "[a] court is generally limited to reviewing what is within the four corners of the complaint" and the

attachments thereto which are undisputed and central to the claim. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002); *Austin v. Modern Woodman of Am.*, 275 F. App'x 925, 926 (11th Cir. 2008) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). In addition, however, the court may consider documents central to a claim whose authenticity is not in dispute as well as matters that are subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (permitting courts to consider documents attached to a motion to dismiss without converting the motion into one for summary judgment, but only if the attached documents are central to the plaintiff's claims and undisputed); *see also* FED. R. EVID. 201 (stating that a court "may judicially notice a fact that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). That said, Courts exercise caution when taking judicial notice because it is "a highly limited process" as it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual

allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

## III.   DISCUSSION

A motion to dismiss in the ERISA context is an "important mechanism for weeding out meritless claims" because ERISA "represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424–25 (2014) (internal quotation marks and citations omitted); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (noting that "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times"). The Supreme Court has recognized that Congress wanted to avoid creating "a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). At the same time, because ERISA plaintiffs generally do not have "inside information" regarding the fiduciary's process, "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story"—just as with motions to dismiss in other areas of substantive law. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016)

(citation omitted); *Hughes*, 142 S. Ct. at 742 (remanding and noting that the lower court must "reevaluate the allegations as a whole" and "in context" by considering whether the plaintiffs "have plausibly alleged a violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in [*Iqbal*] and [*Twombly*]."); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

ERISA's fiduciary duties are "derived from the common law of trusts." *Tibble v. Edison Int'l.*, 575 U.S. 523, 528 (2015). "Certain persons, including those who exercise any authority or control respecting management or disposition of [fund] assets, bear fiduciary responsibility to an ERISA fund." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) (internal quotations omitted). "The responsibility attaching to fiduciary status has been described as 'the highest known to law.'" *Id.* (quoting *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997)). To state a claim for breach of fiduciary duty under ERISA "the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen*, 835 F.3d at 678 (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)); *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), *as amended* (Dec. 21, 2007) (laying out that

a breach of fiduciary duty has three elements: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.").[6]

With respect to the second prong, ERISA imposes a duty of prudence, which includes a duty to monitor.[7] 29 U.S.C. § 1104(a)(1)(B); *Tibble*, 575 U.S. at 528–30 (noting a plaintiff may allege that a fiduciary breached his duty of prudence and "continuing duty to monitor . . . by failing to properly monitor investments and remove imprudent ones."). Here, Plaintiffs allege that the Defendant Investment Committee breached its duty of prudence as a fiduciary of the Plan and that Defendant L3 and the Defendant Board breached their derivative duty to monitor their appointees, the Defendant Investment Committee and its members, and their Plan-related actions. (Doc. 40). For the following reasons, the Court finds both claims survive.

### A.    Count I: The Investment Committee's Duty of Prudence

ERISA fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the

---

[6]   Defendants do not challenge their status as fiduciaries with respect to the Plan or that their actions may have caused a loss at this procedural stage, so the Court does not address these elements. (*See* Docs. 43, 46).

[7]   ERISA mandates that those who invest other peoples' retirement money must do so "with the care, skill, prudence, and diligence" that a reasonable professional in the area would use and "defra[y] reasonable expenses of administering the plan[.]" 29 U.S.C. §§ 1104(a)(1)(B), 1103(c)(1). A fiduciary must also "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A). In addition, a fiduciary can also breach his fiduciary duty if he participates knowingly in, conceals, enables, or has knowledge of another fiduciary's breach. *Id.* § 1105(a). Fiduciaries who breach their duties are personally liable to make good to the plan any losses resulting from each breach. *Id.* § 1109(a).

