# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

LAURA L. DIVANE, APRIL HUGHES,
SUSAN BONA, KATHERINE D.
LANCASTER, AND JASMINE WALKER,
individually and as representatives of a
class of participants and beneficiaries on
behalf of the Northwestern University
Retirement Plan and the Northwestern
University Voluntary Savings Plan,

                    *Plaintiffs*,

   v.

NORTHWESTERN UNIVERSITY,
NORTHWESTERN UNIVERSITY
RETIREMENT INVESTMENT
COMMITTEE, PAMELA S. BEEMER,
RONALD R. BRAEUTIGAM, KATHLEEN
HAGERTY, CRAIG A. JOHNSON, CANDY
LEE, WILLIAM H. McLEAN, INGRID S.
STAFFORD, NIMALAM CHINNIAH, and
EUGENE S. SUNSHINE

                *Defendants*.

Civil Action No. 16-cv-8157

Honorable Jorge L. Alonso

AMENDED COMPLAINT—
CLASS ACTION

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

1.    Plaintiffs Laura L. Divane, April Hughes, Susan Bona, Katherine D.
Lancaster, and Jasmine Walker individually and as representatives of a class and
subclasses of participants and beneficiaries of the Northwestern University
Retirement Plan and the Northwestern University Voluntary Savings Plan (herein
collectively referred to as the "Plans"), bring this action under 29 U.S.C. §1132(a)(2)
on behalf of the Plans against Defendants Northwestern University, Northwestern

University Retirement Investment Committee, Pamela S. Beemer, Ronald R. Braeutigam, Kathleen Hagerty, Craig A. Johnson, Candy Lee, William H. McLean, Ingrid S. Stafford, and Nimalam Chinniah for breach of fiduciary duties under ERISA.[1]

2.      ERISA imposes duties on plan fiduciaries that are "the highest known to the law." *George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011) (Castillo, J.); *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); 29 U.S.C. §1104(a). Fiduciaries must act with "complete and undivided loyalty to beneficiaries of the trust, and with an eye single to the interests of participants and beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984) (internal quotations and citations omitted). In exercising these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

3.      The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plans—which are each among the largest 0.2% of defined contribution plans in the United States—

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

have tremendous bargaining power to demand low-cost administrative and investment management services. As fiduciaries to the Plans, Defendants are obligated to limit the Plans' expenses to a reasonable amount, to ensure that *each* fund in the Plans is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plans; and to analyze the costs and benefits of alternatives for the Plans' administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plans' service providers.

4. Instead of using the Plans' bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plans, Defendants squandered that leverage by allowing the Plans' conflicted third-party service providers—TIAA-CREF and Fidelity—to dictate the Plans' investment lineup, to include hundreds of their proprietary mutual funds in the Plans, to link their recordkeeping services to the placement of those funds in the Plans, and to collect nearly unlimited asset-based compensation from their proprietary products.

5. To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class and subclasses of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition,

Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7. **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8. **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses caused by Defendants' fiduciary breaches and remain exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

    a.    The named Plaintiffs and all participants in the Plans suffered

financial harm as a result of the imprudent or excessive fee options in the Plans because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied its fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.      The named Plaintiffs and all participants in the Plans were financially harmed by Defendants' improper bundling of some of the Plans' investment products, improperly allowing the companies who did recordkeeping for the Plans to require inclusion of their investment products in the Plans, instead of each investment option being independently selected.

c.      The named Plaintiffs' individual accounts in the Plans were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class/subclass period (1) invested in the CREF Stock and TIAA Real Estate accounts—which were improperly bundled with TIAA's recordkeeping services and which Defendants also failed to remove from the Plans when it was clear from past poor performance and their excessive fees that they were imprudent investments—at a time when those options underperformed prudent alternatives in which those assets would have been invested had Defendants not breached its fiduciary duties (Plaintiffs Bona, Lancaster, Walker ), (2)

invested in excessive-cost investment options, including funds that paid revenue sharing to the Plans' recordkeepers and higher-cost share classes of mutual funds priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available to the Plans because of its enormous size (all Plaintiffs), and (3) through the fees charged on their investments in those mutual funds and other investments, paid a portion of the Plans' excessive administrative and recordkeeping fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plans (all Plaintiffs).

       d.    Specifically, during the class period, Plaintiff Bona invested in the higher-cost share classes of TIAA-CREF Equity Index, TIAA-CREF Short-Term Bond, and TIAA-CREF High-Yield as well as TIAA Traditional, TIAA Real Estate, CREF Bond Market, CREF Inflation Linked Bond, and CREF Money Market (among others); Plaintiff Divane invested in the higher-cost share classes of Fidelity Contrafund, Fidelity Growth & Income, Fidelity China Region, Vanguard Institutional Index, Vanguard Extended Market Index, Vanguard Total International Stock, and Vanguard Total Bond Market; Plaintiff Hughes invested in the higher-cost share class of Vanguard Institutional Index, as well as TIAA Traditional, CREF Growth, CREF Social Growth, and CREF Equity Growth (among others); Plaintiff Lancaster invested in the TIAA Traditional, CREF Stock, and TIAA Real Estate; Plaintiff Walker invested in the higher-cost share classes of Fidelity

Freedom 2020 and TIAA-CREF Lifecycle 2035, as well as CREF Global

Equities, TIAA Traditional, CREF Stock, CREF Growth, TIAA Real Estate,

and CREF Money Market. Through their investments in these funds, each

Plaintiff paid excessive investment management fees and each was assessed

a portion of the Plans' excessive administrative and recordkeeping fees.

Plaintiffs would not have suffered these losses if Defendants had prudently

monitored revenue sharing, solicited competitive bids, consolidated

recordkeepers for both Plans, or reduced fees to reasonable levels in

accordance with their fiduciary duties under ERISA.

## PARTIES

### Northwestern University Retirement Plan

9.      The Northwestern University Retirement Plan ("Retirement Plan") is a

defined contribution, individual account, employee pension benefit plan under 29

U.S.C. §1002(2)(A) and §1002(34).

10.     The Retirement Plan is established and maintained under a written

document in accordance with 29 U.S.C. §1102(a)(1).

11.     The Retirement Plan provides for retirement income for certain

employees of Northwestern University. That retirement income depends upon

deferrals of employee compensation, employer matching contributions, and

performance of investment options net of fees and expenses.

12.     As of December 31, 2015, the Retirement Plan had $2.34 billion in net

assets and 21,622 participants with account balances. It is among the largest 0.04%

7

of all defined contribution plans in the United States based on total assets. Plans of such great size are commonly referred to as "jumbo plans."

## Northwestern University Voluntary Savings Plan

13.     The Northwestern University Voluntary Savings Plan ("Voluntary Savings Plan")[2] is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

14.     The Voluntary Savings Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

15.     The Voluntary Savings Plan provides for retirement income for certain employees of Northwestern University. That retirement income depends upon deferrals of employee compensation and performance of investment options net of fees and expenses.

16.     As of December 31, 2015, the Voluntary Savings Plan had $530 million in net assets and 12,293 participants with account balances. It is among the largest 0.2% of all defined contribution plans in the United States based on total assets. Plans of such great size are commonly referred to as "jumbo plans."

17.     The Retirement Plan is funded by both by participants' deferrals of compensation and contributions by Northwestern on behalf of participants. The Voluntary Savings Plan is funded solely by participants' deferrals of compensation.

---

[2] Certain plan-related materials such as account statements also refer to the Voluntary Savings Plan as the "Northwestern University 403(b) Supplemental Plan."

18.     The Plans allow participants to designate investment options into which their individual accounts are invested. Defendants exercise exclusive discretionary authority and control over the investment options that are offered in the Plans.

### Plaintiffs

19.     Laura L. Divane resides in Skokie, Illinois, and is a Staff Nurse at Northwestern University Health Service. She is a participant in the Retirement Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Retirement Plan.

20.     April Hughes resides in Wauconda, Illinois, and formerly worked as a Research Assistant in the Office of Sponsored Research at Northwestern University. She is a participant in the Retirement Plan and the Voluntary Savings Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plans.

21.     Susan Bona resides in Lombard, Illinois and formerly worked as a Program Assistant in the Transplant Surgery Department at Northwestern University School of Medicine. She is a participant in the Retirement Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Retirement Plan.

22.     Katherine D. Lancaster resides in Chicago, Illinois, and works as a Standard Operating Procedures Coordinator at Northwestern University. She is a participant in the Retirement Plan and the Voluntary Savings Plan under 29 U.S.C.

§1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plans.

23.     Jasmine Walker resides in Des Plaines, Illinois, and previously worked as a Business Manager at the NUANCE Center at Northwestern University. She is a participant in the Retirement Plan and the Voluntary Savings Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plans.

### Defendants

24.     Northwestern University ("Northwestern") is a non-profit corporation organized under Illinois law with its principal place of business in Evanston, Illinois.

25.     Under Article 11.1 of both the Retirement Plan and Voluntary Savings Plan, Northwestern is designated as the "Plan Administrator" within the meaning of 29 U.S.C. §1002(16)(A)(i), with responsibility for management of the Plans. Because the Plans name Northwestern as the entity with authority over the management of the Plans, it is a "named fiduciary" within the meaning of 29 U.S.C. §1102(a).

26.     Northwestern is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

10

27.     The Plans authorize Northwestern to delegate in whole or in part any of its responsibilities to one or more officers or committees of the University.

28.     According to Article 11.2 of both Plans, Northwestern delegated to its Executive Vice President all discretionary authority and powers necessary to administer the Plans, other than discretionary authority and power to control and manage the assets of the Plans. These administrative responsibilities include the authority to employ service providers to the Plans and to approve on behalf of Northwestern any contracts related to the administration of the Plans.

29.     Nimalam Chinniah has served as Northwestern's Executive Vice President since September 8, 2014. Previously, Eugene S. Sunshine served in that role.

30.     Nimalam Chinniah and Eugene S. Sunshine are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plans, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

31.     According to Article 11.3 of both Plans, as authorized by the Board of Trustees, Northwestern's Senior Vice President for Business and Finance established the Northwestern University Retirement Investment Committee

(NURIC), effective February 28, 2012.[3] NURIC was granted all discretionary authority and powers necessary to control and manage the assets of the Plans. Article 11.1 of each of the Plans designates NURIC as the named fiduciary with respect to the control or management of the assets of the Plans.

32.     Upon information and belief, the current Chair of NURIC is Pamela S. Beemer. Other current NURIC members include: Ronald R. Braeutigam, Kathleen Hagerty, Craig A. Johnson, Candy Lee, William H. McLean, and Ingrid S. Stafford.

33.     NURIC and its individual members are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of their assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (ii).

34.     Because the Northwestern University entities, officers, and individual committee members described above have acted as alleged herein as the agents of Northwestern University, all defendants are collectively referred to hereafter as "Defendants."

## ERISA FIDUCIARY STANDARDS

35.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plans. 29 U.S.C. §1104(a), states, in relevant part, that:

---

[3] The language of Article 11.3 suggests that the Executive Vice President has now assumed the functions for which the Senior Vice President for Business and Finance was formerly responsible.

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

    (A)    for the exclusive purpose of

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the plan; [and]

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

36. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

37. "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros,* 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of

plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828–29.

38. The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> \* \* \*
>
> (C)    furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ...

39. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly failing to cure any

breach of another fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

40.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil

action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

### I.  Defined contribution plans, services, and fees.

41.     When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).

42.     Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

43.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

44.     A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have

16

exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns that participants receive on their investments.

45.    These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[4] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

46.    The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

---

[4] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

47.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—i.e., proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II.     Defined contribution recordkeeping.

48.     Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

49.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (e.g., recordkeeping, website, call center, etc.). In light of the

18

commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plans

50.     Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

## III.  Defined contribution investment options.

51.     Defined contribution fiduciaries have exclusive control over the particular investment alternatives available in the plan to which participants direct and allocate their plan accounts, and the returns on which are credited to participants' accounts.

52.     Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid, or small domestic or international

companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

53.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

54.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[5] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

55.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of

---

[5] One basis point is equal to 1/100th of one percent (or 0.01%).

securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

56.    Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

57.    The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (analyzing common law of trusts and Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement

explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

58. Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

59.    In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## IV.    Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

60.    There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

61.    In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

62.    A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual

23

account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

63.     As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000-participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

64.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the

24

plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

65.     Defendants use a different method of paying for recordkeeping for the Plans, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

66.     In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

67.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

68.     As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In multi-billion dollar plans with over 10,000 participants, such as the Plans, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—i.e., a bid from another service provider— [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

69.     Industry experts recognize that this principle applies fully in the 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2.*[6] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal.*[7] Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

**V.     Bundled services and open architecture.**

70.     As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services companies entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free"

---

[6] Available at http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2.

[7] Available at http://www.wphealthcarenews.com/403b-retirement-plans-why-a-due-diligence-request-for-proposal/.

plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant condition—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of handpicked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

71.     In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize

28

the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

72.     Open, transparent architecture allows for greater control over revenue sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it provides revenue sharing.

## VI.     403(b) plans share common fiduciary duties with 401(k) plans.

73.     Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

74.     Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plans have never qualified for the safe harbor, and thus has long been subject to ERISA's fiduciary requirements. In the Plans' annual reports (Forms 5500) filed with the Department of Labor, Defendants have acknowledged that the Plans are subject to ERISA.

75.     Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plans that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plans' status for ERISA fiduciary purposes; ERISA already required Defendants to be actively involved in exercising care, prudence, skill, and diligence in administering the Plans for the exclusive benefit of participants.

76.     When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial accounts holding mutual fund shares. 26 U.S.C. §403(b)(7).

77.     Regardless of any differences between 401(k) and 403(b) plans, both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that retirement savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

## VII.    Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.

78.     As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

79.     Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[8] Indeed, sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having excessive recordkeeping costs and structures involving multiple recordkeepers with each recordkeeper having its own investment options in the plan. This left participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees, both for recordkeeping and for investment products in the plans. *Id*. In some cases the recordkeeper insisted on its own funds being included in the plan without any resistance or analysis of those funds by the fiduciaries.

## VIII. TIAA-CREF's bundled 403(b) plan services.

80.     TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans, and has heavily marketed to them. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America (TIAA), and

---

[8] Available at http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

College Retirement Equities Fund (CREF). The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

81.     Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups." Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007).[9] As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

82.     While CREF is organized as a New York not-for-profit corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to some of its subsidiaries as well. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.[10]

83.     TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA, including the following subsidiaries for which TIAA files consolidated federal income tax returns:

---

[9] Available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.
[10] Available at https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

33

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| 730 Texas Forests Holdings, Inc. | | X |
| Covariance Capital Management, Inc. | | X |
| GreenWood Resources, Inc. | | X |
| JWL Properties, Inc. | | X |
| ND Properties, Inc. | | X |
| Nuveen Asia Investments, Inc. | | X |
| Nuveen Holdings, Inc. | | X |
| Nuveen Investments, Inc. | | X |
| Nuveen Investments Advisers, Inc. | | X |
| Nuveen Investments Holdings, Inc. | | X |
| Nuveen Investments Institutional Services Group, LLC | | X |
| Nuveen Investment Solutions, Inc. | | X |
| Nuveen Securities, LLC | | X |
| Oleum Holding Company, Inc. | | X |
| Rittenhouse Asset Management, Inc. | | X |
| T-C Europe Holdings, Inc. | | X |
| T-C SP, Inc. | | X |
| T-C Sports Co., Inc. | | X |
| T-Investment Properties Corp. | | X |
| TCT Holdings, Inc. | | X |
| Teachers Advisors, Inc. | | X |
| Teachers Personal Investors Service, Inc. | | X |
| Terra Land Company | | X |
| TIAA Asset Management Finance Company, LLC | | X |
| TIAA-CREF Life Insurance Company. | | X |
| TIAA-CREF Tuition Financing, Inc. | | X |
| TIAA-CREF Trust Company, FSB | | X |

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| Westchester Group Asset Management, Inc. | | X |
| Westchester Group Farm Management, Inc. | | X |
| Westchester Group Investment Management Holding, Inc. | | X |
| Westchester Group Investment Management, Inc. | | X |
| Westchester Group Real Estate, Inc. | | X |

*See 2015 Annual Statement of the Teachers Insurance and Annuity Association of America* 39, 112–19 (Jan. 26, 2016).[11]

84.     Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[12] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive

---

[11] Available at https://www.tiaa.org/public/pdf/tiaa_annual_statement_2015.pdf. This list does not include the hundreds of TIAA's for-profit, joint venture subsidiaries, all of which are controlled by TIAA. *See id.* at 112–19; *see also* https://www.sec.gov/Archives/edgar/data/1429401/000119312510093446/dex21.htm.

[12] TIAA Compensation Disclosures, Executive Compensation Discussion and Analysis 20 (May 2016), available at https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

officers" earned a combined total of well over $40 million in compensation in 2015. *Id*. When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies.



85.    Adding to this, and undercutting any claim that it operates as a non-profit, TIAA's compensation disclosures further state that its employees' compensation and benefits programs are linked to "*profitability*." TIAA Compensation Disclosures (emphasis added).

86.    Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF responded that such extremely high pay was justified because "the company had to compete for top-level employees with major financial

services corporations." Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History.*[13] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id*.

87. In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

88. TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the Plans, and required the Plans to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, Defendants locked the Plans into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments*

---

[13] Available at http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

*or would become imprudent in the future*. By accepting this arrangement,
Defendants failed to implement an open architecture platform and use another
recordkeeper who could provide the same administrative services at lower cost.
Compounding this bundling requirement by TIAA, Defendants used multiple
recordkeepers, each with their own investment products, resulting in an inefficient
and excessively expensive plan structure, as described in more detail below.

89.     There is no shortage of high-quality, low-cost alternatives to TIAA-
CREF's products in the defined contribution plan market. For example, many 403(b)
plan fiduciaries have recognized that stable value funds are prudent alternatives to
TIAA's Traditional Annuity as a conservative principal preservation option,
providing superior returns to a money market fund, and can be recordkept by
virtually any defined contribution recordkeeper. Other insurance companies, besides
TIAA, also offer fixed annuity products. And there are myriad large cap blend
mutual fund investments in the market that provide far superior returns to the
CREF Stock Account at much lower cost. In light of TIAA-CREF's restrictions and
superior alternatives in the market, fiduciaries of 403(b) defined contribution plans
must evaluate each investment option and engage in a cost-benefit analysis to
determine whether it is prudent and in the exclusive best interest of participants to
lock their plans into an arrangement that precludes the removal of imprudent plan
investments and results in excessive plan fees. Defendants failed to perform such an
evaluation of the funds and services TIAA-CREF required. Defendants also failed to
evaluate whether participants would be better served by using superior low-cost

alternatives to TIAA-CREF's products given that the Plans could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have engaged in this analysis and overhauled their plans for the benefit of participants.

## IX.    Move to consolidation and open architecture in 403(b) plans.

90.    Under the 2007 final regulations that became effective January 1, 2009,[14] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

91.    Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations—whether on an ongoing basis or for the first time—required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants. While the Plans have long been subject to ERISA

---

[14] The regulations gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

because the employer match was sufficient for the Plans to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed Defendants have informed the Department of Labor in the Plans' Forms 5500 that the Plans are subject to ERISA—even if the Plans had not previously been subject to ERISA, there can be no doubt that 403(b) plan fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

92.     Once the regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

93.     For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party." *See* LMU 403(b) Retirement Plan Project Overview, at 1.[15] "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services." *Id*. at 2. Beginning in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third

---

[15] Available at http://www.lmu.edu/AssetFactory.aspx?vid=33038.

party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF.[16] LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009. LMU 403(b) Retirement Plan Project Overview, at 2. Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." *Id.* LMU was therefore able to offer "best in class" funds in each fund category. *Id.* at 6.

94. Similarly, following the new IRS 403(b) regulations, the fiduciaries of the Pepperdine University Retirement Plan recognized the implications of maintaining four different recordkeepers. In order to comply with the regulations and its fiduciary responsibilities, Pepperdine determined that it must make certain changes to the plan, including "Consolidating recordkeeping (by having one fund provider manage administration for multiple providers or by moving to a sole administrator scenario)." *See* Pepperdine University Participant Q & A.[17]

---

[16] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.
[17] Available at http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.

41

Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. *Id.* Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO.[18] Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale." *Id.*

95.     Pepperdine also recognized that the bundled model demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—*whether or not those investments offered participants the best range of choice, value, and relative performance.*" *Id.* (emphasis added). Acting in

---

[18] Available at
http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser— could identify as being the 'best options in their respective asset classes.'" *Id.* After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." *Id.* The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants." *Id.*

96.     In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector." James S. Almond, *403(b) Plan Redesign-Making a Good Retirement Plan Better*, PURDUE UNIVERSITY (emphasis added).[19] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which

---

[19] Available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx.

included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." *Id.* Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." *Id.* Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3-4 million per year* which is then compounded over time." *Id.* (emphasis added).

97.     Likewise, the California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting.

*Caltech Names TIAA-CREF Recordkeeper,* INSTITUTIONAL INVESTOR (Dec. 10, 2009).[20]
In selecting a core set of investment options for the plan, CalTech eliminated over 100
Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed
with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15
million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan
to benefit participants.

98.     Extensive industry literature shows that these sponsors are not
outliers, and that similarly situated fiduciaries who have also comprehensively
reviewed their plans have been able to reduce recordkeeping and investment
management fees, consolidate recordkeepers and investment options, leading to
enhanced outcomes and retirement security for their plans' participants.

99.     In connection with a plan redesign project at the University of Notre
Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt)
issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best
practices taken in response to the IRS 403(b) regulations. Hewitt EnnisKnupp,
*403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014).[21]
Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations
in 2008, there has been an accelerated evolution of the 403(b) marketplace into
something that more closely resembles the private sector 401(k) market." *Id.* at 3.

---

[20] Available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-
Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

[21] Available at https://workplacecontent.fidelity.com/bin-
public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20
White%20Paper.pdf.

100.    Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff." *Id.* at 4. "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully higher than under a single recordkeeper model." *Id.* at 5. Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants." *Id.*

101.    *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." *Id.* Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." *Id.* at 6. An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id.* An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup. *Id.*

102.    Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[22]

103.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Northwestern Plans, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[23] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.[24]

104.    The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[25] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing

---

[22] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.
[23] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.
[24] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.
[25] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from." *Id.* Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

105. AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[26]

106. Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's*

---

[26] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

*Response to a New Defined Contribution Environment*, TOWERS WATSON

VIEWPOINTS, at 2 (2012).[27]

107.    The recommendations of these independent, widely used investment

consultants are buttressed by other industry literature supporting the fact that the

use of a single recordkeeper provides reasonable fees. *See, e.g.,* Kristen Heinzinger,

*Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6,

2012)("One advantage of consolidating to a single provider was an overall drop in

administrative fees and expenses. Recordkeeping basis points returned to the plan

sponsors rather than to the vendor. All plan money aggregated into a single

platform, and participants were able to save on fee structure. This also eliminated

the complications and confusion of having three different recordkeepers.");[28] Paul B.

Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar.

2010)(identifying, among other things, the key disadvantages of maintaining a

multi-provider platform including the fact that it is "cumbersome and costly to

continue overseeing multiple vendors.").[29]

108.    Use of a single recordkeeper is also less confusing to participants and

eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher*

*Education: Getting More from Less*, PLAN SPONSOR (July 29, 2010)(recognizing the

---

[27] Available at
https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-
4C52-BB78-8930F598FD26%7D.
[28] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-
experience/?fullstory=true.
[29] Available at
http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_
Provider_Multiple_Choices.html.

following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[30]

### DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

109. Defendants' longstanding retention of two recordkeepers and hundreds of their proprietary funds—which the recordkeepers required to be included in the Plans—while excluding superior low-cost alternatives from other managers, demonstrates that, in contrast with the comprehensive plan reviews conducted by the similarly situated fiduciaries described above, Defendants failed to adequately engage in a similar analysis. Had Defendants conducted such a review of the Plans, Defendants would not have allowed the Plans to continue to pay excessive administrative fees; would not have maintained an inefficient two-recordkeeper structure; would not have continued to include well over hundreds of investment options in each of the Plans, including duplicative funds in numerous investment styles and higher-cost retail share classes for which identical lower-cost versions of the same funds were available; and would not have retained investment options

---

[30] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

which had a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

## I. The Plans' hundreds of investment options and multiple recordkeepers.

110. Prior to October 2016, Defendants included over *240* investment options in the Retirement Plan and over *180* investment options in the Voluntary Savings Plan. For both Plans these options included mutual funds, insurance pooled separate accounts, and insurance company fixed and variable annuity products. The mutual fund options included *retail* share class mutual funds, despite the massive size of the Plans. These retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

111. The investment options were and are offered by TIAA-CREF and the Fidelity Management Trust Company ("Fidelity"). Defendants select investment options into which participants' investments are directed, including those investment options that are removed from the Retirement Plan and the Voluntary Savings Plan.

112. Under the terms of the Retirement Plan, participants are eligible to contribute a discretionary amount of their annual compensation to the Plan and Northwestern makes a matching contribution. Under the terms of the Voluntary Savings Plan, participants may likewise contribute a discretionary amount of their annual compensation to the Plan, but Northwestern makes no matching contribution.

113.    As of December 31, 2015, Defendants offered a total of 242 investment options to Retirement Plan participants. In particular, the Retirement Plan offered 39 TIAA-CREF investments and 203 Fidelity investments (including both Fidelity funds and third-party funds offered through Fidelity).

114.    These investments are designated by Defendants as available investment alternatives offered under the Retirement Plan.

115.    As of December 31, 2015, Defendants offered a total of 187 investment options to Voluntary Savings Plan participants. In particular, the Voluntary Savings Plan offered 39 TIAA-CREF investments and 148 Fidelity investments (including both Fidelity funds and third-party funds offered through Fidelity).

116.    These investments are designated by Defendants as available investment alternatives offered under the Voluntary Savings Plan.

117.    The TIAA Traditional Annuity offered in both Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent on the claims-paying ability of TIAA. The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans.

118.    Both Plans include the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities that invest in underlying

securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

119.    The TIAA Real Estate Account is an insurance separate account maintained by TIAA. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets.

120.    The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

121.    The Fidelity investment options offered to Plan participants are primarily mutual funds that charge varying amounts for investment management and other expenses, depending on the type of investment and share class.

122.    As of December 31, 2015, of the Retirement Plan's $2.34 billion in net assets, TIAA-CREF funds accounted for nearly $1.8 billion and Fidelity funds accounted for nearly $548 million. As of December 31, 2015, of the Voluntary Savings Plan's $530 million in net assets, TIAA-CREF funds accounted for over $360 million and Fidelity funds accounted for over $160 million.

123. In 2016, Defendants eliminated hundreds of mutual funds provided to the Plans' participants and selected a tiered structure comprised of a limited core set of 32 investment options.[31]

124. Tier 1 consists of Blackrock target date mutual funds. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's expected retirement date, and is often part of the name for the fund. For instance, "2030" target date funds are designed for individuals who intend to retire in the year 2030.

125. Tier 2 includes only five index funds comprising various asset classes and investment styles.

126. Tier 3 includes 26 actively managed investment options, which include mutual funds, variable annuities, and an insurance separate account.

127. Tier 4 consists of a self-directed brokerage window.

128. The Plans' participants could invest in the options offered in Tiers 1–3 beginning July 27, 2016, and in the Tier 4 self-directed brokerage window as of September 16, 2016. Plan participants were permitted to invest in options available under the previous structure until October 21, 2016.

## II. Defendants improperly allowed TIAA-CREF to require the inclusion of its investment products in the Plans and improperly allowed TIAA to require it to provide recordkeeping for its proprietary options.

129. ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at

---

[31] The Plans' target date funds are counted as a single investment option.

423, and to remove imprudent investments no matter how long they have been in a plan, *Tibble*, 135 S. Ct. at 1828–29.

130.     As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products. By agreeing to TIAA's mandate that its recordkeeping services had to be linked to including its funds in the Plans, Defendants promoted TIAA's financial interests at the expense of participants and drove excessive and uncapped revenue to TIAA's recordkeeping arm for years.

131.     By allowing the Plans to enter such a bundled arrangement with TIAA-CREF, Northwestern agreed to lock its employees into funds which Northwestern did not analyze. It can never be prudent to lock in a fund in a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. Defendants thus failed to discharge its duty to independently evaluate whether each investment option was prudent for the Plans; whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants; and whether it was prudent to include and retain the CREF Stock and Money Market accounts and the TIAA Traditional in the Plans. Instead of acting solely in the interest of participants,

Defendants allowed TIAA's financial interest to dictate the Plans' investment selections and recordkeeping arrangement. Because Defendants allowed CREF Stock to be locked into the Plans, Defendants could not satisfy its duty to evaluate the option for inclusion and retention in the Plans, whether it was prudent at the time of inclusion and whether it should be removed if imprudent. As a result of Defendants' breach in allowing CREF Stock to be retained in the Plans because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plans suffered massive losses compared to prudent alternatives, as discussed in more detail below. *See infra* ¶¶186–208.

132. As noted above, the Plans offer the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. An example of the restrictions and penalties for withdrawal imposed by this Annuity include a 2.5% surrender charge if a participant withdraws his or her investment in a single lump sum within 120 days of termination of employment. Participants who wish to withdraw their savings without this 2.5% penalty can only do so by spreading their withdrawal over a *ten-year period*.

133. The Plans include TIAA-CREF's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style.

134.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

      a.    "administrative expense" charge (24 bps);[32]

      b.    "distribution expense" charge (9.5 bps);

      c.    "mortality and expense risk" charge (0.5 bps); and

      d.    "investment advisory expense" charge (ranging from 4 to 12.5 bps).

135.    Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plan's participants, and the other two layers of fees pay for services that provide *no* benefit to the Plan's participants.

    **a.  Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plans' assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

_____

[32] Expenses are stated as of May 1, 2014.

**b. Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

**c. Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plans, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their

variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

**d. Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as the Northwestern Plans, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plans' fiduciaries did not obtain the lower investment management fees that come with the Plans' enormous asset size. As a result, the Plans, with billions of dollars invested in CREF variable annuities, pay the same

asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by Northwestern employees and retirees. The Plans subsidized these efforts for years, often at a loss—compounding their conflict and breaching their duty to participants under ERISA.

136. The excessiveness of this investment management fee is even more egregious because of the way critics have documented how CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. *See supra* ¶86.

137. The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

   a. "administrative expense" charge (26.5 bps);

   b. "distribution expense" charge (8 bps);

   c. "mortality and expense risk" charge (0.5 bps);

   d. "liquidity guarantee" (18 bps); and

   e. "investment management expense" charge (36.5 bps).

138. The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and

lower cost mutual funds such as the Vanguard REIT Index (Inst), which has a *total* expense ratio of 8 bps. *See infra* ¶¶210–213

139.    As noted, the TIAA-CREF mutual funds in the Plans charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class. Thus, the Plans' participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plans do not include such marketing costs.

## III.  Defendants caused the Plans to pay excessive administrative and recordkeeping fees.

140.    As set forth above, the market for defined contribution recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Plans and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

141.    Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put their plans' recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

142.   As detailed above, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees, while the use of a single recordkeeper offers many benefits such as leveraging the plan's participant base to obtain economies of scale to ensure that participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used. Instead of leveraging the size of the participant base to take advantage of economies of scale, using multiple recordkeepers eliminates a plan's leverage. Rather than obtaining pricing based on a 30,000-participant plan from one recordkeeper, Defendants spread recordkeeping of participants among two separate recordkeepers, who pushed each of their own products on the Plans. This took away the Plans' ability to obtain favorable pricing and resulted in the Plans including hundreds of investment options that Defendants never reviewed.

143.   Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continue to contract with two separate recordkeepers (TIAA-CREF and Fidelity) for the Retirement Plan to date and only consolidated the Voluntary Savings Plan to one recordkeeper (TIAA-CREF) in late 2012. There was no loyal or prudent reason that Defendants failed to engage in such process for the Voluntary Savings Plan long before both 2012 and 2009. There is also no loyal or prudent reason that Defendants continue to maintain a costly and ineffective multiple recordkeeping structure for the Retirement Plan to date. In

addition to the uncapped revenue sharing received as payment for these administrative services, the inefficient and costly structure of multiple recordkeepers has caused both Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services.

144.    The Retirement and the Voluntary Savings Plans' recordkeepers receive compensation for providing such services through per-participant fees and revenue sharing payments from the Plans' investments.

145.    Upon information and belief and industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments are set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

146.    Upon information and belief, Fidelity was and/or is compensated for recordkeeping services based on internal revenue sharing it receives from using higher-cost share classes of Fidelity's mutual funds as opposed to the institutional classes readily available to jumbo plans such as the Plans.

147.    In addition, TIAA-CREF and Fidelity also receive and/or received additional indirect compensation, including float, revenue derived from securities

lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

148.    Based on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the number of participants in the Plans combined (approximately 30,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plans would be approximately $1,050,000 in the aggregate for both Plans combined (or a flat fee based on $35 per participant). Even if Defendants had negotiated a reasonable recordkeeping fee for the Retirement and Voluntary Savings Plans separately, the Plans would have paid dramatically less for recordkeeping services.

149.    Based on schedules regarding service provider compensation in the Retirement Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plans' recordkeepers from their proprietary investment options, the Retirement Plan paid between $3.3 and $4.1 million (or approximately $153 to $213 per participant) *per year* from 2010 to 2015, over *500%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

150.    Based on schedules regarding service provider compensation in the Voluntary Savings Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plans' recordkeepers from their proprietary investment options, the Voluntary

Savings Plan paid between $660,000 and $900,000 (or approximately $54 to $87 per participant) per year from 2010 to 2015, over *149%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

151.    Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plans' recordkeeping services. A competitive bidding process for recordkeeping services would have produced a reasonable recordkeeping fee. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, negotiate a reduction in recordkeeping fees, and rebate the full amount of excess expenses paid by participants for recordkeeping services.

