1           IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
2                WESTERN DIVISION

3  ERICA BARRETT, ET AL,        )
                          )
4         Plaintiffs,    ) No.  22-3111-CV-S-BCW
                          ) May 23, 2023
5         v.             ) Kansas City, Missouri
                          ) CIVIL
6  O'REILLY INC. ET AL,         )
                          )
7         Defendants.    )

8

9           TRANSCRIPT OR ORAL ARGUMENT
        BEFORE THE HONORABLE BRIAN C. WIMES
10        UNITED STATES DISTRICT JUDGE

11   Proceedings recorded by electronic voice writing
        Transcript produced by computer
12

13            APPEARANCES

14  For Plaintiffs:    MR. MARK GYANDOH
                  Capozzi Adler
15                 312 Old Lancaster Road
                  Merion Station, PA 19066
16

17  For Defendants:    MR. W. JOSEPH HATLEY
                  Spencer Fane LLP - KCMO
18                 1000 Walnut Street
                  Suite 1400
19                 Kansas City, MO  64106-2140

20                 MR. MICHAEL S. HINES
                  MS. MARY GRINMAN
21                 Skadden, Arps, Slate, Meagher & Flom
                  500 Boylston Street
22                 Boston, MA  02116

23                 MR. JEFFREY GROVES
                  O'Reilly's in-house counsel
24

25        Denise Carroll Halasey CCR, CVR-CM, RVR
           United States Court Reporter

<u>May 23, 2023</u>

1

2          (Proceedings began at 2:37 PM)

3          THE COURT:  Let the Court call the case.  This is

4   Erica Barrett versus O'Reilly Automotive, Inc.  Case No.

5   22-cv-03111.  Can I have parties enter their appearance for

6   the record, and I'll start with the plaintiff.

7          MR. GYANDOH:  Good afternoon, Your Honor.  My name

8   is Mark Gyandoh from Capozzi Adler, and I represent the

9   plaintiff.

10         THE COURT:  Thank you.  Pronounce your last name

11  again.

12         MR. GYANDOH:  John Doe, just like the unidentified

13  person.

14         THE COURT:  John Doe?

15         MR. GYANDOH:  Yes, sir.

16         THE COURT:  Okay.  Thank you.

17         I see you have done that a few times.

18         MR. GYANDOH:  Yes, Your Honor.

19         THE COURT:  Okay.

20         And for the defense.

21         MR. HATLEY:  Good afternoon, Your Honor.  Joe Hatley

22  from Spencer Fane.  I'd like to introduce Michael Hines from

23  Skadden Arps who has been admitted pro hace, and Mr. Hines

24  will introduce the rest of the defense this afternoon.

25         THE COURT:  Okay.  Thank you.

1          MR. HINES:  Good afternoon, Your Honor.

2          Michael Hines on behalf of defendants.  With me from

3    my office is Mary Grinman, and we also brought the summer

4    associate with us to witness the proceedings, Charlie Talisse.

5    And also present in the courtroom is in-house counsel at

6    O'Reilly, Jeffrey Groves.

7          THE COURT:  Okay.  Pleasure.

8          So Mr. Hines, are you making the argument?

9          MR. HINES:  Yes, Your Honor.

10         THE COURT:  Okay.

11         Well, since it's defense motion, Mr. Hines.

12         MR. HINES:  And good afternoon, Your Honor.  It's

13   good to be back.

14         This case concerns allegations that O'Reilly and the

15   other defendants breached fiduciary duties under the Employee

16   Retirement Income Security Act in connection with the

17   management of the O'Reilly 401(k) Retirement Plan.  In the

18   amended complaint it serves two counts.

19         Count 1, alleges that the committee charged with

20   administrating the Plan breached its fiduciary duty of

21   prudence.  Count 2 alleges that O'Reilly and O'Reilly's Board

22   of Directors breached their fiduciary duty to monitor that

23   committee.

24         THE COURT:  Let me ask you this.  So if Count 1

25   fails, would your argument be to the Court that Count 2 fails?

1          MR. HINES:  That's exactly my argument.

2          THE COURT:  Would plaintiffs say that?  And I know

3     you will get up and talk to me about that.  Would the parties

4     agree or are you not sure?

5          MR. HINES:  I believe that Mr. Gyandoh would agree

6     with the concept if Count 1 is dismissed, then Count 2 is also

7     dismissed.

8          And I will let Mr. Gyandoh speak for himself.

9          THE COURT:  Certainly, sir.  I put you on the spot.

10         MR. HINES:  Not at all.  Not at all.

11         So and because of that, Your Honor, I plan to spend

12    most of my time talking about the prudent allegations in Count

13    1.

14         And the ERISA duty of prudence requires that

15    fiduciaries use the same skill, prudence, diligence, under the

16    circumstances as a prudent person would use.

17         In October of last year the Eighth Circuit in the

18    Matousek case reaffirmed the pleading standard to be applied

19    in cases alleging breach of the duty of prudence.  We

20    submitted the Matousek case to Your Honor, Supplemental 30 at

21    Docket No. 44.  And in that case the Eighth Circuit held that

22    where a plaintiff pleads a prudence claim it's the process is

23    what ultimately matters, and not the outcome.  And therefore,

24    a plaintiff must plead enough facts for a Court to be able to

25    --

1          THE COURT:  Process not the outcome, what does that

2     mean?

3          MR. HINES:  It means that let's say for example, if

4     there were performance allegations, and an investment ended up

5     performing poorly, that's not what matters.  What matters is

6     the process that led to the selection of that investment.  And

7     so the Eighth Circuit says that in order to do that it is not

8     enough to merely allege that a retirement plan's costs and

9     fees are too high.  That doesn't work.  Instead, the Eighth

10    Circuit says the key is providing a sound basis for comparison

11    or a meaningful benchmark by which to evaluate a retirement

12    plan's costs or fees or performance.  And that, Your Honor, is

13    what the plaintiffs here failed to do.