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. '[A] pure heart and an empty head are not enough.'" *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (alteration in original) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). "In order to assess the prudence of the fiduciary's actions, they must be evaluated in terms of both procedural regularity and substantive reasonableness." *Allen*, 835 F.3d at 678 (citing *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 680 (7th Cir. 2014)). However, hindsight is potentially misleading, so the focus must be "on a fiduciary's conduct in arriving at [a] . . . decision." *Sweda*, 923 F.3d at 329 (alteration in original) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). To that end, a court should ask "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [course of action]." *Id.* (quoting *Unisys*, 74 F.3d at 434). At the pleading stage, however, factual allegations do not have to "directly address[] the process by which the [p]lan was managed." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Instead, a plaintiff's allegations are sufficient if a court can reasonably infer that "the process was flawed." *Unisys*, 671 F.3d at 327 (quoting *Braden*, 588 F.3d at 596).[8]

---

[8]   The Supreme Court recently discussed the ERISA fiduciary's duty of prudence in *Hughes v.*

With these considerations in mind, the Court now turns to Plaintiffs'
allegations. Plaintiffs allege that the totality of the circumstances demonstrate
that the Defendant Investment Committee failed to administer the Plan in
violation of its fiduciary duty of prudence by selecting funds for the Plan with
excessive fees, failing to identify the lowest fee share class available for funds with
substantial assets, failing to investigate lower cost alternative collective trusts,
not utilizing modern portfolio theory, violating the Plan's Investment Policy
Statement, improperly preferencing actively managed funds over passively
managed funds, offering insufficiently diversified portfolios, and charging
excessive recordkeeping and administrative costs. (Doc. 40, ¶¶ 74–168).
Defendants' main rejoinder is that the pleadings do not raise a plausible claim for
relief because they are undercut by the pleadings themselves or by documents

---

*Northwestern University*, 142 S. Ct. 737 (2022). There, the plaintiffs alleged that the
defendants violated their duty of prudence by offering needlessly expensive investment
options and failing to solicit quotes or competitive bids for recordkeeping services. *Id.* at
740. In the case's leadup, the Seventh Circuit had held that the plaintiffs failed to state a
claim because the plan offered a mix of low-cost index funds, including the types of funds the
plaintiffs wanted; because the plaintiffs' preferred type of investments were available, the
Seventh Circuit reasoned, the plaintiffs could not complain about the flaws in the other
options. *Id.* The Seventh Circuit further found that the amount of recordkeeping fees paid
were within the participants' control, since "'plan participants had options to keep the
expense ratios (and, therefore, recordkeeping expenses) low.'" *Id.* at 742 (quoting *Divane v.
Northwestern Univ.*, 953 F.3d 980, 991 (7th Cir. 2020)).

The Supreme Court rejected the Seventh Circuit's argument that the availability of plan
options eliminated any concern that certain plan options were imprudent. *Id.* The Court
explained that the Seventh Circuit's holding "is inconsistent with the context-specific
inquiry that ERISA requires and fails to take into account respondents' **duty to monitor
all plan investments and remove any imprudent ones**." *Id.* at 740 (citing *Tibble*,
575 U.S. at 530 (2015)) (emphasis added). The Court remanded the case and noted that
"[b]ecause the content of the duty of prudence turns on the circumstances prevailing at the
time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Id.* at
742 (internal quotation marks, citations, and alterations omitted).

which are either subject to judicial notice or not disputed and central to the claim. (Docs. 43, 46, 53). The Court disagrees.[9] While many of these allegations in isolation are insufficient, taken as a whole and interpreted in the light most favorable to Plaintiffs, it is at least plausible that Defendants breached their fiduciary duty of prudence.

---

[9]   While the Court will further address some of these contentions with specificity below, the Court pauses to note that it declines to take judicial notice of the Form 5500s and recordkeeping agreements which Defendant routinely cites. *Huang v. TriNet HR III, Inc.*, No. 8:20-cv-2293, 2022 WL 93571, at *8–9 (M.D. Fl. Jan. 10, 2022) (declining to take judicial notice of various parts of the administrative record and plan-related documents not relied on in the complaint including Form 5500s). First, to do so is not required by Eleventh Circuit precedent as Defendant insinuates. (Doc. 43, p. 3 n.1). True, the Eleventh Circuit counsels judicial notice of these documents at the motion to dismiss stage in securities law cases, but in doing so, the Eleventh Circuit stressed that this special solicitude was granted for the limited purpose of "determining what statements the documents contain and not to prove the truth of the documents' contents" when considering "allegations of material misrepresentations or omissions." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277–78 (11th Cir. 1999). Moreover, the Eleventh Circuit further noted this was proper on a Rule 12(b)(6) motion in light of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 *et seq*. (1999) which, in part, raised the pleading threshold in certain securities cases. *Id.* Despite the overlap in factual subject matter (i.e., investments), ERISA cases are not securities cases, and no such heightened pleading requirement is present in the ERISA context. *See Hughes*, 142 S. Ct. at 742.