152.    Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendants also failed to adequately negotiate rebates of excessive fee payments to TIAA-CREF and Fidelity. As a specific example, because the multi-billion dollar plans paid the same percentage of asset-based fees as much smaller plans that used TIAA-CREF's products and services, Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on the Plans' economies of scale. Just as with investment management fees, the Plans' size would have enabled Defendants to command a much lower fee. Defendants could have also demanded and obtained similar rebates of all excessive fee payments from Fidelity. Had Defendants adequately negotiated for these

rebates, the Plans' recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

153. The impact of excessive fees on employees' and retirees' retirement assets is dramatic, as the U.S. Department of Labor has found. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013) (finding that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career).[33]

154. Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF and Fidelity. Therefore, Defendants caused the participants in both Plans to pay unreasonable expenses for administration. Had Defendants ensured that participants only paid reasonable fees for administrative and recordkeeping services, Retirement and Voluntary Savings Plan participants would not have lost approximately $30 million of their retirement savings.[34]

IV. **Defendant caused the Plans to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.**

155. Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only

---

[33] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

[34] The Plans' losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments growing with the market.

difference between the various share classes is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class-ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[35]

156.    Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost chare class of the same fund is available, to avoid saddling the plan with unnecessary fees.

157.    Jumbo investors like the Plans can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

---

[35] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

158.   Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plans. Institutional share classes sometimes have a minimum investment threshold to qualify for the institutional rate. However,

> For large 401(k) plans with over a billion dollars in total assets ... mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D. Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

159.   As further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plans less expensive institutional share classes of TIAA-CREF and Fidelity mutual fund options despite not meeting the minimum investment thresholds.

160.   Therefore, Defendants knew or should have known that investment providers would have allowed the Plans to provide lower-cost share classes to participants if Defendants had asked.

161.   Defendants selected and continue to retain' investment options in the Retirement and Voluntary Savings Plans with far higher costs than were and are available for the Plans based on their size. This includes Defendants selecting and continuing to offer far higher-cost share classes even though lower-cost share classes of the *exact same mutual funds* were available. The following table sets forth each higher-cost mutual fund share class that was included in the Plans during the

proposed class period for which a significantly lower-cost, but otherwise identical, share class of the same mutual fund was available. The expense ratios identified for the Plans' investment option and the lower-cost share class alternative are based on the earliest date during the proposed class period that the higher-cost fund was included in the Plans:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Calvert New Vision Small Cap (A) (CNVAX) | 189 bps | Calvert New Vision Small Cap (I) (CVSMX) | 92 bps | 105.43% |
| Fidelity Large Cap Growth (FSLGX) | 80 bps | Fidelity Advisor Large Cap Growth (Inst) (FLNOX) | 68 bps | 17.65% |
| Fidelity Mid Cap Growth (FSMGX) | 67 bps | Fidelity Advisor Mid Cap Growth (Inst) (FGCOX) | 59 bps | 13.56% |
| Fidelity Spartan 500 Index (Inv) (FSMKX) | 10 bps | Fidelity Spartan 500 Index (Adv) (FSMAX) | 7 bps | 42.86% |
| Fidelity Stock Selector Small Cap (FDSCX ) | 75 bps | Fidelity Advisor Stock Selector Small Cap (I) (FCDIX) | 62 bps | 20.97% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 47 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 22 bps | 113.64% |
| TIAA-CREF Lifecycle 2015 (Retire) (TCLIX) | 46 bps | TIAA-CREF Lifecycle 2015 (Inst) (TCNIX) | 42 bps | 9.52% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 45 bps | TIAA-CREF Lifecycle 2020 (Inst) (TCWIX) | 42 bps | 7.14% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 44 bps | TIAA-CREF Lifecycle 2025 (Inst) (TCYIX) | 42 bps | 4.76% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 44 bps | TIAA-CREF Lifecycle 2030 (Inst) (TCRIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 44 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 44 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 44 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 44 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Managed Allocation (Retire) (TITRX) | 71 bps | TIAA-CREF Managed Allocation (Inst) (TIMIX) | 46 bps | 54.35% |
| TIAA-CREF Small-Cap Blend Index (Retire) (TRBIX) | 35 bps | TIAA-CREF Small-Cap Blend Index (Inst) (TISBX) | 10 bps | 250.00% |
| TIAA-CREF Small-Cap Equity (Retire) (TRSEX) | 78 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 53 bps | 47.17% |
| TIAA-CREF Social Choice Equity (Retire) (TRSCX) | 47 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 22 bps | 113.64% |
| Vanguard Growth Index (Inv) (VIGRX) | 28 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 250.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 27 bps | Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | 237.50% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard PRIMECAP (Inv) (VPMCX) | 49 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 37 bps | 32.43% |
| Vanguard Small Cap Index (Inv) (NAESX) | 28 bps | Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | 250.00% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 225.00% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 20 bps | 65.00% |
| Calvert Balanced Portfolio (A) (CSIFX) | 123 bps | Calvert Balanced Portfolio (I) (CBAIX) | 72 bps | 70.83% |
| Calvert Capital Accumulation (A) (CCAFX) | 176 bps | Calvert Capital Accumulation (I) (CCPIX) | 86 bps | 104.65% |
| Calvert International Equity (A) (CWVGX) | 180 bps | Calvert International Equity (I) (CWVIX) | 106 bps | 69.81% |
| Calvert Small Cap (A) (CCVAX) | 169 bps | Calvert Small Cap (I) (CSVIX) | 92 bps | 83.70% |
| Domini Social Equity (Inv) (DSEFX) | 123 bps | Domini Social Equity (Inst) (DIEQX) | 75 bps | 64.00% |
| Fidelity 500 Index (Inv) (FUSEX) | 10 bps | Fidelity 500 Index (Prem) (FUSVX) | 7 bps | 42.86% |
| Fidelity Balanced (FBALX) | 61 bps | Fidelity Balanced (K) (FBAKX) | 47 bps | 29.79% |
| Fidelity Blue Chip Growth (FBGRX) | 93 bps | Fidelity Blue Chip Growth (K) (FBGKX) | 74 bps | 25.68% |
| Fidelity Capital Appreciation (FDCAX) | 86 bps | Fidelity Capital Appreciation (K) (FCAKX) | 68 bps | 26.47% |
| Fidelity Contrafund (FCNTX) | 91 bps | Fidelity Contrafund (K) (FCNKX) | 78 bps | 16.67% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Disciplined Equity (FDEQX) | 68 bps | Fidelity Disciplined Equity (K) (FDEKX) | 51 bps | 33.33% |
| Fidelity Diversified International (FDIVX  ) | 96 bps | Fidelity Diversified International (K) (FDIKX) | 77 bps | 24.68% |
| Fidelity Dividend Growth (FDGFX  ) | 92 bps | Fidelity Dividend Growth (K) (FDGKX) | 71 bps | 29.58% |
| Fidelity Equity Income II (FEQTX) | 69 bps | Fidelity Equity Income II (K) (FETKX) | 54 bps | 27.78% |
| Fidelity Equity-Income (FEQIX) | 74 bps | Fidelity Equity-Income (K) (FEIKX) | 54 bps | 37.04% |
| Fidelity Export & Multinational (FEXPX) | 84 bps | Fidelity Export & Multinational K (FEXKX) | 64 bps | 31.25% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom K 2000 (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom K 2005 (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom K 2010 (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom K 2015 (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom K 2020 (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom K 2025 (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom K 2030 (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom K 2035 (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom K 2040 (FFKFX) | 62 bps | 30.65% |
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom K 2045 (FFKGX) | 62 bps | 32.26% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2050  (FFFHX) | 84 bps | Fidelity Freedom K 2050  (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom Income  (FFFAX) | 50 bps | Fidelity Freedom K Income  (FFKAX) | 42 bps | 19.05% |
| Fidelity Fund (FFIDX) | 60 bps | Fidelity Fund (K) (FFDKX) | 43 bps | 39.53% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Global Commodity Stock (I) (FFGIX) | 107 bps | 1.87% |
| Fidelity Growth & Income (FGRIX) | 74 bps | Fidelity Growth & Income (K) (FGIKX) | 53 bps | 39.62% |
| Fidelity Growth Company (FDGRX) | 89 bps | Fidelity Growth Company (K) (FGCKX) | 72 bps | 23.61% |
| Fidelity Growth Discovery (FDSVX) | 75 bps | Fidelity Growth Discovery (K) (FGDKX) | 52 bps | 44.23% |
| Fidelity Growth Strategies (FDEGX) | 77 bps | Fidelity Growth Strategies (K) (FAGKX) | 51 bps | 50.98% |
| Fidelity Independence (FDFFX) | 92 bps | Fidelity Independence (K) (FDFKX) | 77 bps | 19.48% |
| Fidelity International Discovery (FIGRX) | 100 bps | Fidelity International Discovery (K) (FIDKX) | 79 bps | 26.58% |
| Fidelity International Index (Inv) (FSIIX) | 10 bps | Fidelity International Index (Prem) (FSIVX) | 7 bps | 42.86% |
| Fidelity International Small Cap (FISMX) | 142 bps | Fidelity International Small Cap (I) (FIXIX) | 131 bps | 8.40% |
| Fidelity International Small Cap Opportunities (FSCOX) | 89 bps | Fidelity International Small Cap Opportunities (I) (FOPIX) | 88 bps | 1.14% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Leveraged Company Stock (FLVCX ) | 88 bps | Fidelity Leveraged Company Stock (K) (FLCKX) | 69 bps | 27.54% |
| Fidelity Long-Term Treasury Bond Index (Inv) (FLBIX) | 20 bps | Fidelity Long-Term Treasury Bond Index (Prem) (FLBAX) | 10 bps | 100.00% |
| Fidelity Low-Priced Stock (FLPSX ) | 99 bps | Fidelity Low-Priced Stock (K) (FLPKX) | 85 bps | 16.47% |
| Fidelity Magellan (FMAGX) | 74 bps | Fidelity Magellan (K) (FMGKX) | 58 bps | 27.59% |
| Fidelity Mid-Cap Stock (FMCSX ) | 64 bps | Fidelity Mid-Cap Stock (K) (FKMCX) | 41 bps | 56.10% |
| Fidelity OTC (FOCPX) | 104 bps | Fidelity OTC (K) (FOCKX) | 88 bps | 18.18% |
| Fidelity Overseas (FOSFX) | 85 bps | Fidelity Overseas (K) (FOSKX) | 66 bps | 28.79% |
| Fidelity Puritan (FPURX) | 61 bps | Fidelity Puritan (K) (FPUKX) | 47 bps | 29.79% |
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Select Gold (I) (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Select Materials (I) (FMFEX) | 93 bps | 1.08% |
| Fidelity Short-Term Treasury Bond Index (Inv) (FSBIX) | 20 bps | Fidelity Short-Term Treasury Bond Index (Prem) (FSBAX) | 10 bps | 100.00% |
| Fidelity Stock Selector (FDSSX) | 86 bps | Fidelity Stock Selector (K) (FSSKX) | 66 bps | 30.30% |
| Fidelity Total Market Index (Inv) (FSTMX) | 10 bps | Fidelity Total Market Index (Prem) (FSTVX) | 7 bps | 42.86% |
| Fidelity Value (FDVLX) | 63 bps | Fidelity Value (K) (FVLKX) | 46 bps | 36.96% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Value Discovery (FVDFX) | 95 bps | Fidelity Value Discovery (K) (FVDKX) | 74 bps | 28.38% |
| Fidelity Value Strategies (FSLSX) | 80 bps | Fidelity Value Strategies (K) (FVSKX) | 56 bps | 42.86% |
| TIAA-CREF Equity Index (Retire) (TIQRX) | 33 bps | TIAA-CREF Equity Index (Inst) (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income (Retire) (TRGIX) | 73 bps | TIAA-CREF Growth & Income (Inst) (TIGRX) | 52 bps | 40.38% |
| TIAA-CREF High-Yield (Retire) (TIHRX) | 65 bps | TIAA-CREF High-Yield (Inst) (TIHYX) | 40 bps | 62.50% |
| TIAA-CREF International Equity (Retire) (TRERX) | 78 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Inst) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Growth (Retire) (TILRX) | 75 bps | TIAA-CREF Large-Cap Growth (Inst) (TILGX) | 50 bps | 50.00% |
| TIAA-CREF Large-Cap Growth Index (Retire) (TRIRX) | 34 bps | TIAA-CREF Large-Cap Growth Index (Inst) (TILIX) | 9 bps | 277.78% |
| TIAA-CREF Large-Cap Value (Retire) (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 49 bps | 51.02% |
| TIAA-CREF Large-Cap Value Index (Retire) (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index (Inst) (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Mid-Cap Growth (Retire) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 52 bps | 48.08% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Mid-Cap Value (Retire) (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value (Inst) (TIMVX) | 49 bps | 51.02% |
| TIAA-CREF Real Estate Securities (Retire) (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities (Inst) (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index (Retire) (TRSPX) | 33 bps | TIAA-CREF S&P 500 Index (Inst) (TISPX) | 8 bps | 312.50% |
| TIAA-CREF Short-Term Bond (Retire) (TISRX) | 55 bps | TIAA-CREF Short-Term Bond (Inst) (TISIX) | 30 bps | 83.33% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX ) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) (I) (FIEMX) | 119 bps | 5.04% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Japan (I) (FJPIX) | 75 bps | 6.67% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Real Estate Income (I) (FRIRX) | 89 bps | 3.37% |
| Vanguard Growth Index (Signal) (VIGSX) | 10 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 25.00% |
| Vanguard Mid Cap Index (Signal) (VMISX) | 14 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 133.33% |
| Vanguard Small Cap Index (Signal) (VSISX) | 10 bps | Vanguard Small Cap Index (Inst Pl) (VSCPX) | 6 bps | 66.67% |
| Vanguard Value Index (Signal) (VVISX) | 12 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 50.00% |
| Fidelity 500 Index (Inst) (FXSIX) | 5 bps | Fidelity 500 Index (Inst Prem) (FXAIX) | 3 bps | 66.67% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond (Inst) (FCNVX) | 30 bps | 33.33% |
| Fidelity Emerging Markets Index (Prem) (FPMAX) | 22 bps | Fidelity Emerging Markets Index (Inst Prem) (FPADX) | 12 bps | 83.33% |
| Fidelity Extended Market Index (Prem) (FSEVX) | 7 bps | Fidelity Extended Market Index (Inst Prem) (FSMAX) | 6 bps | 16.67% |
| Fidelity Global ex-US Index (Prem) (FSGDX) | 18 bps | Fidelity Global ex-US Index (Inst Prem) (FSGGX) | 10 bps | 80.00% |
| Fidelity International Index (Prem) (FSIVX) | 7 bps | Fidelity International Index (Inst Prem) (FSPSX) | 6 bps | 16.67% |
| Fidelity Mid Cap Index (Prem) (FSCKX) | 12 bps | Fidelity Mid Cap Index (Inst Prem) (FSMDX) | 6 bps | 100.00% |
| Fidelity Small Cap Index (Prem) (FSSVX) | 17 bps | Fidelity Small Cap Index (Inst Prem) (FSSNX) | 11 bps | 54.55% |
| Fidelity Total Market Index (Prem) (FSTVX) | 7 bps | Fidelity Total Market Index (Inst Prem) (FSKAX) | 5 bps | 40.00% |
| Fidelity U.S. Bond Index (Prem) (FSITX) | 12 bps | Fidelity U.S. Bond Index (Inst Prem) (FXNAX) | 5 bps | 140.00% |
| Fidelity China Region (FHKCX) | 98 bps | Fidelity Advisor China Region I (FHKIX) | 93 bps | 5.38% |
| Fidelity Inflation-Protected Index (Prem) (FSIYX) | 10 bps | Fidelity Inflation-Protected Index (Inst Prem) (FIPDX) | 5 bps | 100.00% |
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate (I) (FIRIX) | 109 bps | 4.59% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Latin America (FLATX) | 103 bps | Fidelity Latin America (I) (FLFIX) | 101 bps | 1.98% |
| Fidelity Real Estate Index (Prem) (FSRVX) | 9 bps | Fidelity Real Estate Index (Inst) (FSRNX) | 7 bps | 28.57% |
| Strategic Advisers Core Multi-Manager (FLAUX) | 96 bps | Strategic Advisers Core Multi-Manager (F) (FHJSX) | 86 bps | 11.63% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager (F) (FMBKX) | 107 bps | 8.41% |
| Strategic Advisers Value Multi-Manager (FKMOX) | 97 bps | Strategic Advisers Value Multi-Manager (F) (FGWBX) | 87 bps | 11.49% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth (Z) (FZAJX) | 88 bps | 18.18% |
| Fidelity Mega Cap Stock (FGRTX ) | 68 bps | Fidelity Mega Cap Stock (Z) (FZALX) | 54 bps | 25.93% |
| Strategic Advisers Small Mid Cap Multi-Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi-Manager (F) (FARMX) | 105 bps | 10.48% |
| Vanguard Growth Index (Adm) (VIGAX) | 9 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 12.50% |
| Vanguard Mid Cap Index (Adm) (VIMAX) | 9 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 50.00% |
| Vanguard Small Cap Index (Adm) (VSMAX) | 9 bps | Vanguard Small Cap Index (Inst Pl) (VSCPX) | 6 bps | 50.00% |
| Vanguard Value Index (Adm) (VVIAX) | 9 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 12.50% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Emerging Markets Discovery (FEDDX) | 144 bps | Fidelity Emerging Markets Discovery (I) (FEDIX) | 143 bps | 0.70% |
| Fidelity Europe (FIEUX) | 101 bps | Fidelity Europe (I) (FHJMX) | 96 bps | 5.21% |
| Fidelity Total Bond (FTBFX) | 45 bps | Fidelity Total Bond (Z) (FBKWX) | 36 bps | 25.00% |