14         THE COURT:  And let me ask you this, Mr. Hines,

15    typically, in these 12(b)(6) cases, at least the arguments

16    made to the Court and I'm like, well, Judge, we've pled

17    enough, let's get through discovery and at this stage maybe,

18    Judge, you shouldn't be ruling favorably on a motion to

19    dismiss at this early stage.  Is it different some way than

20    kind of the typical case or same standard or has the law

21    suggested otherwise for this Court?  Do you see where I'm

22    going?

23         MR. HINES:  I do see where you are going, Your

24    Honor, and I guess I have a few responses to that.

25         THE COURT:  Sure.

1          MR. HINES:  Is the pleading standard different?

2    Well, in ERISA cases you do have to plead a meaningful

3    benchmark.  And I'll get to that with Judge Clark and Judge

4    Pitlyk and those cases, and I'll talk about that.

5          THE COURT:  Okay.  Out of the Eastern District of

6    Missouri?

7          MR. HINES:  Correct, both of those cases are in the

8    Eastern District.

9          THE COURT:  Okay.

10         MR. HINES:  But I would also say, Your Honor, the

11   argument, well, let's just proceed to discovery and let it

12   sort itself out and we can get to the summary judgment.  Well,

13   I would say there, Your Honor, that the Supreme Court in the

14   Dudenhoeffer case which we cite in our cases or in our briefs,

15   says that what?  The motion to dismiss is an important

16   mechanism to weed out these cases early.  And the Second

17   Circuit, and we said this in our opening brief at Page 5 in

18   the Pension Benefit case, and they say -- addressing a similar

19   type of argument.  They say, in deed the prospect of discovery

20   and the suit claiming breach of fiduciary duty is ominous

21   potentially exposing ERISA fiduciaries to probing and costly

22   inquiries and document requests.  Dismissing ERISA claims that

23   rest on conclusion or allegations prevents settlement

24   extorsion where a plaintiff with a largely groundless claim

25   will simply take up the time of a number of other people with

1   the right to do so representing an in terrorem increment of

2   the settlement value.  So Your Honor, I would say that -- I

3   would respectfully object to the proposition that we should

4   just allow this to go to discovery and sort it out later, for

5   varying reasons, but for the Supreme Court and the Second

6   Circuit.

7           THE COURT:  Sure.

8           MR. HINES:  Getting back to the meaningful

9   benchmark.  We respectfully submit, Your Honor, that's what is

10  missing here.  And here the plaintiffs' duty of prudence claim

11  is based on three categories of allegations.  The first set of

12  allegations is that some of the Plans' investment options cost

13  too much.  That's at Paragraphs 66 through 70.  The second set

14  of allegations that the plaintiff say the Plans' fees for

15  record-keeping services are too high.  And then lastly,

16  plaintiffs allege that the Plans' total costs, that is

17  essentially investment fees plus the record-keeping fees, are

18  too high.  And we respectfully submit that the amended

19  complaint should be dismissed under the pleading standard

20  articulated in Matousek, and as recently applied in cases with

21  identical allegations, not similar, identical allegations by

22  Judge Clark in the Riley case, and Judge Pitlyk on the

23  Williams.  And we cited Judge Clark's Riley decisions

24  throughout our papers.  And we submitted Judge Pitlyk's

25  decision in Williams as Supplemental 40, Docket No. 62.

1          THE COURT:  Is that simply persuasive for the Court?

2          MR. HINES:  Correct, Your Honor.  It is certainly

3     not binding.  I'd say Matousek, the Eighth Circuit certainly

4     is.  But Judge Clark and Judge Pitlyk applying Matousek, I

5     think, I submit is persuasive, correct.

6          THE COURT:  Okay.

7          MR. HINES:  And unless Your Honor would like to

8     proceed differently, I thought I would address plaintiffs'

9     three categories of allegations beginning with the investment

10    cost claims.

11         THE COURT:  Sure.

12         MR. HINES:  In support of the allegation that the

13    funds or certain that the funds cost too much, plaintiffs rely

14    exclusively on industry averages and medians provided by the

15    Investment Company Institute or ICI.  And that is in

16    Paragraphs 67 to 68.  But in the Eighth Circuit ICI medians

17    and averages are not sufficient to state in a prudence claim.

18    And Judge Clark in the Riley case rejected the identical ICI

19    data as insufficient to satisfy the Eighth Circuit's

20    meaningful benchmark standard.  In there he held, quote, "The

21    Eighth Circuit requires the Court to thoroughly compare

22    challenged funds and punitive benchmark funds with regard to

23    fund holdings, investment style, and investment strategy."

24    And in that case, Judge Clark held that because neither the

25    complaint in that case nor the ICI data itself provided that

1    required information that they did not constitute -- or the

2    ICI data did not constitute a meaningful benchmark by which to

3    compare the fees for the investment options in that claim.

4            Judge Pitlyk held the same thing in the Williams

5    case on the same grounds, and she fuller stated citing to

6    Matousek, that it simply isn't enough to allege that costs are

7    too high.  That is all that the plaintiffs here have done,

8    Your Honor, exactly what the plaintiffs in Riley and Williams

9    did.  And the ICI averages that are in the complaint tell the

10   Court nothing about the funds that comprise those averages.

11   And because of that they cannot constitute meaningful

12   benchmarks in this Circuit.