Consequently, the Court will not take judicial notice of the Form 5500s and the recordkeeping agreements to which Defendants repeatedly cite. Even if this was a securities law case, it is not clear to the Court that judicial notice would be appropriate at the motion to dismiss stage for the purpose of ascertaining the truth of Plaintiffs' allegations regarding the actual fees charged under the Plan; this is not an instance where the Plaintiffs are alleging fraud or misrepresentation after all. Furthermore, as Defendants tacitly admit by arguing the actual Plan fees were lower than alleged due to various rebates and revenue sharing agreements, (*e.g.*, Doc. 46, p. 6), finding the facts on these issues is not so straightforward as simply looking up various data points in the securities filings. In contrast, in a case repeatedly cited by Defendants, *Matney v. Barrick Gold of N. Am., Inc.*, No. 20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022), the court there took judicial notice of these Form 5500s, and therefore the Court here summarily disagrees with many of the conclusions of the *Barrick Gold* court and will only address them when they are not contingent upon this different approach.

The Court will, however, consider the various documents cited directly in the Amended Complaint, including the ICI study, as they are central to the claims and not reasonably in dispute.

### 1. Excessive Management Fees

"[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). Nevertheless, "'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (*en banc*) (quoting RESTATEMENT (THIRD) OF TRUSTS, § 90, cmt. b) ("*Tibble II*"). "Beneficiaries subject to higher fees . . . lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks."). As such, while higher fees in comparison with the industry alone are not suspect, their continued presence in an ERISA plan may at some point raise an inference of an imprudent management process. *See Braden*, 488 F.3d at 596–97. With this in mind, the Court analyzes the following three ways which Plaintiffs allege the Plan incurred excessive management expenses due to imprudent management.

### a. Higher Expense Ratios for Similar Funds

The Court starts by noting that Plaintiffs' list of expense ratio medians and averages from the ICI Study by itself tells the Court little. For one, the ICI Study

itself notes that "[t]his material is intended to provide general information on fees paid by participants in a wide variety of plans to provide insight into average fees across the marketplace. It is not intended for benchmarking the costs of specific plans to the broad averages presented here." *ICI Study*, p. 18.

Moreover, the expense ratios themselves are not the whole story when it comes to fund costs—Plaintiffs themselves allege that the true expenses for a fund are obscured by revenue sharing agreements and rebates which are specific to the fund in question. (Doc. 40, ¶¶ 153–55). Thus, even if the Court accepts Plaintiffs' allegations that the industry-wide comparison of averages and medians to individual Plan funds are matched with apt benchmark comparators, it is unclear if the lower expense ratios cited are truly representative of systematic losses incurred by Plan participants. At the same time, it is not obvious that any revenue sharing or rebates will accrue to the benefit of the Plan participants. *See Braden*, 588 F.3d at 598–99 (noting revenue sharing agreements may not always lead to lower plan costs for the plan participants themselves). Thus, while the ICI Study cannot carry the day by itself even at the motion to dismiss stage, it at least piques the Court's interest that something may be amiss in the management of the Plan due to the contrasting picture it paints with the alleged Plan expense ratios.

### b.   *Lower Available Fee Share Classes and CITs*

The Court agrees with Defendants that ERISA does not "require[] plan fiduciaries to include any particular mix of investment vehicles in their plan."