162.    These lower-cost share classes have been available to the Retirement Plan and Voluntary Savings Plan for years, some dating back to the early 2000's or before.

163.    Further, even after the changes made effective October 2016, Defendants continue to provide higher-cost Vanguard mutual funds than are available, including the Vanguard Total Bond Market Fund, the Vanguard Total International Stock Index Fund, the Vanguard Extended Market Index, and the Vanguard Institutional Index Fund.

164.    Because the share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost, Defendants' failure to select the lower-cost share classes for the Plans' mutual fund options demonstrates that Defendants failed to prudently consider and use the size and purchasing power of the Plans when selecting the Plans' investment options.

165.     Defendants' use of the higher-cost share classes instead of the available lower-cost versions caused the Plans' participants to lose millions of dollars of their retirement savings due to wholly unnecessary fees.

## V.     Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to pay lower fees and confusing participants.

166.     Defendants provided a multitude of duplicative funds in the same investment style, thereby depriving the Plans of their bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to what industry experts have described as "decision paralysis" for participants. *See, e.g.*, Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009) ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions."). For the Retirement and Voluntary Savings Plans, Defendants placed over 240 and 180 investment options in the core lineup of each Plan respectively in the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and fixed guaranteed annuity.

167.     Having such an overwhelming number of investment options also places a monumental burden on the Plans' participants in selecting options in which to invest. Mutual funds are required to offer a prospectus, which is designed to provide material information to potential investors to enable them to make an

informed, prudent investment decision. The prospectus sets forth a fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information. For the Fidelity Freedom Funds alone, the prospectus and supporting materials filed with the SEC span almost *800* printed pages.[36] If a Retirement Plan or Voluntary Savings Plan participant were to review the prospectuses of all the more than 240 or 180 investment options that were placed in the Retirement Plan and the Retirement Plan respectively, they would have to read many thousands of pages of materials. This is a virtually impossible burden. Even for the Plans' fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the hundreds of funds they selected and retained for each of the Plans.

168.    In comparison to the hundreds of investment options offered in the Retirement Plan and Voluntary Savings Plan, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[37] This reasonable number of options provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

---

[36] *See* Fidelity Freedom Funds Prospectus, Form N-1A (May 28, 2016), available at https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm.

[37] Available at https://www.callan.com/research/files/990.pdf.

169.   A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

170.   Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. Including a large number of alternatives removes the benefit of pooling assets consistent with the size of the Plans. Assembling a haphazard lineup of hundreds of duplicative options, proprietary to the Plans' recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

171.   Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and

82

investment style. When many investment options in a single investment style are included in a plan, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

172.    Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do,[38] when many actively managed funds are included within the same investment style, this results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

173.    In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments*, T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[39]

---

[38] Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476, 1481 (2015)("It is well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

[39] Available at

174. Moreover, having many actively managed funds in the Plans within the same investment style results in the Plans effectively having an index fund return even though the Plans are paying fees for active management that are much higher than the fees of a passive index fund.

175. From 2010 to October 2016, the Retirement Plan included duplicative investments in every major asset class and investment style, including balanced/asset allocation (16 options), fixed income and high yield bond (32 options), specialty/focused (41 options), international (36 options), large cap domestic equities (48 options), mid cap domestic equities (15 options), small cap domestic equities (12 options), real estate (2 options), money market (9 options), and target date investments (2 fund families). Over the same period, the Voluntary Savings Plan included duplicative investments in balanced/asset allocation (16 options), fixed income and high yield bond (32 options), specialty/focused (41 options), international (35 options), large cap domestic equities (48 options), mid cap domestic equities (15 options), small cap domestic equities (11 options), real estate (6 options), and money market (9 options), and target date investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and leads to "decision paralysis".

176. For illustration purposes, Defendants included 14 large cap domestic blend investments for both the Retirement Plan and Voluntary Savings Plan as of

---

http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

December 31, 2015. These investments are summarized below and compared to a far lower-cost alternative: the Vanguard Institutional Index Fund (Instl Plus). The Vanguard Institutional Index Fund (Instl Plus) (VIIIX), by definition, mirrors the market, and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Total Assets | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $527,984,153 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $52,667,490 | 37 bps | 2 bps | 1750% |
| TIAA-CREF Equity Index (INST) (TIEIX) | $12,606,572 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index (INST) (TISPX) | $25,385,799 | 6 bps | 2 bps | 200% |
| Fidelity Domini Social Equity (INV) (DSEFX) | $949,081 | 116 bps | 2 bps | 5700% |
| Fidelity Disciplined Equity (K) (FDEKX) | $2,251,402 | 79 bps | 2 bps | 3850% |
| Fidelity Dividend Growth (K) (FDGKX) | $4,097,254 | 57 bps | 2 bps | 2750% |
| Fidelity Growth & Income (K) (FGIKX) | $6,419,109 | 52 bps | 2 bps | 2650% |
| Fidelity Large Cap Core Enhanced Index (FLCEX) | $365,500 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock (FLCSX) | $1,392,162 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock (FGRTX) | $738,905 | 67 bps | 2 bps | 3250% |
| Fidelity Spartan 500 Index (INST) (FXSIX) | $38,057,710 | 4 bps | 2 bps | 100% |
| Fidelity Spartan Total Market Index (ADV) (FSTVX) | $16,697,483 | 5 bps | 2 bps | 150% |
| Strategic Advisers Core Multi-Manager (FLAUX) | $23,547 | 97 bps | 2 bps | 4750% |

| Large Cap Blend Investments | Total Assets | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| Total of Higher-Cost Alternatives | *$689,636,167* | | | |

177.    With over *$580 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps.



178.    Many other large cap index funds are also available at far lower costs than the Plans' large cap blend funds. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Instl Plus), Plan participants would have avoided losing well in excess of $2.6 million dollars in fees for 2015 alone, and many more millions since 2010.

179.    In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as the S&P 500, by holding a representative sample of securities in the index. Because no stock selection or research is needed, index fund fees are much lower than the fees of actively-managed funds in the same investment style, as set forth in ¶¶57–59, 188–192.

180.    For example, in the large cap blend investment style, Defendants provided four separate index funds in each Plan that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection. As another example, Defendants retained five separate index funds for the fixed income and intermediate-term bond investment style.

181.    Since index funds merely hold the same securities in the same proportions as the index,[40] having multiple index funds of the same category or investment style in the Plans provides no benefit to participants. As Morningstar CEO Joe Mansueto recently observed, "[b]asic market indexes are virtually interchangeable." Lewis Braham, *Morningstar Announces Free Use of Its Indexes*,

---

[40] Another example of an index is the Dow Jones Industrial Average.

Barron's (Nov. 5, 2016).[41] Including multiple similar index funds in the same investment style hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

182.    A Had Defendants combined hundreds of millions of dollars in the Plans' assets from duplicative index funds into a single index fund, as set forth in ¶176, the Plans would have generated higher investment returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

## VI.    Defendants imprudently and disloyally retained historically underperforming Plan investments.

183.    The excessive fees in the Plans' investments were not justified by superior investment returns. Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plans' investments resulted in options being retained in the Plans despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plans compared to what those assets would have earned if invested in prudent alternatives.

184.    As of December 31, 2014, of the Plans' investment options which had at least a five-year performance history, *57% of those funds—119 out of 208—*

---

[41] Available at http://www.barrons.com/articles/morningstar-announces-free-use-of-its-indexes-1478322642.

underperformed their respective benchmarks over the previous five-year period.[42]

The same performance chart shows that over *78%* of those underperforming funds—

93 out of 119—also underperformed their benchmark over the preceding *ten-year*

period. The 119 funds that underperformed over the five-year period include the

following:

| Fund Name | Ticker |
|---|---|
| Calvert Balanced Portfolio (A) | CSIFX |
| Calvert Capital Accumulation (A) | CCAFX |
| Calvert International Equity (A) | CWVGX |
| Calvert Small Cap (A) | CCVAX |
| CREF Bond Market | N/A |
| CREF Equity Index | N/A |
| CREF Growth | N/A |
| CREF Inflation-Linked Bond | N/A |
| CREF Money Market | N/A |
| CREF Social Choice | N/A |
| CREF Stock | N/A |
| Domini Social Equity (INV) | DSEFX |
| Fidelity Asset Manager 50% | FASMX |
| Fidelity Asset Manager 60% | FSANX |
| Fidelity Asset Manager 70% | FASGX |
| Fidelity Asset Manager 85% | FAMRX |
| Fidelity Balanced  (K) | FBAKX |
| Fidelity Blue Chip Value | FBCVX |

---

[42] These results are based on the performance and benchmark for each fund as shown on the Northwestern University 403(b) Retirement Plan and Voluntary Savings Plan Quarterly Investment Notice, Section 3. This figure excludes 25 funds in the Plans (out of the 233) which did not have 5-year performance histories as December 30, 2014. Over half of these funds—13 out of 25—underperformed their benchmarks on a one-year basis and since inception.

| Fund Name | Ticker |
|---|---|
| Fidelity Cash Reserves Management | FDRXX |
| Fidelity Contrafund  (K) | FCNKX |
| Fidelity Disciplined Equity  (K) | FDEKX |
| Fidelity Dividend Growth  (K) | FDGKX |
| Fidelity Equity Dividend Income  (K) | FETKX |
| Fidelity Equity-Income  (K) | FEIKX |
| Fidelity Export & Multinational  (K) | FEXKX |
| Fidelity Floating Rate High Income | FFRHX |
| Fidelity Focused High Income | FHIFX |
| Fidelity Four in One Index | FFNOX |
| Fidelity Freedom  (K) 2015 | FKVFX |
| Fidelity Freedom  (K) 2020 | FFKDX |
| Fidelity Freedom  (K) 2025 | FKTWX |
| Fidelity Freedom  (K) 2030 | FFKEX |
| Fidelity Freedom  (K) 2035 | FKTHX |
| Fidelity Freedom  (K) 2040 | FFKFX |
| Fidelity Freedom  (K) 2045 | FFKGX |
| Fidelity Freedom  (K) 2050 | FFKHX |
| Fidelity Fund  (K) | FFDKX |
| Fidelity Global Balanced | FGBLX |
| Fidelity Global Commodity Stock | FFGCX |
| Fidelity Global Strategies | FDYSX |
| Fidelity Government Income | FGOVX |
| Fidelity Government Money Market | SPAXX |
| Fidelity Growth Strategies  (K) | FAGKX |
| Fidelity High Income | SPHIX |
| Fidelity Inflation Protected Bond | FINPX |
| Fidelity Limited Term Government Fund | FFXSX |
| Fidelity Intermediate Government Income | FSTGX |

| Fund Name | Ticker |
|---|---|
| Fidelity International Value | FIVLX |
| Fidelity Japan | FJPNX |
| Fidelity Large Cap Growth Enhanced Index | FLGEX |
| Fidelity Latin America | FLATX |
| Fidelity Magellan  (K) | FMGKX |
| Fidelity Mid-Cap Stock  (K) | FKMCX |
| Fidelity Money Market | SPRXX |
| Fidelity Money Market Trust Retirement Government Money Market Portfolio | FGMXX |
| Fidelity NASDAQ Composite Index | FNCMX |
| Fidelity New Markets Income | FNMIX |
| Fidelity Puritan  (K) | FPUKX |
| Fidelity Real Estate Income | FRIFX |
| Fidelity Retirement Money Market | FRTXX |
| Fidelity Select Banking | FSRBX |
| Fidelity Select Brokerage & Investment Management | FSLBX |
| Fidelity Select Communications Equipment | FSDCX |
| Fidelity Select Computers | FDCPX |
| Fidelity Select Consumer Finance | FSVLX |
| Fidelity Select Consumer Staples | FDFAX |
| Fidelity Select Energy | FSENX |
| Fidelity Select Energy Services | FSESX |
| Fidelity Select Environment and Alternative Energy | FSLEX |
| Fidelity Select Financial Services | FIDSX |
| Fidelity Select Gold | FSAGX |
| Fidelity Select Industrial Equipment | FSCGX |
| Fidelity Select Materials | FSDPX |
| Fidelity Select Money Market | FSLXX |
| Fidelity Select Natural Gas | FSNGX |
| Fidelity Select Natural Resources | FNARX |

| Fund Name | Ticker |
|---|---|
| Fidelity Select Technology | FSPTX |
| Fidelity Select Telecommunications | FSTCX |
| Fidelity Select Utilities | FSUTX |
| Fidelity Select Wireless | FWRLX |
| Fidelity Small Cap Growth | FCPGX |
| Fidelity Small Cap Stock | FSLCX |
| Fidelity Spartan 500 Index (INST) | FXSIX |
| Fidelity Spartan Intermediate Treasury Index (ADV) | FIBAX |
| Fidelity Spartan International Index  (ADV) | FSIVX |
| Fidelity Spartan Long Term Treasury Bond Index (ADV) | FLBAX |
| Fidelity Spartan Short Term Treasury Index (ADV) | FSBAX |
| Fidelity Spartan Total Market Index (ADV) | FSTVX |
| Fidelity Spartan U.S. Bond Index (ADV) | FSITX |
| Fidelity Stock  Selector All Cap  (K) | FSSKX |
| Fidelity Stock  Selector Large Cap Value | FSLVX |
| Fidelity Stock Selector Mid Cap | FSSMX |
| Fidelity Strategic Dividend & Income | FSDIX |
| Fidelity Telecom & Utilities | FIUIX |
| Fidelity Treasury Only Money Mar (K)et | FDLXX |
| Fidelity US Government Reserves | FGRXX |
| Fidelity Value   (K) | FVLKX |
| Fidelity Value Strategies  (K) | FVSKX |
| TIAA Real Estate | QREARX |
| TIAA-CREF Equity Index (INST) | TIEIX |
| TIAA-CREF Growth & Income (INST) | TIGRX |
| TIAA-CREF High-Yield (INST) | TIHYX |
| TIAA-CREF Large-Cap Growth Index (INST) | TILIX |
| TIAA-CREF Large-Cap Value Index (INST) | TILVX |
| TIAA-CREF Large-Cap Value (INST) | TRLIX |

| Fund Name | Ticker |
|---|---|
| TIAA-CREF Lifecycle 2015 (INST) | TCNIX |
| TIAA-CREF Lifecycle 2020 (INST) | TCWIX |
| TIAA-CREF Lifecycle 2025 (INST) | TCYIX |
| TIAA-CREF Lifecycle 2030 (INST) | TCRIX |
| TIAA-CREF Lifecycle 2035 (INST) | TCIIX |
| TIAA-CREF Lifecycle 2040 (INST) | TCOIX |
| TIAA-CREF Lifecycle 2045 (INST) | TTFIX |
| TIAA-CREF Lifecycle 2050 (INST) | TFTIX |
| TIAA-CREF Managed Allocation (INST) | TIMIX |
| TIAA-CREF Mid-Cap Growth (INST) | TRPWX |
| TIAA-CREF Mid-Cap Value (INST) | TIMVX |
| TIAA-CREF S&P 500 Index (INST) | TISPX |
| TIAA-CREF Social Choice Equity (INST) | TISCX |
| Vanguard Windsor (ADM) | VWNEX |

185. Had Defendants conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plans or replaced. Defendants' failure to do so caused the Plans substantial losses compared to prudent alternative investments that were available to the Plans. Two funds in particular demonstrate the severe harm to the Plans resulting from Defendants' breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

**A.    CREF Stock Account.**

186. The CREF Stock Account is one of the largest investment options, by asset size, in the Plans with nearly $528 million in total assets, and has been offered to participants throughout the period from 2010 to date and many years

prior. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years, and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

187.    TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

188.    As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap

market because such companies are the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

189.     Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991);[43] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

190.     To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

191.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance

---

[43] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, J. FIN. 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

192.    Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

193.    Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J. FIN. 549, 571 (1995).[44]

194.    Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks ... The median active fund underperformed the passive index in 12 out of 18 years [for the large- cap fund universe] ... The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
> ****
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

195.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management.