13           And moving to plaintiffs' record-keeping claims.

14   Plaintiffs allege at Paragraph 90 that the Plans'

15   record-keeping fees also cost too much.  And according to the

16   complaint the Court should infer that those fees are excessive

17   based on three things.  The plaintiffs prefer the comparison

18   of the alleged fees of the O'Reilly Plan with the

19   record-keeping fees of certain other retirement plans.

20   Secondly, the complaint, the amended complaint cites to a

21   stipulation entered into by different record-keeper, Fidelity,

22   in a different litigation.  And then third, plaintiffs' allege

23   that the O'Reilly fiduciaries failed to conduct what

24   plaintiffs say is a required, a mandatory request for proposal

25   for record-keeping fees.  And Judge Clark and Judge Pitlyk,

they address each of those allegations individually or
collectively, they do not stand a claim.  And taking each one
in term, first, the fees of the comparative plans.  At
Paragraphs 96 and 97 of the amended complaint, plaintiffs'
allege that because 19 other retirement plans paid less fees
on a per participant basis than did the O'Reilly Plan, the
O'Reilly's Plans' record-keeping fees must be too high.  But
the comparative plans are not meaningful benchmarks in this
circuit because in this complaint are allegations comparing
the services provided by the record-keeper to the O'Reilly
Plan, with the services provided by the record-keepers to the
comparatory plans.  In the Eighth Circuit in Matousek held
that a plaintiff must identify similar plans offering the same
services for less.  And applying that standard in the Riley
case, Judge Clark rejected a similar table purporting to list
the record-keeping fees of other plaintiffs.  And in that
regard, Judge Clark held that to plead such a claim in this
circuit, the plaintiff must plead that the administrative fees
are excessive in relation to the specific services received.
And because there the plaintiffs did not plead any facts about
the specific services of those plans, those comparison plans
were not meaningful benchmarks.  Judge Pitlyk held the exact
same thing.  And in fact, I would say in Judge Pitlyk's case,
Judge Pitlyk rejected the identical table that the plaintiffs'
put forth here at Paragraph 96, right down to the same

1   comparatory plans.  And she said because the amended complaint

2   is silent as to which record-keeping service those plans

3   received, they do not constitute meaningful benchmarks.  And I

4   would submit here, so here too, Your Honor, the amended

5   complaint does not plead any services received by the

6   comparative plans making an apples to apples comparison

7   impossible.

8            Plaintiffs also allege that the fidelity, a fidelity

9   stipulation leads to an inference that the O'Reilly's

10  plaintiffs' fees were excessive.  In the Fidelity stipulation,

11  Fidelity stipulated in a completely different litigation that

12  the services it provided to its own in-house 401(k) Plans had

13  a market value of $14 dollars to $21 dollars per participant.

14  Judge Pitlyk considered that allegation in the Williams case,

15  and she held, quote, "Plaintiffs do not explain how the

16  services that Fidelity provided to its own Plans are

17  equivalent to the services provided to the plans at issue in

18  this case.  And without such allegations the $14 to $21 dollar

19  figure cannot serve as an adequate market comparatory."  I

20  would submit to Your Honor that plaintiffs' identical

21  allegation, the same one that Judge Pitlyk considered in

22  Williams should be rejected for the exact same reason.

23            And then lastly, when it comes to record-keeping

24  fees, plaintiffs' allege at Paragraphs 88 and 89 that

25  fiduciaries must conduct a request for proposal for

record-keeping fees, and there is little here to suggest that the defendants did so.

Again, I hate to sound like a broken record --

THE COURT: Say that again.

MR. HINES: Sure.

THE COURT: Repeat what you just said.

MR. HINES: Sure.

She said, the allegation here at the amended complaint, Paragraphs 88 and 89, plaintiffs' allege that fiduciaries, quote, "must" unquote, conduct a request for proposal for record-keeping fees. And they also allege that there is little to suggest that the defendants' conducted a requested proposal in this case. And Judge Pitlyk ruled on that identical allegation word for word. And there she held that even if true, that is, even if the defendants in that case did not conduct an RFP for record-keeping services, that is of no moment because they are not required to do so. And in making that holding, Judge Pitlyk replied on Judge Clark's decision on Riley, where he held, quote, allegations that the plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation, unquote.

I submit to Your Honor that plaintiffs' identical allegations at Paragraphs 88 and 89 also fail to state a claim for those same reasons.

Moving on for a total Plan costs which is the third

1    category of allegations that plaintiffs' claim need reach

2    fiduciary duty of prudence.  Plaintiffs' allege that

3    Paragraphs 72 to 75 that ICI developed a total Plan cost

4    measures that includes all fees of the retirement plan and

5    O'Reilly's retirement Plans total plan cost was higher than

6    the average total plan cost of similarly sized plans.  But

7    similar to plaintiffs' investment fee allegations based on ICI

8    averages, Judge Pitlyk held that a general industry average

9    cannot serve as a meaningful benchmark.  Because to be

10   meaningful in this Circuit, a plaintiff must plead that the

11   challenged fees are excessive in relation to specific services

12   received.  And the same is true here, and in fact, plaintiffs'

13   total Plan costs allocations in this case are word for word

14   identical to those in the Williams compliant.

15            So summing up Count 1, Your Honor, because

16   plaintiffs merely allege that certain other plans costs are

17   too high without providing a meaningful benchmark in which the

18   Court can compare those costs, Count 1 fails to state a claim.

19            THE COURT:  Would it be fair kind of generally and

20   maybe this is over simplifying the issue.  There has to be a

21   level of -- with these in terms of the record-keeping, the

22   total cost, total plan cost, and -- there has to be a level of

23   particularity as it relates to the comparison they make within

24   their pleading.  Does that make sense?