*Hecker*, 556 F.3d at 586. In this case, however, Plaintiffs' principal allegation is that otherwise identical funds are available in the market with lower fees—either as different fee share classes or CITs—that could have been made available to the Plan either through proper investigation, due diligence, or the leveraging of the Plan's significant size. (Doc. 40, ¶¶ 83–100). This is not the same as requiring a specific fund type's inclusion in the Plan—instead, it plausibly raises an inference that the Defendant Investment Committee did not engage in prudent management of the Plan if, once a fund type is selected, it failed to offer that fund (or its otherwise identical alternative) at a meaningfully lower cost reasonably available in the market. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (finding plausible the allegation that ERISA plan fiduciaries breached their duty of prudence by offering plan participants only retail shares of mutual funds rather than less-expensive institutional shares of the same funds despite its size and leverage). Defendants' main arguments in response contest the factual accuracy of Plaintiffs' allegations, making them inappropriate at this procedural stage.[10] (*See* Doc. 43, pp. 8–12).

---

[10]  Interpreted in the light most favorable to Plaintiffs, the Court disagrees that the Amended Complaint concedes that the 20 basis points in revenue sharing accrues to the benefit of Plan participants. (Doc. 40, ¶ 155). The thrust of Plaintiffs' allegations appears to be that revenue sharing obscures the true cost of the Plan *to the detriment* of Plan participants, not that the revenue sharing necessarily benefits Plan participants. Defendants other factual protestations are simply inappropriate at this procedural posture. (*See* Doc. 43, pp. 8–12).

c.    *Actively Managed Over Passively Managed*

The Court agrees with the Eighth Circuit when it states that:

> It is true that some analysts think it is better for investors to put their money in . . . a[ passively managed] index fund rather than an actively managed portfolio. But it is not imprudent for a fiduciary to provide both investment options. They have different aims, different risks, and different potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other.

*Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020). Here, given that Plan participants can choose several passively managed funds, it was not plausibly imprudent for the Defendant Investment Committee to offer a far greater number of actively managed funds; the blend offered in the Plan's menu of funds still allows its participants to construct a portfolio which correlates with their individual risk appetites. (Doc. 40, ¶¶ 116–35).

2.    *Excessive Recordkeeping and Administrative Costs*

Plaintiffs' allegations here are simple: they allege the Defendant Investment Committee tolerated excessively high recordkeeping fees over the time period in question relative to those charged to similarly sized plans. (*Id.* ¶¶ 145–68). Defendants' rebuttal is also simple:  they contend that Plaintiffs' allegations are directly undercut by the terms of the Plan's recordkeeping contract with Fidelity, the Plan's recordkeeper. (Doc. 43, p. 22). The Court's

response is likewise simple: the facts are not properly at issue before the Court at this time.[11]

### 3.    Alternative Measures of Performance: Failure to Utilize MPT

In a chart, Plaintiffs cite seven different investing statistical measures for both the Plan funds and the comparator funds. (Doc. 40, ¶ 106). The relevance of these cherry-picked categories is not explained beyond conclusory allegations that they are intrinsic to MPT. (*See id.* ¶¶ 101–12). Indeed, with respect to these MPT statistics, sometimes the Plan funds are better performing, sometimes worse, and sometimes about the same. (*See id.*). Moreover, Plaintiffs do not allege or clarify how these statistical measures should work together in a systematic way to show that any Plan investment was imprudent; instead, Plaintiffs focus on the instances where the statistics appear to highlight the Defendant Investment Committee could have made a better choice based on the benefit of hindsight. (*Id.* ¶ 106) ("This data clearly shows that several better performing less expensive alternatives were available to the Plan but not chosen by the Plan's fiduciaries . . . ."). But the Court cannot give credence to backward-looking market results alone. *Unisys*, 74 F.3d at 434 ("the courts measure [ERISA's] 'prudence' requirement according to an objective standard, focusing on