196.    Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in

---

[44] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

the Plans. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. By allowing the Plans to be bound by this requirement, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plans.

197.    Additionally, as detailed above in ¶¶134–136, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plans' participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plans invested over *$528 million* in total assets in the CREF Stock Account.

198.    Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

199.    Defendants and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate investment results of the CREF Stock Account, as shown in the excerpts below that were provided to the Plans' participants.[45]

---

[45]Available at
https://www.tiaa.org/public/pdf/obiee/101332_Investment_Comparative_Chart.pdf  and
http://www.northwestern.edu/hr/benefits/retirement-plans/feedisclosure.pdf.

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol |
|---|---|---|
| CREF Stock Account<br><br><br>*Russell 3000 Index* | Large Blend | CSTK# |



200.   The CREF Stock Account did not merely underperform in a single year or two. Historical performance of the CREF Stock Account has been persistently poor for many years compared to this identified benchmark index (Russell 3000 Index), and also as compared to available low-cost index funds. The following two charts compare the investment returns of the CREF Stock Account to its benchmark (the Russell 3000) and two other passively managed index funds in the same investment style for the one-, three-, five-, and ten-year periods ending September 30, 2016. For each comparison, the CREF Stock Account dramatically

underperformed the benchmarks and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



**CREF Stock Account**
**One-, Three-, and Five-Year Investment Returns**
**Compared to Benchmarks**
(as of Sept. 30, 2016)





201.   The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund-Instl Plus (2 bps) and the Vanguard Institutional Index-Instl Plus (2 bps).

202.   Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, three-, five-, and ten-year periods ending September 30, 2016. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard PRIMECAP-Adm (VPMAX) and the Vanguard Capital Opp.-Adm (VHCAX).





102

203. This sustained underperformance went back even further. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[46]



[46] For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.





204.    Despite the consistent underperformance, the CREF Stock Account,

with an expense ratio of 46 bps as of December 31, 2014, was more expensive than

better-performing actively managed alternatives: the Vanguard PRIMECAP-Adm (35 bps) and the Vanguard Capital Opp.-Adm (40 bps).

205.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[47] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

206.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its continuing to underperform lower-cost investment alternatives that were readily available to the Plans.

---

[47] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

207.    Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

208.    Had Defendants removed the CREF Stock Account and the amounts been invested in any of the passively or actively managed lower-cost alternatives identified in ¶¶200 and 202, participants in the Plans would not have lost millions of dollars in retirement savings. Compared to the returns of the Vanguard PRIMECAP Fund Admiral—one of the Plans' core options after the October 2016 restructuring—the Plans lost in excess of $202 million at the plan level as a result of Defendants retaining the CREF Stock Account in the Plans.[48] The aggregate losses of all putative subclass members may be greater than that figure because the proposed subclass excludes participants (if any) whose CREF Stock Account investment outperformed the prudent alternative identified in the subclass definition, *see infra* ¶228.

**B.    TIAA Real Estate Account.**

209.    Defendants selected and retained the TIAA Real Estate Account as one of the real estate investment options in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently

---

[48] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

underperform comparable real estate investment alternatives, including the Vanguard REIT Index I (VGSNX).

210.    Additionally, as detailed in ¶¶137–138, the 87 bps that the TIAA Real Estate Account charged was comprised of *five* layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plans' participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided.

211.    With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Instl) with an expense ratio of 8 bps.



212.    The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[49] Despite this, Defendants selected and to this date retained it in the Plans.



---

[49] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Instl) was 5.49%.





213.    This underperformance occurred for years before 2009 and has

continued after 2009 to date. The TIAA Real Estate Account significantly

underperformed the Vanguard REIT Index I over the one-, three-, five-, and ten-

year periods ending September 30, 2016.



214.    As the Supreme Court unanimously ruled in *Tibble*, prudent

fiduciaries of defined contribution plans continuously monitor plan investment

options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast,

Defendants failed to conduct such a process and continue to retain the TIAA Real

Estate Account as an investment option in the Plans, despite its continued dramatic

underperformance and far higher cost compared to available investment alternatives.

215.    Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index (Instl), the Plans would not have lost at least $13.6 million in retirement savings at the plan level.[50] The aggregate losses of all putative subclass members may be greater than that figure because the proposed subclass excludes participants (if any) whose TIAA Real Estate Account investment outperformed the prudent alternative identified in the subclass definition, *see infra* ¶228.

## VII.    Defendants have admitted that the prior structure of the Plans was imprudent and that they allowed excessive fees to be charged to the Plans.

216.    Defendants expressly recognized that the Plans paid excessive administrative fees to TIAA-CREF and Fidelity. In an April 4, 2016 letter to the Plans' participants, Defendants explained that Northwestern had "negotiated a credit of fees, called a 'revenue credit,' from both Fidelity and TIAA."[51]

217.    A "revenue credit" is a rebate to retirement plan participants to compensate them for overpayments made to plan service providers—in this case, the recordkeepers.

218.    Northwestern informed Plan participants that the "modest" credits that each participant would receive would be "based on the proportion of [the

---

[50] Losses in the Plans have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Instl) to compensate participants who have not been reimbursed for their losses.

[51] April 4, 2016 letter from Pamela S. Beemer, available at http://www.northwestern.edu/hr/benefits/retirement-plans/2016-Revenue-Credit-Letter.pdf.

participant's] aggregate Northwestern University retirement account balance … as of March 31, 2016."[52] The credits, if any, appeared on participants' account statements for the second quarter of 2016. Thus, the effect of the credit was to offset overcharges after March 31, 2016.

219.    As Northwestern admitted, the revenue credits were "modest."[53] The amount of the credits did not begin to approach the roughly $30 million that the Plans' participants lost due to being overcharged by TIAA-CREF and Fidelity for recordkeeping services from 2010 through 2015, as described *supra* ¶¶148–150, 154.

220.    Defendants similarly acknowledged that the structure of the Plans prior to 2016—with *hundreds* of overlapping, duplicative, and costly investment options—caused participants to pay unreasonable investment fees.

221.    In a June 2016 letter to the Plans' participants, Defendants acknowledged that the new tiered structure was "designed to be simpler and **allow for informed decisions** to be made based upon an individual's personal investment comfort level and expertise," that would "**enable simpler decision-making**."[54]

222.    In an August 2016 "town hall" meeting presentation, Defendants explained that the new tiered structure would: "**[r]educe[] administration fees**," which would in turn "**increase[] participant returns**;" offer a "[s]treamlined

---

[52] *Id.*

[53] *Id.*

[54] June 2016 letter from Pamela S. Beemer, available at http://www.northwestern.edu/hr/benefits/retirement-plans/2016%20Investment%20Change.pdf.

menu for all investor types;" and provide "[a]ccess to **lower cost share classes** when available."[55]

223.    Defendants acknowledged that restructuring the Plans' investment options "**[b]etter aligns us with peers as many have reduced their line-ups, or are in [the] process of doing so.**"[56]

224.    Defendants also admitted that the recent shift in the Plans' structures "[p]ositions NURIC to **meet expanded fiduciary responsibilities** based on IRS regulations which now **mandate greater oversight by employers**."[57]

225.    Had Defendants used the massive bargaining power afforded them by the Plans' vast assets to obtain revenue credits, reduce administration fees, and obtain lower cost share classes by 2009 (if not years earlier), the Plans' participants would have avoided paying millions of dollars in unreasonable investment and administrative fees, and millions of dollars in performance losses.

226.    In restructuring the Plans' investment options, Defendants removed hundreds of unnecessary mutual funds from the Plans. However, they left both the CREF Stock Fund and the TIAA Real Estate Fund as investment options, despite their poor performance history as detailed in ¶¶186–215.

---

[55] "What You Need to Know: Changes to the Northwestern University Retirement Plans," available at http://www.northwestern.edu/hr/benefits/retirement-plans/Town%20Hall%20Meetings%20Presentation_Aug2016.pdf.
[56] *Id.*
[57] *Id.*

## CLASS ACTION ALLEGATIONS

227.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

228.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans, with two subclasses. Plaintiffs seek to certify, and to be appointed as representatives of, the following class and subclasses:

**Excessive Fee claims and class:**
All participants and beneficiaries of the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan, excluding the Defendants and any participant who is a fiduciary to the Plans, who had an account balance at any time between August 17, 2010 through the date of judgment.

**CREF Stock Account subclass:**
All participants and beneficiaries of the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan, excluding the Defendants and any participant who is a fiduciary to the Plans, who invested in the CREF Stock Account in either of the Plans at any time between August 17, 2010 through the date of judgment and whose investment in the CREF Stock Account underperformed the Russell 3000 Index minus 2 basis points for investment management.

**TIAA Real Estate Account subclass:**
All participants and beneficiaries of the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan, excluding the Defendants and any participant who is a fiduciary to the Plans, who invested in the TIAA Real Estate Account in either of the Plans at any time between August 17, 2010 date through the date

of judgment and whose investment in the TIAA Real Estate Account underperformed the Vanguard REIT Index (Instl).

229.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 20,000 members and the subclasses include thousands of members, and are thus so large that joinder of all members is impracticable,

b.    There are questions of law and fact common to this Class and subclasses because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.    Plaintiffs' claims are typical of the claims of the Class and subclasses because the Plaintiffs were participants during the time period at issue in this action and all participants in the Plans were harmed by the Plans' excessive fees and other misconduct, as described above; Plaintiffs Lancaster and Walker each invested in the CREF Stock Account during the proposed subclass period and suffered losses, and Plaintiffs Bona, Lancaster,

and Walker each invested in the TIAA Real Estate Account during the proposed subclass period and suffered losses.

        d.     Plaintiffs are adequate representatives of the Class and subclasses because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class or subclasses, are committed to the vigorous representation of the Class and subclasses, and have engaged experienced and competent attorneys to represent the Class and subclasses.

        e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

230.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries

is impracticable, the losses suffered by individual participants and beneficiaries may be small, it would be impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class or subclass member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class and subclasses under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

231.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and subclasses and is best able to represent the interests of the Class and subclasses under Rule 23(g).

a.    Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed*

*Martin Corp*., No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015).  In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

b.      Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc*., No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

c.      "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp*., No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

d.      "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co*., No. 06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id*. at *8 (internal quotations omitted).

118

e.     U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

f.     U.S. District Judge Herndon of the Southern District of Illinois, recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general..." *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

g.     The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work … investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

h.    Schlichter, Bogard & Denton handled the only full trial of an
ERISA excessive fee case, resulting in a $36.9 million judgment for the
plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,
Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the
district court concluded that "Plaintiffs' attorneys are clearly experts in
ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS
157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court
again awarded Plaintiffs' attorney's fees, emphasizing the significant
contribution Plaintiffs' attorneys have made to ERISA litigation, including
educating the Department of Labor and federal courts about the importance
of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by
> the Plaintiffs whose litigation clarified ERISA standards in the context
> of investment fees. The litigation educated plan administrators, the
> Department of Labor, the courts and retirement plan participants
> about the importance of monitoring recordkeeping fees and separating
> a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D.
Mo. Dec. 9, 2015).

i.    In *Spano v. Boeing Co.*, in approving a settlement reached after
nine years of litigation which included $57 million in monetary relief and
substantial affirmative relief to benefit participants, the court found that
"[t]he law firm Schlichter, Bogard & Denton has significantly improved
401(k) plans across the country by bringing cases such as this one, which

120

have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

      j.      Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

      k.      On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

      l.      Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135

S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

    m.    The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[58] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[59] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[60] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[61] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[62] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [63] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on*

---

[58] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[59] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[60] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[61] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[62] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[63] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

*Trial*, NPR (Dec. 15, 2014);[64] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[65] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[66]

## COUNT I

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

232. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

233. Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

234. Defendants were required to independently assess "the prudence of *each* investment option" for the Plans on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plans' participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendants were also required to remove investments that were no longer prudent

---

[64] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[65] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[66] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

for the Plans, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

235.    By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plans, as well as the TIAA Traditional Annuity, and to require that it provide recordkeeping for its proprietary options, Defendants committed the Plans to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plans from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendants abdicated their duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendants favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from TIAA-CREF's proprietary funds over the interest of participants.