25            MR. HINES:  It does, Your Honor.

1          THE COURT:  It seems to me in just looking at this

2    and looking at the case law, there has to be -- we can't make

3    these broad, kind of comparisons, without some level of

4    meaningful -- and I know maybe the term we'll use and maybe I

5    should do that, is meaningful benchmarks.  But it has to be

6    some sound comparison.

7          MR. HINES:  Correct, Your Honor.  And I don't think

8    that is oversimplifying at all.  And in fact, I think that's

9    what the Eighth Circuit requires.

10          THE COURT:  Okay.

11          MR. HINES:  And that's exactly what Judge Clark and

12    Judge Pitlyk said.

13          THE COURT:  Okay.

14          MR. HINES:  I talked about the Count 2, Your Honor,

15    if Count 1 fails, Count 2 fails too, as well.

16          One other small point, Your Honor, if I may?  In the

17    concluding paragraph of the opposition brief plaintiffs'

18    request to file a further amended pleading, if, and only if

19    Your Honor grants our motion.

20          THE COURT:  That's what I was going to ask too.

21          MR. HINES:  We submit that a further amendment is

22    not appropriate particularly because plaintiff previously

23    amended once in response to our first motion to dismiss.

24    Judge Pitlyk denied an identical informal request to amend in

25    the concluding paragraph of the opposition brief in that case

1  as well for the same reason.  We respectfully submit that the

2  amended complaint should be dismissed with prejudice.

3            THE COURT:  Okay.  Thank you.

4            MR. HINES:  Thank you, Your Honor.

5            THE COURT:  Mr. Gyandoh.

6            MR. GYANDOH:  Thank you, Your Honor.

7            I think I'll start with where we are with the case

8  law.

9            THE COURT:  And let me ask you this with regard to

10  Count 1 and Count 2?

11            MR. GYANDOH:  I concede that if Count 1 fails, Count

12  2 fails.

13            THE COURT:  Okay.  That's what I wanted to know.

14            MR. GYANDOH:  Pretty simple.

15            THE COURT:  Yes.

16            Let's talk about case law.

17            MR. GYANDOH:  Okay.

18            Let me start with the Eighth Circuit in Matousek.

19  That actually was one of the cases -- it was my case which I

20  argued before the Eighth Circuit.  And the issue there was a

21  little different than the issue here.  The issue of Matousek

22  that the Eighth Circuit focused in on was the fact that in

23  that complaint plaintiffs had alleged that it was -- the

24  record-keeper had charged like something like $300 per

25  participant for record-keeping.  If the defendants had

1   introduced evidence to show that that amount also included

2   other services other than record-keeping, so what the Eighth

3   Circuit said was we hadn't really distinguished -- it wasn't

4   an amenable comparing, because we are comparing the $300 to

5   other record-keeping fees whereas she should have done it to

6   fees that included record-keeping and other services.

7          THE COURT: Would defense disagree with that? I

8   don't want to limit it.

9          MR. HINES: Let me answer it this way, I think that

10  is one of the issues.

11         THE COURT: Okay. All right.

12         MR. GYANDOH: And --

13         THE COURT: Let me ask you this question, and maybe

14  I'll answer my own question. Okay, say that was the issue.

15         MR. GYANDOH: Yeah.

16         THE COURT: Say the Eighth Circuit did say, well,

17  you know, because the record-keeping fees included others and

18  this didn't, right? So that is not a meaningful comparison.

19  It still requires, right? It still requires not some blanket

20  or generalized pleading, it requires a level of comparison

21  beyond just, hey, I picked this and record-keeping and these

22  numbers are significantly higher than this. To me it seems

23  like, okay, I would agree with you. The Eighth Circuit is

24  saying this, and they're telling me a meaningful benchmark

25  lies on a sound basis of comparison. And in that case there

1   wasn't a sound basis of comparison when you look further and

2   determined that these included other things.  Would you

3   disagree?

4          MR. GYANDOH:  No, I'm with you there with respect to

5   that case.  But I think we have a sound basis here because

6   what we have attempted to do is compare record-keeping to

7   record-keeping.  Record-keeping which in our comparatives.

8   And why I think it sound.  First of all, the Eighth Circuit

9   has also said in the Washington versus Davis case there was no

10   one way to show making comparisons.

11          THE COURT:  There has to be some level of

12   similarity.

13          MR. GYANDOH:  That's right.

14          THE COURT:  How big is this Plan and how big are the

15   ones that you're comparing them to record-keeping?

16          MR. GYANDOH:  Yes, that's a great question.  So this

17   Plan has 50,000 participants.  What we allege and what I don't

18   think is disputable is that most industry experts agree that

19   the more plan participants we have, the more the

20   record-keeping fees should be.  So if you have 10,000

21   participants versus 50,000 participants, the 10,000

22   participant plan should have the higher fee than the

23   50,000-dollar participant plan.

24          THE COURT:  But that's a general, but are we really

25   comparing it?  That's my question because that to me sounds

1   like what you mentioned is, well, Judge, the record-keeping

2   fees required here and their services attached, and in this

3   instance there wasn't services attached, therefore, we don't

4   have the level of meaningful, what I'll call meaningful, a

5   sound basis for comparison.  To me that's not just a sound

6   basis.  That's saying, well, more plans tend to have more and

7   this tends to have less, therefore, your costs should be lower

8   than my cost.  Let me ask you, do you believe that's enough?

9   I'm asking you.

10          MR. GYANDOH:  Is it enough as we have it here?

11          THE COURT:  Yes.

12          MR. GYANDOH:  Yes.  Because it is -- as part of

13   delegations is that record-keeping is driven by the number of

14   participants.  So we do have other plans that have the same

15   amount of participants.