---

[11] The Court disagrees that it can consider the recordkeeping agreement with Fidelity. (Doc. 43, p. 22). For reasons already explained, it has declined to take judicial notice of such documents. *See supra note 9.* And the Plaintiffs did not ever expressly incorporate the agreement in question by reference in their Amended Complaint, unlike in *Tobias v. NVIDIA Corp.*, No. 20-cv-6081, 2021 WL 4148706, at *4 (N.D. Cal. Sept. 13, 2021). In this Court's estimation, to consider these documents and *the disputed inferences* made by Defendants *on the basis of their interpretation of them* would be too procedurally hasty.

a fiduciary's conduct in arriving at an investment decision, not on its results"). What a fiduciary must do is weigh the information that would be relied on by other prudent investors and come to a reasoned judgment, and little about the data by itself suggests the fiduciaries did not do that here. *Hughes*, 142 S. Ct. at 742 (noting "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," so courts must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise"). That said, Plaintiffs are careful to allege the backward-looking data alone is not the issue but instead that the data is indicative of a flawed process. (Doc. 40, ¶¶ 106, 112). The Court agrees in part: alone this data is not enough to push Plaintiffs' claims over the line from the merely possible to the plausible, but it might make the difference in combination with Plaintiffs' other allegations.

### 4.    *Insufficient Diversification*

As part of their duty of prudence, ERISA fiduciaries have a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses . . . ." 29 U.S.C. § 1104(a)(1)(C). To plausibly allege a breach of this duty, however, a complaint must include allegations about the plan's assets "as a whole, not to each investment option." *Schweitzer v. Inv. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 195–96 (5th Cir. 2020). Stated more specifically, a "narrow focus on a few individual funds, rather than the plan as [a] whole, is insufficient to state a claim for lack of diversification." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009). In a defined contribution plan, "fiduciaries . . .

need only provide investment options that enable participants to create diversified portfolios; they need not ensure that participants actually diversify their portfolios." *Schweitzer*, 960 F.3d at 196.

Plaintiffs' allegations are too narrow on this front. Plaintiffs focus the Court's attention on only five funds and ignore the remainder of the Plan menu. (Doc. 40, ¶¶ 136–44). Plaintiffs thus fail to plausibly allege the Defendant Investment Committee acted imprudently due to insufficient diversification options within the Plan.

### 5. *Violations of the Plan's Investment Policy Statement*

The Court finds Plaintiffs' allegations that the Defendant Investment Committee violated the Plan's IPS to be duplicative of previous allegations. (Doc. 40, ¶¶ 113–15). In other words, although the IPS requires that the Defendant Investment Committee "modify, as appropriate, the investment policies for the Plan . . . and monitor the performance of investment options against performance criteria" and Plaintiffs allege that funds continued to be offered in the Plan despite historically underperforming according to their preferred investment metrics or fund-type blend (passively-managed v. actively managed), this is just another way to infer the relative prudence of the Defendant Investment Committee's decisions based on alleged actions, which the Court has already considered above. (*Id.*).

6.     *Totality of the Circumstances*

While the Court doubts that some of the individual allegations here by themselves are enough to state a claim, in sum total the Court finds it plausible that the Defendant Investment Committee's process was flawed. Notably, this is not a case where nothing plus nothing adds up to something; instead, the individual well-pled allegations accumulate as fractional parts of the whole, at some point crossing the plausibility line. This is particularly so in part because the Court agrees with its sister court in a similar ERISA fiduciary duty case which found that the defendants' arguments, which contended that the plaintiffs' claims were "factually incorrect" or relied on "inapt comparators," were inappropriate at the motion to dismiss stage. *TriNet*, 2022 WL 93571, at *8–9. Defendants attempt to distinguish *TriNet* by arguing, "[the case] is distinguishable in almost every respect: it involved a different type of plan (multi-employer instead of single employer), a different procedural posture (a post-administrative appeal), and different arguments." (Doc. 53, pp. 2–3). The Court disagrees because the slightly different procedural posture and multi-employer facts are differences of no moment. The core issue is the same: what weight at this procedural posture should the Court give well-pled allegations regarding a breach of fiduciary duty— a duty the Eleventh Circuit has described as "the highest known to law"—given that Defendant has produced some counter-vailing factual considerations? *Hall*, 334 F.3d at 1013. In the Court's judgment in accord with *TriNet*, most of Defendants' factual contentions are inappropriate on a motion to dismiss such

that Plaintiffs' combined allegations have just enough weight to tip the scales in their favor.