236.    Because Defendants shackled the Plans with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decision-making process as to the prudence of those options, Defendants are liable to make good to the Plans all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plans suffered massive losses from the inclusion of the CREF Stock Account in the Plans compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plans, and

124

also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

237.    Total Plan losses will be determined after complete discovery in this case and are continuing.

238.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

239.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

240.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

241.    Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a

125

direct or indirect –

> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *
> (C)     furnishing of goods, services, or facilities between the plan and  party in interest;
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

242.    Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As a service provider to the Plans, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

243.    By allowing the Plans to be locked into an unreasonable arrangement that required the Plans to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plans due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendants caused the Plans to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plans and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of the Plans' assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D).

These transactions occurred each time the Plans paid fees to TIAA-CREF in connection with the Plans' investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

244. Total Plan losses will be determined after complete discovery in this case and are continuing.

245. Under 29 U.S.C. §1109(a), Defendants are personally liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

**COUNT III**

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**Unreasonable Administrative Fees**

246. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

247. Defendants were required to discharge its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

248. If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George,* 641 F.3d at 798–99. Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue

127

sharing" as a result of failures to "calculate the amount the Plan was paying …
through revenue sharing," to "determine whether [the recordkeeper's] pricing was
competitive," and to "leverage the Plan's size to reduce fees," while allowing the
"revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a
breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

249.    Defendants' process for monitoring and controlling the Plans'
recordkeeping fees was a fiduciary breach in that Defendants failed to adequately
monitor the amount of the revenue sharing received by the Plans' recordkeepers,
determine if those amounts were competitive or reasonable for the services provided
to the Plans, or use the Plans' size to reduce fees or obtain sufficient rebates to the
Plans for the excessive fees paid by participants. Moreover, Defendants failed to
solicit bids from competing providers on a flat per-participant fee basis. As the
Plans' assets grew, the asset-based revenue sharing payments to the Plans'
recordkeepers grew, even though the services provided by the recordkeepers
remained the same. This caused the recordkeeping compensation paid to the
recordkeepers to exceed a reasonable fee for the services provided. This conduct was
a breach of fiduciary duties.

250.    By allowing TIAA-CREF and Fidelity to put their proprietary
investments in the Plans without scrutinizing those providers' financial interest in
using funds that provided them a steady stream of revenue sharing payments,
Defendants failed to act in the exclusive interest of participants.

251.   In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decision-making process to determine whether the Plans would similarly benefit from consolidating the Plans' administrative and recordkeeping services under a single provider. Instead, Defendants continued to contract with two separate recordkeepers. This failure to consolidate the recordkeeping services until late 2012 for the Voluntary Savings Plan and to this date for the Retirement Plan eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper. Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 796.

252.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

253.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

254.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of

the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Administrative Services and Fees

255.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

256.    As service providers to the Plans, TIAA-CREF and Fidelity are parties in interest. 29 U.S.C. §1002(14)(B).

257.    By causing the Plans to use TIAA-CREF and Fidelity as the Plans' recordkeepers from year to year, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plans and TIAA-CREF and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plans and TIAA-CREF and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of the Plans' assets to, or use by or for the benefit of TIAA-CREF and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF and Fidelity and in connection with the Plans' investments in funds that paid revenue sharing to TIAA-CREF and Fidelity.

258.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

259.    Under 29 U.S.C. §1109(a), Defendants are personally liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Unreasonable Investment Management Fees, Unnecessary Marketing and Distribution (12b-1) Fees and Mortality and Expense Risk Fees, and Performance Losses

260.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

261.    Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plans' assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plans' investments on an ongoing basis and to "remove imprudent ones" regardless of how long a fund has been in the plan. *Tibble,* 135 S. Ct. at 1829.

262.    These duties required Defendants to independently assess whether each option was a prudent choice for the Plans, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put nearly their entire investment lineups in the Plans' menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

263.    In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation

alternative investments that were available to the Plans, the recordkeepers'
financial interest in having their proprietary investment products included in the
Plans, and whether the higher cost of actively managed funds was justified by a
realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR
Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b);
Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

264.    Defendants selected and retained for years as the Plans' investment
options mutual funds and insurance company variable annuities with high expenses
and poor performance relative to other investment options that were readily
available to the Plans at all relevant times.

265.    Many of these options included unnecessary layers of fees that
provided no benefit to participants but significant benefits to TIAA-CREF, including
marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

266.    Rather than prudently consolidating the Plans' hundreds of
investment options into a core lineup in which prudent investments were selected
for a given asset class and investment style, as is the case with most defined
contribution plans, Defendants retained multiple investment options in each asset
class and investment style until October 2016, thereby depriving the Plans of their
ability to qualify for lower cost share classes of certain investments, while violating
the well-known principle for fiduciaries that such a high number of investment
options causes participant confusion and inaction. In addition, as a fiduciary
required to operate as a prudent financial expert, *Katsaros,* 744 F.2d at 279.

Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. Nearly all of the Plans' options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plan, which Defendants failed to adequately consider. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. This was a breach of fiduciary duties.

267. Defendants failed to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones within a reasonable period. This resulted in the Plans continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were

available to the Plans. As of December 31, 2014, of the Plans' investment options which had at least a five-year performance history, *fifty-seven percent* of those funds—119 out of 208—underperformed their respective benchmarks over the previous 5-year period

268. <u>CREF Stock Account</u>: Defendants included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendants and TIAA told participants was the appropriate benchmark. *See supra* ¶199. The 46 bps charged by the CREF Stock Account included *four* layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF. *See supra* ¶¶134–136. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided.

269. <u>TIAA Real Estate Account</u>: Defendants included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments. The 87 bps that the TIAA Real Estate Account charged was comprised of *five* layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plans' participants. *See supra* ¶¶137–138. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided.

270. Had Defendants engaged in a prudent investment review process, it would have concluded that these options were causing the Plans to lose tens of

millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans, and thus should be removed from the Plans or, at a minimum, frozen to new investments.

271. Total losses to the Plans will be determined after complete discovery in this case and are continuing.

272. Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

273. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Investment Services and Fees

274. Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

275. As the Plans' providers of investment services, TIAA-CREF and Fidelity are parties in interest. 29 U.S.C. §1002(14)(B).

276.    By including investment options managed by TIAA-CREF and Fidelity in which nearly all of the Plans' $2.87 billion in assets were invested, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plans and TIAA-CREF and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plans and TIAA-CREF and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plans' assets to, or use by or for the benefit of TIAA-CREF and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF and Fidelity in connection with the Plans' investments in TIAA-CREF and Fidelity options.

277.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

278.    Under 29 U.S.C. §1109(a), Defendants are personally liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

## COUNT VII

## Failure to Monitor Fiduciaries

279.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

280.    This Count alleges breach of fiduciary duties against Northwestern University, Nimalam Chinniah, and Eugene S. Sunshine.

281.    Northwestern University is the Plan Administrator of the Plans under 29 U.S.C. §1002(16)(A)(i) and a named fiduciary under 29 U.S.C. §1102(a) with overall authority to control and manage the operation and administration of the Plans.

282.    Northwestern delegated certain of its fiduciary responsibilities for administrative matters to its Executive Vice President, Nimalam Chinniah, and previously Eugene S. Sunshine. Having delegated those duties, Northwestern remained responsible for monitoring its delegee, the Executive Vice President, to ensure that the delegated tasks were being performed prudently and loyally.

283.    Northwestern, through its Board of Trustees, authorized the Senior Vice President for Business and Finance (a role now fulfilled by the Executive Vice President), to create NURIC, and to confer or delegate to NURIC all discretionary authority and powers necessary to control and manage the assets of the Plans. Northwestern and the Executive Vice President remained responsible for monitoring NURIC and its members to ensure that the delegated tasks were being performed prudently and loyally.

284.    If a monitoring fiduciary knows or should know that the monitored fiduciaries are not properly performing their fiduciary obligations, the monitoring fiduciary must take prompt and effective action to protect the plan and participants.

285.    Defendants Northwestern University, Nimalam Chinniah, and Eugene S. Sunshine breached their fiduciary monitoring duties by, among other things:

        a.      Failing to monitor their appointees, to evaluate their

137

performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plans;

b.     Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistently underperforming investments in the Plans in violation of ERISA;

c.     Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

d.     Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' investments; and

e.     Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly,

and poorly performing investments, all to the detriment of Plan participants'
retirement savings.

286.   Had Defendants Northwestern University, Nimalam Chinniah, and
Eugene S. Sunshine discharged their fiduciary monitoring duties prudently as
described above, the Plans would not have suffered these losses. Therefore, as a
direct result of the breaches of fiduciary duty alleged herein, the Plans, the
Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement
savings.

## JURY TRIAL DEMANDED

287.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States,
Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly
situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached their fiduciary
  duties as described above;

- Find and adjudge that Defendants are personally liable to make good
  to the Plans all losses to the Plans resulting from each breach of
  fiduciary duty, and to otherwise restore the Plans to the position they
  would have occupied but for the breaches of fiduciary duty;

- Determine the method by which losses to the Plans under 29 U.S.C.
  §1109(a) should be calculated;

- Order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plans to include only prudent investments;

- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class and subclasses, appoint the Plaintiffs as class representatives of the Class and subclasses, and appoint Schlichter, Bogard & Denton LLP as Class Counsel for the Class and subclasses;

- Award to the Plaintiffs and the Class and subclasses their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems
  appropriate.

December 15, 2016                    Respectfully submitted,

                                     /s/ Jerome J. Schlichter
                                     SCHLICHTER, BOGARD & DENTON LLP
                                     Jerome J. Schlichter, No. 2488116
                                     Troy A. Doles, No. 6242803
                                     Heather Lea, No. 6276614
                                     Sean E. Soyars, MO No. 57317
                                     100 South Fourth Street, Suite 1200
                                     St. Louis, Missouri 63102
                                     Telephone: (314) 621-6115
                                     Facsimile: (314) 621-5934
                                     jschlichter@uselaws.com
                                     tdoles@uselaws.com
                                     hlea@uselaws.com
                                     ssoyars@uselaws.com

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5 and Northern District of

Illinois Local Rule 5.5., the undersigned, an attorney of record in this case, hereby

certifies that on December 15, 2016, a true and correct copy of Plaintiffs' **Amended

Complaint** was filed electronically by CM/ECF, which caused notice to be sent to

all counsel of record.

                                     /s/ Jerome J. Schlichter
                                     Jerome J. Schlichter