16          THE COURT:  You do?

17          MR. GYANDOH:  Yeah, if you look at our -- the

18   complaint we start on Paragraph 96, and we have we show that

19   the O'Reilly Plan had 53,000 participants.  And then we go

20   through all the way -- we cite several plans, including the

21   Kaiser Plan, which had 47,000 participants.  The key point

22   here is plans are considered large if you have more than

23   15,000 participants.  So they are within the range -- the

24   comparative plans are within the range of the O'Reilly Plan.

25          THE COURT:  So you're saying if I have 15,000 or

                    Denise Carroll Halasey CCR, CVR-CM, RVR
                        United States Court Reporter

1   50,000, well, they are the larger plans therefore, we should

2   consider them?

3         MR. GYANDOH:  I think they are reasonable

4   comparators.

5         THE COURT:  You think?  Is that the type of

6   comparison we need in terms of a meaningful benchmark?  I

7   guess that would be the question.

8         MR. GYANDOH:  Yes.  And is that the only comparative

9   we have because this is -- the other problem -- we have cited

10  cases that sort of adopted it, not in this Circuit, but with

11  Fidelity, it's your price are both national record-keepers.

12  So what we did is we cited the -- there's a stipulation that

13  Fidelity had entered in in another case.  What I take from

14  that stipulation is that Fidelity said they had a plan that

15  had 57,000 participants, and from 2014 to 2017, the services,

16  the value of services in that plan was anywhere from $14 to

17  $21.

18        THE COURT:  Now, it seems like my colleagues from

19  the Eastern District, Judge Clark and Judge Pitlyk may have

20  found differently.  And first let me ask is how counsel

21  Mr. Hines he suggested it was almost identical, the language

22  with regard to the petition that you're suggesting to this

23  Court.  And they found that the services were equivalent or at

24  least enough -- again, I go back.  I keep repeating a sound

25  basis for a sound comparison.

1          MR. GYANDOH:  I would submit, yes, those cases are

2    similar.  But here is one thing that --

3          THE COURT:  So what is the difference?  How should I

4    look at it differently?

5          MR. GYANDOH:  I would like for you to understand

6    this from my perspective.

7          THE COURT:  Sure.

8          MR. GYANDOH:  Because the defendants not just in

9    this case, in a number of cases, have argued and some courts

10   have agreed that we have to allege the differences of services

11   between these plan.  I will submit to you that the service

12   agreements of the comparative plans are not publically

13   available.  When plaintiffs file a case we do not have an

14   access to service agreements for these other plans.  So if

15   this Court -- where the Eighth Circuit says plaintiffs we

16   can't discuss a case when we have information not in their

17   possession.

18         THE COURT:  Like publically available?

19         MR. GYANDOH:  Exactly.  It leads to confidential

20   agreements which we can't get publically available.  Even our

21   clients in the normal course wouldn't be able to get the

22   service agreements.  So we had to plead around that because we

23   don't have that information.  So asking us to provide the

24   services is really not --

25         THE COURT:  -- so can I ask you.  I may have

1   misstated.  So to the extent you understand or recognize the

2   cases in which counsel, Mr. Hines, is talking about, I'm

3   focusing on the Eastern District and I'm focusing on Judge

4   Clark and Judge Pitlyk, in terms of those cases, right?  Were

5   they plead in the same way as it related to record-keeping

6   fees to your knowledge as this was?

7              MR. GYANDOH:  Very similar.

8              THE COURT:  Now, so the argument I would suspect had

9   to have been made to them -- say one was suggesting to me,

10  Judge Clark, these, the services or what we are pleading are

11  not available publically, therefore, I can not include them in

12  my petition.

13             MR. GYANDOH:  We didn't have oral argument in those

14  cases.  So I can't confirm that that argument was made.  It

15  may have been done in the pleadings, but it was -- I don't

16  know if they actually took that into consideration.

17             THE COURT:  Okay.  But you're saying that the

18  pleadings may be the same, but we didn't have an opportunity

19  to argue that those particular services weren't public.  We

20  have no way of putting them in.

21             MR. GYANDOH:  That's right.

22             THE COURT:  Okay.

23             MR. GYANDOH:  So I think it all boils down to -- one

24  other thing, I know there was District Court decisions, I

25  can't do nothing about it, other cases, even cases within this

1   Circuit that went the other way.

2           THE COURT:  Cases within this Circuit?

3           MR. GYANDOH:  Yes.

4           THE COURT:  With these same issues?

5           MR. GYANDOH:  Yes.

6           THE COURT:  The Eighth Circuit it seems like here is

7   pretty clear with respect to the standard, it seems to me.  So

8   yes, persuasive from other circuits, other districts?  Yes.

9   Just like the Courts in Eastern District of Missouri,

10  persuasive, I don't have to follow.  Just like I don't even

11  have to follow if it was even in this Court.  However, it's

12  within the Eighth Circuit interpreting case law from the

13  Eighth Circuit as opposed to outside the Circuit.

14          MR. GYANDOH:  I believe we submitted the Hy-Vee

15  case.  I don't have a copy of it, but in the Hy-Vee case the

16  judge said -- allowed the record-keeping claims to go forward

17  because a lot of the arguments were motion to be developed in

18  discovery.  But what I was going to say was the most recent

19  decision was the decision in the Hughes versus Northwestern

20  which is from the Seventh Circuit.  The Seventh Circuit was

21  interpreting -- it was a remand from the Supreme Court which

22  is sent back --

23          THE COURT:  What did they say?

24          MR. GYANDOH:  What they said was with allegations

25  similar to these -- the first thing they said was defendants'

1    reliance -- was Mr. Hines argument, is not as clear-cut as

2    they are making it to be because due to complications of

3    different cases and company stock so that does not in any way

4    heighten the pleading standard.

5            THE COURT:  Do you agree there is a level of

6    heightened standard?

7            MR. GYANDOH:  There is not.

8            THE COURT:  On these type of cases in the Eighth

9    Circuit?

10           MR. GYANDOH:  I do not think so.  I do not think so

11   because the Matousek case was distinguishable as I said.  And

12   all it says is you need a meaningful benchmark.

13           THE COURT:  Which is what?

14           MR. GYANDOH:  Well, the company provided the

15   context, not just the fact that there was other plans, but

16   also as the Northwestern case found, there was no request for

17   proposal which we --

18           THE COURT:  Is there a requirement for that?

19           MR. GYANDOH:  There is no requirement, but as the

20   Northwestern Court says, there is no requirement, but if you

21   didn't do it, it's just another factor.

22           THE COURT:  But it's not required?

23           MR. GYANDOH:  It's not required.  It helps to reduce

24   the record-keeping costs.

25           THE COURT:  And what case is that again?

1          MR. GYANDOH:  Hughes versus Northwestern.

2          THE COURT:  And where is that out of?

3          MR. GYANDOH:  It's out of the Seventh Circuit.

4          THE COURT:  What am I obligated to follow?

5          MR. GYANDOH:  It's persuasive.

6          THE COURT:  It's persuasive?  Hold it.  It's

7   persuasive, but you're sitting in the Eighth Circuit.

8          MR. GYANDOH:  I know.

9          THE COURT:  And if the Eighth Circuit is -- and

10  maybe this is too strong of a word, because I get on attorneys

11  when they use it so I'm a little hesitant.  When it's clear

12  that that's not Eighth Circuit or it appears that that's

13  not -- that's what this Court has to follow, Eighth Circuit

14  precedent.

15         MR. GYANDOH:  All right.

16         THE COURT:  Not Seventh.

17         MR. GYANDOH:  I understand that, but I think it's

18  within the Eighth Circuit precedent.

19         And first thing I think it is worth emphasizing

20  that, going back to the Brady versus Walmart case which is the

21  original Eighth Circuit case that said plaintiffs can't plead

22  a case to circumstantial evidence, and all claims should not

23  be dismissed because we don't have access to information.  And

24  I'm paraphrasing, but that is what it said.  And here I'm

25  saying that one of the key arguments from defendants is that

1   we didn't argue or allege that the services being obtained by

2   this Plan was -- were how it was different or the same to the

3   other plans.  And what we are saying is that that information

4   one of the pieces of information that is not available to the

5   plaintiffs at the pleading stage.  So in light of Eighth

6   Circuit precedent I think it allows us to plead a plausible

7   claim.  At this point the whole goal here is that we are

8   trying to show the pleading stage that there is a prudent

9   process.  That is what Your Honor is trying to find.  Where we

10  put enough nuggets out there for you to think there is a

11  prudent process.  We may not win at the end of the day, but

12  that is not the issue at this point.

13          THE COURT:  But there's some limitation or at least

14  some -- it seems to me just reviewing the case, there seems to

15  be some limitation because of the cost and other things

16  associated with letting this move -- we want to make sure that

17  these benchmarks are comparative, because to move beyond that

18  state the cost that may be associated with the discovery and

19  other matters in this.  Would you agree or disagree?

20          MR. GYANDOH:  I would disagree to a point because

21  that advocates, advocates the discovery has the same issues.

22          THE COURT:  Well, this seems to be more

23  particularized at least how I read it.  There is a level of

24  and let me say in this case -- and then, counsel, I'll find it

25  here, one second.

1          You can go ahead.

2          MR. GYANDOH:  Plaintiffs should not be hiding

3     pleading standard and there is none in this case simply to

4     avoid discovery.  The rules allow notice pleading under

5     12(b)(6) as a leading standard.  Here, I think, additionally,

6     if anything there is a real reason to stay in the 12(b)(6)

7     stage than other cases given the fact that we're about to

8     plead circumstantial evidence, where in other cases the Court

9     needs more particularize evidence.

10         THE COURT:  They have to be meaningful.

11         MR. GYANDOH:  Meaningful, yes.  So at this stage the

12    plaintiffs have plead as much as a meaningful benchmark as

13    they can as they have access to.  The other things we point to

14    in order to show that there is a prudent process was that some

15    had high expenses compared to medians.  I know that defendants

16    have argued that that is not a meaningful benchmark.

17         THE COURT:  In terms of what?  Now say that again.

18         MR. GYANDOH:  I'm sorry.  In order to show that

19    perhaps there was -- the defendants were not prudently

20    managing the Plan, we purported to a handful of investment

21    options in the Plan which were more expensive than the median

22    and averages in those plans.  We plead that in order to show

23    that where there is smoke, there is fire or there could be

24    fire.

25         THE COURT:  Again, it seems to me that we're
                    Denise Carroll Halasey CCR, CVR-CM, RVR
                       United States Court Reporter

1   stopping when it should take a step further.  Just again, this

2   term keeps coming up in my mind, it has to be apples to apples

3   or oranges to oranges, doesn't it?

4          MR. GYANDOH:  It does.  And I think what we have

5   done here is an apples to apples comparison.

6          THE COURT:  Okay.

7          MR. GYANDOH:  You know, in several courts -- granted

8   some courts within the Eighth Circuit have not -- have denied

9   motions -- granted motions to dismiss.  But certainly all the

10  courts have not.  And I submit the -- although, we believe --

11  I don't think Matousek undercuts what we are seeing here

12  because that was a different posture.

13         And the other thing about the total Plan costs is

14  that too is an indication that there was not a prudent process

15  in place because their Plan costs were so much higher than

16  other plans that there is an indictions that these fiduciaries

17  were not prudently managing their Plan.  I think we have to

18  look at this not just from one factor, but all the factors

19  which alleged as the totality of the circumstances, and I

20  think that pushes us over the plausibility line.  And, you

21  know, certainly it allows us to move forward to try to prove

22  our claims.  But I think to prevent plaintiffs from moving

23  forward at this stage based on what we have pled I think goes

24  against the standards that have been set for 12(b)(6).  And as

25  the Supreme Court pretty well ruled --

1          THE COURT:  Well, I need you to say as the Eighth

2   Circuit.

3          MR. GYANDOH:  Yeah.

4          THE COURT:  Listen.  You saying everything ruled,

5   but you're saying everything but the Eighth Circuit.  That is

6   what ultimately this Court follows.

7          For example, we have this one, investment by

8   investment, when they talk about it can't be simply bear

9   allegations, they have to be meaningful, management style of

10  this particular Plan.  There is a level of particularity that

11  these cases that the Eighth Circuit is ruling on that shows

12  the strategy of these plans that is more of a comparison than

13  some general -- that is what I'm trying to get.  That is what

14  it appears to me.  And so these kind of vague comparisons to

15  me simply makes me question whether or not there is a

16  meaningful benchmark.  But I'll let you finish, and then I'll

17  have a few questions for counsel.

18         MR. GYANDOH:  I'll just finish by just focusing on

19  what the Eighth Circuit requires.

20         THE COURT:  And I'm not saying the others is not

21  persuasive, but at the end of the day, you know, I'm looking

22  to the Eighth Circuit.

23         MR. GYANDOH:  That's right, sir.

24         THE COURT:  Go ahead.

25         MR. GYANDOH:  What I was saying is that we need to

1    look at the Eighth Circuit case law through the lens of three

2    cases.  The first case is the Brady versus Walmart case which

3    was many years ago, but it was one of the first cases that

4    dealt with these excessive fee cases.  And that is the case

5    that said that you have -- some of the information is not in

6    the preview of plaintiffs so we have to allow them to plead

7    circumstantial evidence, and you can't dismiss them just

8    because they don't have information.  So that is one case.

9          Then there is the Washington versus Davis case which

10    is the more recent Eighth Circuit case which also says there's

11    no set of meaningful benchmarks, it can be anything.

12          And the third case is Matousek which is the case I

13    started off with.  But Matousek is not exactly on point here

14    because of the allegations in that case, but the meaningful

15    benchmark comment from there still pertains.  And all -- it

16    talks about services, but here in order as I said plaintiffs

17    -- not just me, plaintiffs have a right, don't have access to

18    these service agreement, so what we thought in order to allege

19    that the services here were comparable is to say that --

20          THE COURT:  You mean in terms of --

21          MR. GYANDOH:  The record-keeping services.

22          THE COURT:  The record-keeping?

23          MR. GYANDOH:  Yes.  And this is how we plead around

24    it.  What we say is Fidelity and T.Rowe are both national

25    record keepers.  They both are capable of providing the same

1    service and they both provide service to the same size plan.

2    So you can make the assumption if you will that the same size

3    plans require the same level of services.  But yet, Fidelity

4    and other record-keepers we cite which are like T.Rowe charge

5    less for their record-keeping than T.Rowe.  So we have apples

6    to apples by comparing T.Rowe price to other national record

7    keepers.  We have apples to apples by looking at the number of

8    participants, which is the driver of the fees for the

9    services.  And consistently we show that the O'Reilly Plan was

10   charging higher.

11            THE COURT:  Okay.

12            MR. GYANDOH:  Thank you, Your Honor.

13            THE COURT:  Mr. Hines.

14            Mr. Hines, how am I ever going to plead if I can't

15   have publically available information that I'm not privy to

16   unless the discovery process moves forward?

17            MR. HINES:  Well, there are two things about that,

18   Your Honor.  If were talking about investment management fees

19   there are prospectuses available publically, there are

20   performance data publically, and plaintiffs can use that data

21   to plead a claim.  And many courts have said that.  If we move

22   to record-keeping I agree with Mr. Gyandoh that the Davis case

23   says there is no one way.  And that's the point, Mr. Gyandoh

24   says I need a record-keeping fee contract.  Well, he happened

25   to pick something, I agree, you can't get publically.  But

1    there are other ways to plead a record-keeping claim.  ERISA

2    requires extensive disclosures to participants.  So

3    participants have a lot of information available to them

4    including plan documents, summary plan descriptions, and most

5    importantly account statements that participants get on a

6    quarterly basis that set fourth the fees that they pay on

7    record-keeping, that sets forth the fees and performance of

8    their investment options, and that's how the plaintiffs in the

9    Rosenkrantz case successfully pleaded a record-keeping claim

10   by using those participants statements and detailing exactly

11   what they pay for what.  And plaintiffs presumably have their

12   record -- I'm sorry, their participants statements here, but

13   they chose not to use them.  My brother brought up the

14   Northwestern case, and yes, it's in the Seventh Circuit, but

15   that's another example of how a plaintiff may plead a

16   record-keeping claim.  And we submitted the complaint there at

17   Supplemental 4066-1 because it's important to look at what

18   they allege.  There it was about a university plans, and they

19   alleged details about what four other plans did.  They

20   reviewed, the plaintiffs in that case reviewed publically

21   available information, found what other plans did in the

22   university space and conducted --

23              THE COURT:  How did they get all this public

24   information?

25              MR. HINES:  They scoured websites.

1          THE COURT:  Yeah.

2          MR. HINES:  And they were able to plead what others

3   did.

4          THE COURT:  So you're saying in this case that they

5   chose to plead this particular way?

6          MR. HINES:  That is exactly what I'm saying.

7          THE COURT:  That there are other options that other

8   successful claims in terms at this stage, the 12(b)(6) stage,

9   that they just pled it differently, but they were able to get

10  that type of comparable.

11          MR. HINES:  Correct.  They chose to plead with a

12  chart and fees.  And that is one way that they can try to do

13  it, but I submit to Your Honor that that is not meaningful in

14  any way, shape, or form.

15          If I might the last thing I want to address is this

16  concept that I've heard it a couple times, heightened pleading

17  or particularity.  I personally would stay away from that, and

18  I would just say that that is what the Eighth Circuit, the

19  meaningful benchmark standard is how the Eighth Circuit has

20  applied an eight ball to these particular cases.

21          THE COURT:  As opposed to some heightened.  And that

22  is what the Court has been using.  But, yes, I agree with you.

23          MR. HINES:  That's exactly right.

24          THE COURT:  That's just how they applied at this

25  stage.  Thank you.

                Denise Carroll Halasey CCR, CVR-CM, RVR
                     United States Court Reporter

1          Counsel, I'll give you about two minutes and then we

2    will windup.  What about that?  That's a good point and then

3    we will done.  That, you know, they pled it the way they pled

4    it, and it's not meaningful.  That's not a meaningful

5    benchmark.  There are opportunities to get the very

6    information you have.  And if you would have utilized these

7    ways, if it's there, then you could get there.

8          MR. GYANDOH:  Yes.  I would say this to that.

9          So we have an occasion to discovery, our personal

10   pain is that --

11          THE COURT:  I don't want to know your personal pain.

12   I want to know what the law says.

13          MR. GYANDOH:  What the law says.

14          So if necessary I think we could amend the complaint

15   to state a claim because we could --

16          THE COURT:  But counsel argues, it's too late,

17   Judge.  They have been here.  This case is fully briefed, they

18   amended it once, and now they have had all this time and they

19   want to amend it again.

20          MR. GYANDOH:  Well, there was law submitted up until

21   the Court says no more.

22          THE COURT:  I understand that.  I guess, counsel is

23   saying, no more, Judge.  They have had two bites at the apple.

24          MR. GYANDOH:  I identified how I think our case has

25   meet the pleading standard.  Your Honor has talked about all

 1    the ways that could meet it.  Some of the ways were account
 2    statements which we got through discovery.  Some of which are
 3    record-keeping agreements which we got through discovery.
 4    Which are what we used to submit the complaint.  I would
 5    submit that if Your Honor's inclined to dismiss the case, I do
 6    think we are allowed one more opportunity to amend the
 7    complaint to using what we've got in discovery to amend the
 8    complaint.
 9              THE COURT:  Okay.  Thank you.
10              Let me take a brief recess and then the Court will
11    be out to make a ruling on the record.
12    (THEREUPON, a short recess was had; WHEREUPON, the following
13    proceedings were had.)
14              THE COURT:  You all can be seated.
15              Well, let me first start by thanking counsel for
16    coming in.  It always helps the Court in terms of bringing
17    clarity to questions of law or fact that may not be as clear
18    to the Court just from the written briefs.  That's why I tend
19    to call folks in.  It helps put a fine point on argument.  And
20    I think today is no different with respect to these particular
21    issues in this case.
22              The Court having heard argument and the Court finds
23    consistent with the record will grant defendants' motion
24    12(b)(6)motion.  The Court finds the plaintiff through
25    pleadings have failed to provide a solid basis for comparison,

1   a meaningful benchmark, as it relates to record-keeping,

2   investment funds, and total Plan costs. I think consistent

3   with the case law that both parties have articulated to the

4   Court, that have failed to show a meaningful benchmark.

5          What remains is the question with regard to whether

6   or not the Court will allow plaintiff the opportunity to amend

7   the pleadings. And that will be also denied by this Court.

8   This matter has, you know, I think the case law supports and I

9   went back and had to double check with particularity how these

10  matters and I think the Eighth Circuit said how these matters

11  specifically could be pled, and which would clear the hurdle

12  of 12 (b)(6) dismissal. And I think the plaintiff in this

13  case, as the Court has articulated has failed to plead that

14  meaningful benchmark. And so any motion, oral motion for

15  leave to amend will be denied.

16         Anything further for the record?

17         MR. HINES: Nothing from defendant, Your Honor.

18  Thank you.

19         THE COURT: Anything from the plaintiff?

20         MR. GYANDOH: No, Your Honor.

21         THE COURT: Thank you all. I appreciate it.

22         What I forgot, and thank you, Ashanti.

23         You know, initially, my initial question to both

24  parties was if Count 1 fails where does that led us with

25  regard to Count 2. And I think by plaintiff own -- and I

1   think the parties agree that if Count 1 fails, Count 2 fails?

2   Is that correct?

3           MR. GYANDOH:  Yes, Judge.

4           THE COURT:  Okay.  I just wanted to make that clear

5   for the record.  Thank you.

6

7   (THEREUPON, the following proceedings were adjourned.)

8

9                        CERTIFICATE

10

11          I certify that the foregoing is a correct transcript

12  from the record of the proceedings in the above-entitled

13  matter.

14

        June 13, 2023

15

16                  /s/ Denise C. Halasey
                    Denise C. Halasey, CCR, CVR-CM, RVR
17                  United States Court Reporter

18

19

20

21

22

23

24

25