Put another way, while Plaintiffs' claim may ultimately fail, in light of the allegations as a whole it is plausible at this juncture that the Defendant Investment Committee engaged in a flawed process such that it imprudently managed the Plan, and thus, Plaintiffs should enjoy the benefits of discovery to further ascertain whether these allegations have legs, particularly when the Court considers that the Supreme Court has recently reaffirmed that ERISA claims are subject to the same pleading standards as all other claims. *Hughes*, 142 S. Ct. at 742 (noting ERISA claims must be evaluated "as a whole" and "in context" by subjecting them to the same "pleading standard discussed in [*Iqbal*] and [*Twombly*].").

### B.    Count II: L3 and the Board's Duty to Monitor

"A claim for the failure to monitor derives from and depends on an 'underlying breach of fiduciary duty cognizable under ERISA'"—that is, the duty of prudence. *Kendall v. Pharm. Prod. Dev., LLC*, No. 7:20-cv-71, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021) (quoting *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003)). The duty to monitor requires that plan fiduciaries "systematic[ally] conside[r] all the investments . . . at regular intervals to ensure that they are appropriate." *Tibble*, 575 U.S. at 529 (quoting A. Hess, G. Bogert, & G. Bogert, *Law of Trusts and Trustees* § 684, at 145–46 (3d ed. 2009)). In short, "a fiduciary is required to conduct a regular review of its

investment"—the fiduciary cannot rely on fulfilling its "duty to exercise prudence in selecting investments at the outset." *Id.* at 528–29.

An appointing fiduciary—that is, a fiduciary who through their role in "appoint[ing] trustees or other fiduciaries" who actively manage ERISA plans—has a specialized duty to monitor that requires reviewing "[a]t reasonable intervals the performance of [the appointed] trustees and other fiduciaries . . . in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards[] and satisfies the needs of the plan." 29 C.F.R. § 2509.75-8, at FR-17; *see also Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465–66 (4th Cir. 1996). Thus, an appointing fiduciary's duty to monitor is no broader than the underlying duty of prudence claim. *Kendall*, 2021 WL 1231415, at *12 (internal quotation marks omitted) (quoting *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *11 (S.D.N.Y. Sept. 29, 2017)). Indeed, "the responsibility to monitor appointees" does not expose "the appointing fiduciary to open-ended liability." *Coyne*, 98 F.3d at 1466 n.10; *see also Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992) ("We reemphasize that a party is a fiduciary only as to the activities which bring the person within the definition."). Thus, courts have properly taken a restrictive view of the scope of this duty to monitor appointees and their plan-related activities. *See, e.g., Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991) (finding board members with power to appoint and remove plan fiduciaries not liable because nothing "put [them] on notice of

possible misadventure by their appointees").  Nevertheless, where a plausible breach of the fiduciary duty of prudence is alleged against the appointees of appointing fiduciaries, courts have routinely found similarly plausible an attendant failure to monitor. *See e.g.*, *Kendall*, 2021 WL 1231415, at *12.

Defendant argues that the failure to monitor claim should fail because it is dependent on the duty of prudence claim and it is supported only by conclusory allegations. (Doc. 46, p. 26). As the court has found Plaintiffs' allegations state a plausible claim of breach of the Defendant Investment Committee's duty of prudence, Plaintiffs' allegations that Defendant L3 and the Defendant Board, as appointing fiduciaries, failed to adequately monitor the performance and investing decisions of the Defendant Investment Committee, the appointed fiduciaries, may survive as well. (Doc. 40, ¶¶ 36–43, 176–82).  In other words, it is at least plausible that Defendant L3 and the Defendant Board breached their fiduciary duty by failing to adequately monitor the Defendant Investment Committee in light of the totality of the allegations against all Defendants.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion (Docs. 43, 46) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on March 2, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties